(Slip Opinion)          OCTOBER TERM, 2006          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PARENTS INVOLVED IN COMMUNITY SCHOOLS *v.* SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–908.  Argued December 4, 2006—Decided June 28, 2007*

Respondent school districts voluntarily adopted student assignment plans that rely on race to determine which schools certain children may attend.  The Seattle district, which has never operated legally segregated schools or been subject to court-ordered desegregation, classified children as white or nonwhite, and used the racial classifications as a "tiebreaker" to allocate slots in particular high schools. The Jefferson County, Ky., district was subject to a desegregation decree until 2000, when the District Court dissolved the decree after finding that the district had eliminated the vestiges of prior segregation to the greatest extent practicable.  In 2001, the district adopted its plan classifying students as black or "other" in order to make certain elementary school assignments and to rule on transfer requests.

Petitioners, an organization of Seattle parents (Parents Involved) and the mother of a Jefferson County student (Joshua), whose children were or could be assigned under the foregoing plans, filed these suits contending, *inter alia,* that allocating children to different public schools based solely on their race violates the Fourteenth Amendment's equal protection guarantee.  In the Seattle case, the District Court granted the school district summary judgment, finding, *inter alia,* that its plan survived strict scrutiny on the federal constitutional claim because it was narrowly tailored to serve a compelling government interest.  The Ninth Circuit affirmed.  In the Jefferson County case, the District Court found that the school district had as-

————————

*Together with No. 05–915, *Meredith, Custodial Parent and Next Friend of McDonald* v. *Jefferson County Bd. of Ed et al.,* on certiorari to the United States Court of Appeals for the Sixth Circuit.

serted a compelling interest in maintaining racially diverse schools, and that its plan was, in all relevant respects, narrowly tailored to serve that interest. The Sixth Circuit affirmed.

*Held:* The judgments are reversed, and the cases are remanded.

No. 05–908, 426 F. 3d 1162; No. 05–915, 416 F. 3d 513, reversed and remanded.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I, II, III–A, and III–C, concluding:

1. The Court has jurisdiction in these cases. Seattle argues that Parents Involved lacks standing because its current members' claimed injuries are not imminent and are too speculative in that, even if the district maintains its current plan and reinstitutes the racial tiebreaker, those members will only be affected if their children seek to enroll in a high school that is oversubscribed and integration positive. This argument is unavailing; the group's members have children in all levels of the district's schools, and the complaint sought declaratory and injunctive relief on behalf of members whose elementary and middle school children may be denied admission to the high schools of their choice in the future. The fact that those children may not be denied such admission based on their race because of undersubscription or oversubscription that benefits them does not eliminate the injury claimed. The group also asserted an interest in not being forced to compete in a race-based system that might prejudice its members' children, an actionable form of injury under the Equal Protection Clause, see, *e.g., Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 211. The fact that Seattle has ceased using the racial tiebreaker pending the outcome here is not dispositive, since the district vigorously defends its program's constitutionality, and nowhere suggests that it will not resume using race to assign students if it prevails. See *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189. Similarly, the fact that Joshua has been granted a transfer does not eliminate the Court's jurisdiction; Jefferson County's racial guidelines apply at all grade levels and he may again be subject to race-based assignment in middle school. Pp. 9–11.

2. The school districts have not carried their heavy burden of showing that the interest they seek to achieve justifies the extreme means they have chosen—discriminating among individual students based on race by relying upon racial classifications in making school assignments. Pp. 11–17, 25–28.

(a) Because "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," *Fullilove* v. *Klutznick*, 448 U. S. 448, 537 (STEVENS, J., dissenting), governmental distributions of burdens or benefits based

on individual racial classifications are reviewed under strict scrutiny, *e.g., Johnson* v. *California*, 543 U. S. 499, 505–506. Thus, the school districts must demonstrate that their use of such classifications is "narrowly tailored" to achieve a "compelling" government interest. *Adarand, supra*, at 227.

Although remedying the effects of past intentional discrimination is a compelling interest under the strict scrutiny test, see *Freeman* v. *Pitts*, 503 U. S. 467, 494, that interest is not involved here because the Seattle schools were never segregated by law nor subject to court-ordered desegregation, and the desegregation decree to which the Jefferson County schools were previously subject has been dissolved. Moreover, these cases are not governed by *Grutter* v. *Bollinger*, 539 U. S. 306, 328, in which the Court held that, for strict scrutiny purposes, a government interest in student body diversity "in the context of higher education" is compelling. That interest was not focused on race alone but encompassed "all factors that may contribute to student body diversity," *id.,* at 337, including, *e.g.,* having "overcome personal adversity and family hardship," *id.,* at 338. Quoting Justice Powell's articulation of diversity in *Regents of the University of California* v. *Bakke*, 438 U. S. 265, 314–315, the *Grutter* Court noted that " 'it is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups,' that can justify the use of race," 539 U. S., at 324–325, but " 'a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element,' " *id.,* at 325. In the present cases, by contrast, race is not considered as part of a broader effort to achieve "exposure to widely diverse people, cultures, ideas, and viewpoints," *id.,* at 330; race, for some students, is determinative standing alone. The districts argue that other factors, such as student preferences, affect assignment decisions under their plans, but under each plan when race comes into play, it is decisive by itself. It is not simply one factor weighed with others in reaching a decision, as in *Grutter*; it is *the* factor. See *Gratz* v. *Bollinger*, 539 U. S. 244, 275. Even as to race, the plans here employ only a limited notion of diversity, viewing race exclusively in white/nonwhite terms in Seattle and black/"other" terms in Jefferson County. The *Grutter* Court expressly limited its holding—defining a specific type of broad-based diversity and noting the unique context of higher education—but these limitations were largely disregarded by the lower courts in extending *Grutter* to the sort of classifications at issue here. Pp. 11–17.

  (b) Despite the districts' assertion that they employed individual racial classifications in a way necessary to achieve their stated ends, the minimal effect these classifications have on student assignments

suggests that other means would be effective. Seattle's racial tie-breaker results, in the end, only in shifting a small number of students between schools. Similarly, Jefferson County admits that its use of racial classifications has had a minimal effect, and claims only that its guidelines provide a firm definition of the goal of racially integrated schools, thereby providing administrators with authority to collaborate with principals and staff to maintain schools within the desired range. Classifying and assigning schoolchildren according to a binary conception of race is an extreme approach in light of this Court's precedents and the Nation's history of using race in public schools, and requires more than such an amorphous end to justify it. In *Grutter*, in contrast, the consideration of race was viewed as indispensable in more than tripling minority representation at the law school there at issue. See 539 U. S., at 320. While the Court does not suggest that *greater* use of race would be preferable, the minimal impact of the districts' racial classifications on school enrollment casts doubt on the necessity of using such classifications. The districts have also failed to show they considered methods other than explicit racial classifications to achieve their stated goals. Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," *id.,* at 339, and yet in Seattle several alternative assignment plans—many of which would not have used express racial classifications—were rejected with little or no consideration. Jefferson County has failed to present any evidence that it considered alternatives, even though the district already claims that its goals are achieved primarily through means other than the racial classifications. Pp. 25–28.

THE CHIEF JUSTICE, joined by JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO, concluded for additional reasons in Parts III–B and IV that the plans at issue are unconstitutional under this Court's precedents. Pp. 17–25, 28–41.

1. The Court need not resolve the parties' dispute over whether racial diversity in schools has a marked impact on test scores and other objective yardsticks or achieves intangible socialization benefits because it is clear that the racial classifications at issue are not narrowly tailored to the asserted goal. In design and operation, the plans are directed only to racial balance, an objective this Court has repeatedly condemned as illegitimate. They are tied to each district's specific racial demographics, rather than to any pedagogic concept of the level of diversity needed to obtain the asserted educational benefits. Whatever those demographics happen to be drives the required "diversity" number in each district. The districts offer no evidence that the level of racial diversity necessary to achieve the asserted educational benefits happens to coincide with the racial demograph-

ics of the respective districts, or rather the districts' white/nonwhite or black/"other" balance, since that is the only diversity addressed by the plans. In *Grutter*, the number of minority students the school sought to admit was an undefined "meaningful number" necessary to achieve a genuinely diverse student body, 539 U. S., at 316, 335–336, and the Court concluded that the law school did not count back from its applicant pool to arrive at that number, *id.,* at 335–336. Here, in contrast, the schools worked backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported benefits. This is a fatal flaw under the Court's existing precedent. See, *e.g., Freeman, supra*, at 494. Accepting racial balancing as a compelling state interest would justify imposing racial proportionality throughout American society, contrary to the Court's repeated admonitions that this is unconstitutional. While the school districts use various verbal formulations to describe the interest they seek to promote— racial diversity, avoidance of racial isolation, racial integration—they offer no definition suggesting that their interest differs from racial balancing. Pp. 17–25.

2. If the need for the racial classifications embraced by the school districts is unclear, even on the districts' own terms, the costs are undeniable. Government action dividing people by race is inherently suspect because such classifications promote "notions of racial inferiority and lead to a politics of racial hostility," *Croson, supra*, at 493, "reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin," *Shaw* v. *Reno*, 509 U. S. 630, 657, and "endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict," *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 603 (O'Connor, J., dissenting). When it comes to using race to assign children to schools, history will be heard. In *Brown* v. *Board of Education*, 347 U. S. 483, the Court held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because the classification and separation themselves denoted inferiority. *Id.,* at 493–494. It was not the inequality of the facilities but the fact of legally separating children based on race on which the Court relied to find a constitutional violation in that case. *Id.,* at 494. The districts here invoke the ultimate goal of those who filed *Brown* and subsequent cases to support their argument, but the argument of the plaintiff in *Brown* was that the Equal Protection Clause "prevents states from according differential treatment to American children on the basis of their color or race," and that view prevailed—this Court ruled in its remedial opinion that *Brown* required school dis-

tricts "to achieve a system of determining admission to the public schools *on a nonracial basis*." *Brown* v. *Board of Education*, 349 U. S. 294, 300–301 (emphasis added). Pp. 28–41.

JUSTICE KENNEDY agreed that the Court has jurisdiction to decide these cases and that respondents' student assignment plans are not narrowly tailored to achieve the compelling goal of diversity properly defined, but concluded that some parts of the plurality opinion imply an unyielding insistence that race cannot be a factor in instances when it may be taken into account. Pp. 1–9.

(a) As part of its burden of proving that racial classifications are narrowly tailored to further compelling interests, the government must establish, in detail, how decisions based on an individual student's race are made in a challenged program. The Jefferson County Board of Education fails to meet this threshold mandate when it concedes it denied Joshua's requested kindergarten transfer on the basis of his race under its guidelines, yet also maintains that the guidelines do not apply to kindergartners. This discrepancy is not some simple and straightforward error that touches only upon the peripheries of the district's use of individual racial classifications. As becomes clearer when the district's plan is further considered, Jefferson County has explained how and when it employs these classifications only in terms so broad and imprecise that they cannot withstand strict scrutiny. In its briefing it fails to make clear—even in the limited respects implicated by Joshua's initial assignment and transfer denial—whether in fact it relies on racial classifications in a manner narrowly tailored to the interest in question, rather than in the far-reaching, inconsistent, and *ad hoc* manner that a less forgiving reading of the record would suggest. When a court subjects governmental action to strict scrutiny, it cannot construe ambiguities in favor of the government. In the Seattle case, the school district has gone further in describing the methods and criteria used to determine assignment decisions based on individual racial classifications, but it has nevertheless failed to explain why, in a district composed of a diversity of races, with only a minority of the students classified as "white," it has employed the crude racial categories of "white" and "non-white" as the basis for its assignment decisions. Far from being narrowly tailored, this system threatens to defeat its own ends, and the district has provided no convincing explanation for its design. Pp. 2–6.

(b) The plurality opinion is too dismissive of government's legitimate interest in ensuring that all people have equal opportunity regardless of their race. In administering public schools, it is permissible to consider the schools' racial makeup and adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. Cf. *Grutter* v. *Bollinger*, 539 U. S. 306. School authori-

ties concerned that their student bodies' racial compositions interfere with offering an equal educational opportunity to all are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion based solely on a systematic, individual typing by race. Such measures may include strategic site selection of new schools; drawing attendance zones with general recognition of neighborhood demographics; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race.

Each respondent has failed to provide the necessary support for the proposition that there is no other way than individual racial classifications to avoid racial isolation in their school districts. Cf. *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 501. In these cases, the fact that the number of students whose assignment depends on express racial classifications is small suggests that the schools could have achieved their stated ends through different means, including the facially race-neutral means set forth above or, if necessary, a more nuanced, individual evaluation of school needs and student characteristics that might include race as a component. The latter approach would be informed by *Grutter*, though the criteria relevant to student placement would differ based on the students' age, the parents' needs, and the schools' role. Pp. 6–9.

ROBERTS, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, and III–C, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined, and an opinion with respect to Parts III–B and IV, in which SCALIA, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed a dissenting opinion. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 05–908 and 05–915

_____

PARENTS INVOLVED IN COMMUNITY
SCHOOLS, PETITIONER
05–908          *v.*
SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


CRYSTAL D. MEREDITH, CUSTODIAL PARENT AND NEXT
FRIEND OF JOSHUA RYAN McDONALD, PETITIONER
05–915          *v.*
JEFFERSON COUNTY BOARD OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 28, 2007]

CHIEF JUSTICE ROBERTS announced the judgment of the Court, and delivered the opinion of the Court with respect to Parts I, II, III–A, and III–C, and an opinion with respect to Parts III–B and IV, in which JUSTICES SCALIA, THOMAS, and ALITO join.

The school districts in these cases voluntarily adopted student assignment plans that rely upon race to determine which public schools certain children may attend. The Seattle school district classifies children as white or nonwhite; the Jefferson County school district as black or "other." In Seattle, this racial classification is used to

allocate slots in oversubscribed high schools.  In Jefferson County, it is used to make certain elementary school assignments and to rule on transfer requests.  In each case, the school district relies upon an individual student's race in assigning that student to a particular school, so that the racial balance at the school falls within a predetermined range based on the racial composition of the school district as a whole.  Parents of students denied assignment to particular schools under these plans solely because of their race brought suit, contending that allocating children to different public schools on the basis of race violated the Fourteenth Amendment guarantee of equal protection.  The Courts of Appeals below upheld the plans. We granted certiorari, and now reverse.

I

Both cases present the same underlying legal question— whether a public school that had not operated legally segregated schools or has been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments.  Although we examine the plans under the same legal framework, the specifics of the two plans, and the circumstances surrounding their adoption, are in some respects quite different.

A

Seattle School District No. 1 operates 10 regular public high schools.  In 1998, it adopted the plan at issue in this case for assigning students to these schools.  App. in No. 05–908, pp. 90a–92a.[1]  The plan allows incoming ninth

_____

[1] The plan was in effect from 1999–2002, for three school years.  This litigation was commenced in July 2000, and the record in the District Court was closed before assignments for the 2001–2002 school year were made.  See Brief for Respondents in No. 05–908, p. 9, n. 9.  We rely, as did the lower courts, largely on data from the 2000–2001 school

graders to choose from among any of the district's high schools, ranking however many schools they wish in order of preference.

Some schools are more popular than others. If too many students list the same school as their first choice, the district employs a series of "tiebreakers" to determine who will fill the open slots at the oversubscribed school. The first tiebreaker selects for admission students who have a sibling currently enrolled in the chosen school. The next tiebreaker depends upon the racial composition of the particular school and the race of the individual student. In the district's public schools approximately 41 percent of enrolled students are white; the remaining 59 percent, comprising all other racial groups, are classified by Seattle for assignment purposes as nonwhite. *Id.,* at 38a, 103a.[2] If an oversubscribed school is not within 10 percentage points of the district's overall white/nonwhite racial balance, it is what the district calls "integration positive," and the district employs a tiebreaker that selects for assignment students whose race "will serve to bring the school into balance." *Id.,* at 38a. See *Parents Involved VII,* 426 F. 3d 1162, 1169–1170 (CA9 2005) (en banc).[3] If it is still necessary to select students for the school after using the racial tiebreaker, the next tiebreaker is the geographic proximity of the school to the student's residence. App. in No. 05–908, at 38a.

Seattle has never operated segregated schools—legally

––––––––––

year in evaluating the plan. See 426 F. 3d 1162, 1169–1171 (CA9 2005) (en banc) (*Parents Involved VII*).

  [2] The racial breakdown of this nonwhite group is approximately 23.8 percent Asian-American, 23.1 percent African-American, 10.3 percent Latino, and 2.8 percent Native-American. See 377 F. 3d 949, 1005–1006 (CA9 2004) (*Parents Involved VI*) (Graber, J., dissenting).

  [3] For the 2001–2002 school year, the deviation permitted from the desired racial composition was increased from 10 to 15 percent. App. in No. 05–908, p. 38a. The bulk of the data in the record was collected using the 10 percent band, see n. 1, *supra.*

separate schools for students of different races—nor has it ever been subject to court-ordered desegregation. It nonetheless employs the racial tiebreaker in an attempt to address the effects of racially identifiable housing patterns on school assignments. Most white students live in the northern part of Seattle, most students of other racial backgrounds in the southern part. *Parents Involved VII*, *supra*, at 1166. Four of Seattle's high schools are located in the north—Ballard, Nathan Hale, Ingraham, and Roosevelt—and five in the south—Rainier Beach, Cleveland, West Seattle, Chief Sealth, and Franklin. One school—Garfield—is more or less in the center of Seattle. App. in No. 05–908, at 38a–39a, 45a.

For the 2000–2001 school year, five of these schools were oversubscribed—Ballard, Nathan Hale, Roosevelt, Garfield, and Franklin—so much so that 82 percent of incoming ninth graders ranked one of these schools as their first choice. *Id.,* at 38a. Three of the oversubscribed schools were "integration positive" because the school's white enrollment the previous school year was greater than 51 percent—Ballard, Nathan Hale, and Roosevelt. Thus, more nonwhite students (107, 27, and 82, respectively) who selected one of these three schools as a top choice received placement at the school than would have been the case had race not been considered, and proximity been the next tiebreaker. *Id.,* at 39a–40a. Franklin was "integration positive" because its nonwhite enrollment the previous school year was greater than 69 percent; 89 more white students were assigned to Franklin by operation of the racial tiebreaker in the 2000–2001 school year than otherwise would have been. *Ibid.* Garfield was the only oversubscribed school whose composition during the 1999–2000 school year was within the racial guidelines, although in previous years Garfield's enrollment had been predominantly nonwhite, and the racial tiebreaker had been used to give preference to white students. *Id.,* at 39a.

Opinion of the Court

Petitioner Parents Involved in Community Schools (Parents Involved) is a nonprofit corporation comprising the parents of children who have been or may be denied assignment to their chosen high school in the district because of their race. The concerns of Parents Involved are illustrated by Jill Kurfirst, who sought to enroll her ninth-grade son, Andy Meeks, in Ballard High School's special Biotechnology Career Academy. Andy suffered from attention deficit hyperactivity disorder and dyslexia, but had made good progress with hands-on instruction, and his mother and middle school teachers thought that the smaller biotechnology program held the most promise for his continued success. Andy was accepted into this selective program but, because of the racial tiebreaker, was denied assignment to Ballard High School. *Id.,* at 143a–146a, 152a–160a. Parents Involved commenced this suit in the Western District of Washington, alleging that Seattle's use of race in assignments violated the Equal Protection Clause of the Fourteenth Amendment,[4] Title VI of the Civil Rights Act of 1964,[5] and the Washington Civil Rights Act.[6] *Id.,* at 28a–35a.

The District Court granted summary judgment to the school district, finding that state law did not bar the district's use of the racial tiebreaker and that the plan survived strict scrutiny on the federal constitutional claim because it was narrowly tailored to serve a compelling

---

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, §1.

[5] "No person in the United States shall, on the ground of race . . . be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 78 Stat. 252, 42 U. S. C. §2000d.

[6] "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Wash. Rev. Code §49.60.400(1) (2006).

government interest. 137 F. Supp. 2d 1224, 1240 (WD
Wash. 2001) (*Parents Involved I*). The Ninth Circuit
initially reversed based on its interpretation of the Wash-
ington Civil Rights Act, 285 F. 3d 1236, 1253 (2002) (*Par-
ents Involved II*), and enjoined the district's use of the
integration tiebreaker, *id.,* at 1257. Upon realizing that
the litigation would not be resolved in time for assignment
decisions for the 2002–2003 school year, the Ninth Circuit
withdrew its opinion, 294 F. 3d 1084 (2002) (*Parents In-
volved III*), vacated the injunction, and, pursuant to Wash.
Rev. Code §2.60.020 (2006), certified the state-law ques-
tion to the Washington Supreme Court, 294 F. 3d 1085,
1087 (2002) (*Parents Involved IV*).

The Washington Supreme Court determined that the
State Civil Rights Act bars only preferential treatment
programs "where race or gender is used by government to
select a less qualified applicant over a more qualified
applicant," and not "[p]rograms which are racially neu-
tral, such as the [district's] open choice plan." *Parents
Involved in Community Schools* v. *Seattle School Dist., No.
1,* 149 Wash. 2d 660, 689–690, 663, 72 P. 3d 151, 166, 153
(2003) (en banc) (*Parents Involved V*). The state court
returned the case to the Ninth Circuit for further proceed-
ings. *Id.,* at 690, 72 P. 3d, at 167.

A panel of the Ninth Circuit then again reversed the
District Court, this time ruling on the federal constitu-
tional question. *Parents Involved VI,* 377 F. 3d 949 (2004).
The panel determined that while achieving racial diversity
and avoiding racial isolation are compelling government
interests, *id.,* at 964, Seattle's use of the racial tiebreaker
was not narrowly tailored to achieve these interests, *id.,* at
980. The Ninth Circuit granted rehearing en banc, 395
F. 3d 1168 (2005), and overruled the panel decision, af-
firming the District Court's determination that Seattle's
plan was narrowly tailored to serve a compelling govern-
ment interest, *Parents Involved VII*, 426 F. 3d, at 1192–

1193.  We granted certiorari.  547 U. S. __ (2006).

B

Jefferson County Public Schools operates the public school system in metropolitan Louisville, Kentucky.  In 1973 a federal court found that Jefferson County had maintained a segregated school system, *Newburg Area Council, Inc.* v. *Board of Ed. of Jefferson Cty.*, 489 F. 2d 925, 932 (CA6), vacated and remanded, 418 U. S. 918, reinstated with modifications, 510 F. 2d 1358, 1359 (CA6 1974), and in 1975 the District Court entered a desegregation decree.  See *Hampton* v. *Jefferson Cty. Bd. of Ed.*, 72 F. Supp. 2d 753, 762–764 (WD Ky. 1999).  Jefferson County operated under this decree until 2000, when the District Court dissolved the decree after finding that the district had achieved unitary status by eliminating "[t]o the greatest extent practicable" the vestiges of its prior policy of segregation.  *Hampton* v. *Jefferson Cty. Bd. of Ed.*, 102 F. Supp. 2d 358, 360 (2000).  See *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 249–250 (1991); *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 435–436 (1968).

In 2001, after the decree had been dissolved, Jefferson County adopted the voluntary student assignment plan at issue in this case.  App. in No. 05–915, p. 77.  Approximately 34 percent of the district's 97,000 students are black; most of the remaining 66 percent are white. *McFarland* v. *Jefferson Cty. Public Schools*, 330 F. Supp. 2d 834, 839–840, and n. 6 (WD Ky. 2004) (*McFarland I*). The plan requires all nonmagnet schools to maintain a minimum black enrollment of 15 percent, and a maximum black enrollment of 50 percent.  App. in No. 05–915, at 81; *McFarland I*, *supra*, at 842.

At the elementary school level, based on his or her address, each student is designated a "resides" school to which students within a specific geographic area are

assigned; elementary resides schools are "grouped into
clusters in order to facilitate integration." App. in No. 05–
915, at 82.  The district assigns students to nonmagnet
schools in one of two ways: Parents of kindergartners,
first-graders, and students new to the district may submit
an application indicating a first and second choice among
the schools within their cluster; students who do not sub-
mit such an application are assigned within the cluster by
the district.  "Decisions to assign students to schools
within each cluster are based on available space within
the schools and the racial guidelines in the District's
current student assignment plan." *Id.,* at 38.  If a school
has reached the "extremes of the racial guidelines," a
student whose race would contribute to the school's racial
imbalance will not be assigned there.  *Id.,* at 38–39, 82.
After assignment, students at all grade levels are permit-
ted to apply to transfer between nonmagnet schools in the
district.  Transfers may be requested for any number of
reasons, and may be denied because of lack of available
space or on the basis of the racial guidelines. *Id.,* at 43.[7]

When petitioner Crystal Meredith moved into the school
district in August 2002, she sought to enroll her son,
Joshua McDonald, in kindergarten for the 2002–2003
school year.  His resides school was only a mile from his
new home, but it had no available space—assignments
had been made in May, and the class was full.  Jefferson
County assigned Joshua to another elementary school in
his cluster, Young Elementary.  This school was 10 miles
from home, and Meredith sought to transfer Joshua to a
school in a different cluster, Bloom Elementary, which—

--------

[7] Middle and high school students are designated a single resides
school and assigned to that school unless it is at the extremes of the
racial guidelines.  Students may also apply to a magnet school or
program, or, at the high school level, take advantage of an open enroll-
ment plan that allows ninth-grade students to apply for admission to
any nonmagnet high school.  App. in No. 05–915, pp. 39–41, 82–83.

like his resides school—was only a mile from home. See Tr. in *McFarland I*, pp. 1–49 through 1–54 (Dec. 8, 2003). Space was available at Bloom, and intercluster transfers are allowed, but Joshua's transfer was nonetheless denied because, in the words of Jefferson County, "[t]he transfer would have an adverse effect on desegregation compliance" of Young. App. in No. 05–915, at 97.[8]

Meredith brought suit in the Western District of Kentucky, alleging violations of the Equal Protection Clause of the Fourteenth Amendment. The District Court found that Jefferson County had asserted a compelling interest in maintaining racially diverse schools, and that the assignment plan was (in all relevant respects) narrowly tailored to serve that compelling interest. *McFarland I*, *supra*, at 837.[9] The Sixth Circuit affirmed in a *per curiam* opinion relying upon the reasoning of the District Court, concluding that a written opinion "would serve no useful purpose." *McFarland* v. *Jefferson Cty. Public Schools*, 416 F. 3d 513, 514 (2005) (*McFarland II*). We granted certiorari. 547 U. S. __ (2006).

## II

As a threshold matter, we must assure ourselves of our jurisdiction. Seattle argues that Parents Involved lacks standing because none of its current members can claim an imminent injury. Even if the district maintains the

---

[8] It is not clear why the racial guidelines were even applied to Joshua's transfer application—the guidelines supposedly do not apply at the kindergarten level. *Id.,* at 43. Neither party disputes, however, that Joshua's transfer application was denied under the racial guidelines, and Meredith's objection is not that the guidelines were misapplied but rather that race was used at all.

[9] Meredith joined a pending lawsuit filed by several other plaintiffs. See *id.,* at 7–11. The other plaintiffs all challenged assignments to certain specialized schools, and the District Court found these assignments, which are no longer at issue in this case, unconstitutional. *McFarland I*, 330 F. Supp. 2d 834, 837, 864 (WD Ky. 2004).

current plan and reinstitutes the racial tiebreaker, Seattle argues, Parents Involved members will only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive—too speculative a harm to maintain standing. Brief for Respondents in No. 05–908, pp. 16–17.

This argument is unavailing. The group's members have children in the district's elementary, middle, and high schools, App. in No. 05–908, at 299a–301a; Affidavit of Kathleen Brose Pursuant to this Court's Rule 32.3 (Lodging of Petitioner Parents Involved), and the complaint sought declaratory and injunctive relief on behalf of Parents Involved members whose elementary and middle school children may be "denied admission to the high schools of their choice when they apply for those schools in the future," App. in No. 05–908, at 30a. The fact that it is possible that children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage—does not eliminate the injury claimed. Moreover, Parents Involved also asserted an interest in not being "forced to compete for seats at certain high schools in a system that uses race as a deciding factor in many of its admissions decisions." *Ibid.* As we have held, one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff, *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 211 (1995); *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656, 666 (1993), an injury that the members of Parents Involved can validly claim on behalf of their children.

In challenging standing, Seattle also notes that it has ceased using the racial tiebreaker pending the outcome of this litigation. Brief for Respondents in No. 05–908, at 16–17. But the district vigorously defends the constitu-

tionality of its race-based program, and nowhere suggests that if this litigation is resolved in its favor it will not resume using race to assign students. Voluntary cessation does not moot a case or controversy unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (quoting *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968) (internal quotation marks omitted)), a heavy burden that Seattle has clearly not met.

Jefferson County does not challenge our jurisdiction, Tr. of Oral Arg. in No. 05–915, p. 48, but we are nonetheless obliged to ensure that it exists, *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006). Although apparently Joshua has now been granted a transfer to Bloom, the school to which transfer was denied under the racial guidelines, Tr. of Oral Arg. in No. 05–915, at 45, the racial guidelines apply at all grade levels. Upon Joshua's enrollment in middle school, he may again be subject to assignment based on his race. In addition, Meredith sought damages in her complaint, which is sufficient to preserve our ability to consider the question. *Los Angeles* v. *Lyons*, 461 U. S. 95, 109 (1983).

### III
### A

It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny. *Johnson* v. *California*, 543 U. S. 499, 505–506 (2005); *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003); *Adarand, supra*, at 224. As the Court recently reaffirmed, "'racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.'" *Gratz* v. *Bollinger*, 539 U. S. 244, 270

(2003) (quoting *Fullilove* v. *Klutznick*, 448 U. S. 448, 537 (1980) (STEVENS, J., dissenting); brackets omitted). In order to satisfy this searching standard of review, the school districts must demonstrate that the use of individual racial classifications in the assignment plans here under review is "narrowly tailored" to achieve a "compelling" government interest. *Adarand*, *supra*, at 227.

Without attempting in these cases to set forth all the interests a school district might assert, it suffices to note that our prior cases, in evaluating the use of racial classifications in the school context, have recognized two interests that qualify as compelling. The first is the compelling interest of remedying the effects of past intentional discrimination. See *Freeman* v. *Pitts*, 503 U. S. 467, 494 (1992). Yet the Seattle public schools have not shown that they were ever segregated by law, and were not subject to court-ordered desegregation decrees. The Jefferson County public schools were previously segregated by law and were subject to a desegregation decree entered in 1975. In 2000, the District Court that entered that decree dissolved it, finding that Jefferson County had "eliminated the vestiges associated with the former policy of segregation and its pernicious effects," and thus had achieved "unitary" status. *Hampton*, 102 F. Supp. 2d, at 360. Jefferson County accordingly does not rely upon an interest in remedying the effects of past intentional discrimination in defending its present use of race in assigning students. See Tr. of Oral Arg. in No. 05–915, at 38.

Nor could it. We have emphasized that the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and that "the Constitution is not violated by racial imbalance in the schools, without more." *Milliken* v. *Bradley*, 433 U. S. 267, 280, n. 14 (1977). See also *Freeman*, *supra*, at 495–496; *Dowell*, 498 U. S., at 248; *Milliken* v. *Bradley*, 418 U. S. 717, 746 (1974). Once Jefferson County achieved unitary status, it

had remedied the constitutional wrong that allowed race-based assignments. Any continued use of race must be justified on some other basis.[10]

The second government interest we have recognized as compelling for purposes of strict scrutiny is the interest in diversity in higher education upheld in *Grutter*, 539 U. S., at 328. The specific interest found compelling in *Grutter* was student body diversity "in the context of higher education." *Ibid.* The diversity interest was not focused on race alone but encompassed "all factors that may contribute to student body diversity." *Id.,* at 337. We described the various types of diversity that the law school sought:

> "[The law school's] policy makes clear there are many possible bases for diversity admissions, and provides examples of admittees who have lived or traveled widely abroad, are fluent in several languages, have

---

[10] The districts point to dicta in a prior opinion in which the Court suggested that, while not constitutionally mandated, it would be constitutionally permissible for a school district to seek racially balanced schools as a matter of "educational policy." See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 16 (1971). The districts also quote with approval an in-chambers opinion in which then-Justice Rehnquist made a suggestion to the same effect. See *Bustop, Inc.* v. *Los Angeles Bd. of Ed.*, 439 U. S. 1380, 1383 (1978). The citations do not carry the significance the districts would ascribe to them. *Swann,* evaluating a school district engaged in court-ordered desegregation, had no occasion to consider whether a district's voluntary adoption of race-based assignments in the absence of a finding of prior *de jure* segregation was constitutionally permissible, an issue that was again expressly reserved in *Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457, 472, n. 15 (1982). *Bustop*, addressing in the context of an emergency injunction application a busing plan imposed by the Superior Court of Los Angeles County, is similarly unavailing. Then-Justice Rehnquist, in denying emergency relief, stressed that "equitable consideration[s]" counseled against preliminary relief. 439 U. S., at 1383. The propriety of preliminary relief and resolution of the merits are of course "significantly different" issues. *University of Texas* v. *Camenisch*, 451 U. S. 390, 393 (1981).

overcome personal adversity and family hardship, have exceptional records of extensive community service, and have had successful careers in other fields." *Id.,* at 338 (brackets and internal quotation marks omitted).

The Court quoted the articulation of diversity from Justice Powell's opinion in *Regents of the University of California* v. *Bakke*, 438 U. S. 265 (1978), noting that "it is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, that can justify the use of race." *Grutter*, *supra,* at 324–325 (citing and quoting *Bakke*, *supra*, at 314–315 (opinion of Powell, J.); brackets and internal quotation marks omitted). Instead, what was upheld in *Grutter* was consideration of "a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." 539 U. S., at 325 (quoting *Bakke*, *supra*, at 315 (opinion of Powell, J.); internal quotation marks omitted).

The entire gist of the analysis in *Grutter* was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group. The classification of applicants by race upheld in *Grutter* was only as part of a "highly individualized, holistic review," 539 U. S., at 337. As the Court explained, "[t]he importance of this individualized consideration in the context of a race-conscious admissions program is paramount." *Ibid.* The point of the narrow tailoring analysis in which the *Grutter* Court engaged was to ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance, which the Court explained would be "patently unconstitutional." *Id.*, at 330.

In the present cases, by contrast, race is not considered

as part of a broader effort to achieve "exposure to widely diverse people, cultures, ideas, and viewpoints," *ibid.*; race, for some students, is determinative standing alone. The districts argue that other factors, such as student preferences, affect assignment decisions under their plans, but under each plan when race comes into play, it is decisive by itself. It is not simply one factor weighed with others in reaching a decision, as in *Grutter*; it is *the* factor. Like the University of Michigan undergraduate plan struck down in *Gratz*, 539 U. S., at 275, the plans here "do not provide for a meaningful individualized review of applicants" but instead rely on racial classifications in a "nonindividualized, mechanical" way. *Id.,* at 276, 280 (O'Connor, J., concurring).

Even when it comes to race, the plans here employ only a limited notion of diversity, viewing race exclusively in white/nonwhite terms in Seattle and black/"other" terms in Jefferson County.[11] But see *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 610 (1990) ("We are a Nation not of black and white alone, but one teeming with divergent communities knitted together with various traditions and carried forth, above all, by individuals") (O'Connor, J., dissenting). The Seattle "Board Statement Reaffirming Diversity Rationale" speaks of the "inherent educational value" in "[p]roviding students the opportunity to attend schools with diverse student enrollment," App. in No. 05–908, at 128a, 129a. But under the Seattle plan, a school with 50 percent Asian-American students and 50 percent white students but no African-American, Native-American, or Latino students would qualify as balanced,

_____

[11] The way Seattle classifies its students bears this out. Upon enrolling their child with the district, parents are required to identify their child as a member of a particular racial group. If a parent identifies more than one race on the form, "[t]he application will not be accepted and, if necessary, the enrollment service person taking the application will indicate one box." App. in No. 05–908, at 303a.

while a school with 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white students would not.  It is hard to understand how a plan that could allow these results can be viewed as being concerned with achieving enrollment that is "'broadly diverse,'" *Grutter, supra,* at 329.

Prior to *Grutter*, the courts of appeals rejected as unconstitutional attempts to implement race-based assignment plans—such as the plans at issue here—in primary and secondary schools.  See, *e.g., Eisenberg* v. *Montgomery Cty. Public Schools*, 197 F. 3d 123, 133 (CA4 1999); *Tuttle* v. *Arlington Cty. School Bd.*, 195 F. 3d 698, 701 (CA4 1999); *Wessman* v. *Gittens*, 160 F. 3d 790, 809 (CA1 1998).  See also *Ho* v. *San Francisco Unified School Dist.*, 147 F. 3d 854, 865 (CA9 1998).  After *Grutter*, however, the two Courts of Appeals in these cases, and one other, found that race-based assignments were permissible at the elementary and secondary level, largely in reliance on that case.  See *Parents Involved VII*, 426 F. 3d, at 1166; *McFarland II*, 416 F. 3d, at 514; *Comfort* v. *Lynn School Comm.*, 418 F. 3d 1, 13 (CA1 2005).

In upholding the admissions plan in *Grutter*, though, this Court relied upon considerations unique to institutions of higher education, noting that in light of "the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."  539 U. S., at 329.  See also *Bakke, supra,* at 312, 313 (opinion of Powell, J.).  The Court explained that "[c]ontext matters" in applying strict scrutiny, and repeatedly noted that it was addressing the use of race "in the context of higher education." *Grutter, supra,* at 327, 328, 334.  The Court in *Grutter* expressly articulated key limitations on its holding—defining a specific type of broad-based diversity and noting the unique context of higher education—but these limitations were largely disregarded by the lower courts in

extending *Grutter* to uphold race-based assignments in elementary and secondary schools. The present cases are not governed by *Grutter*.

## B

Perhaps recognizing that reliance on *Grutter* cannot sustain their plans, both school districts assert additional interests, distinct from the interest upheld in *Grutter*, to justify their race-based assignments. In briefing and argument before this Court, Seattle contends that its use of race helps to reduce racial concentration in schools and to ensure that racially concentrated housing patterns do not prevent nonwhite students from having access to the most desirable schools. Brief for Respondents in No. 05–908, at 19. Jefferson County has articulated a similar goal, phrasing its interest in terms of educating its students "in a racially integrated environment." App. in No. 05–915, at 22.[12] Each school district argues that educational and broader socialization benefits flow from a racially diverse learning environment, and each contends that because the diversity they seek is racial diversity—not the broader diversity at issue in *Grutter*—it makes sense to promote that interest directly by relying on race alone.

The parties and their *amici* dispute whether racial diversity in schools in fact has a marked impact on test scores and other objective yardsticks or achieves intangible socialization benefits. The debate is not one we need to

---

[12] Jefferson County also argues that it would be incongruous to hold that what was constitutionally required of it one day—race-based assignments pursuant to the desegregation decree—can be constitutionally prohibited the next. But what was constitutionally required of the district prior to 2000 was the elimination of the vestiges of prior segregation—not racial proportionality in its own right. See *Freeman* v. *Pitts*, 503 U. S. 467, 494–496 (1992). Once those vestiges were eliminated, Jefferson County was on the same footing as any other school district, and its use of race must be justified on other grounds.

resolve, however, because it is clear that the racial classifications employed by the districts are not narrowly tailored to the goal of achieving the educational and social benefits asserted to flow from racial diversity. In design and operation, the plans are directed only to racial balance, pure and simple, an objective this Court has repeatedly condemned as illegitimate.

The plans are tied to each district's specific racial demographics, rather than to any pedagogic concept of the level of diversity needed to obtain the asserted educational benefits. In Seattle, the district seeks white enrollment of between 31 and 51 percent (within 10 percent of "the district white average" of 41 percent), and nonwhite enrollment of between 49 and 69 percent (within 10 percent of "the district minority average" of 59 percent). App. in No. 05–908, at 103a. In Jefferson County, by contrast, the district seeks black enrollment of no less than 15 or more than 50 percent, a range designed to be "equally above and below Black student enrollment systemwide," *McFarland I*, 330 F. Supp. 2d, at 842, based on the objective of achieving at "all schools . . . an African-American enrollment equivalent to the average district-wide African-American enrollment" of 34 percent. App. in No. 05–915, at 81. In Seattle, then, the benefits of racial diversity require enrollment of at least 31 percent white students; in Jefferson County, at least 50 percent. There must be at least 15 percent nonwhite students under Jefferson County's plan; in Seattle, more than three times that figure. This comparison makes clear that the racial demographics in each district—whatever they happen to be—drive the required "diversity" numbers. The plans here are not tailored to achieving a degree of diversity necessary to realize the asserted educational benefits; instead the plans are tailored, in the words of Seattle's Manager of Enrollment Planning, Technical Support, and Demographics, to "the goal established by the school board of attain-

ing a level of diversity within the schools that approximates the district's overall demographics." App. in No. 05–908, at 42a.

The districts offer no evidence that the level of racial diversity necessary to achieve the asserted educational benefits happens to coincide with the racial demographics of the respective school districts—or rather the white/nonwhite or black/"other" balance of the districts, since that is the only diversity addressed by the plans. Indeed, in its brief Seattle simply assumes that the educational benefits track the racial breakdown of the district. See Brief for Respondents in No. 05–908, at 36 ("For Seattle, 'racial balance' is clearly not an end in itself but rather a measure of the extent to which the educational goals the plan was designed to foster are likely to be achieved"). When asked for "a range of percentage that would be diverse," however, Seattle's expert said it was important to have "sufficient numbers so as to avoid students feeling any kind of specter of exceptionality." App. in No. 05–908, at 276a. The district did not attempt to defend the proposition that anything outside its range posed the "specter of exceptionality." Nor did it demonstrate in any way how the educational and social benefits of racial diversity or avoidance of racial isolation are more likely to be achieved at a school that is 50 percent white and 50 percent Asian-American, which would qualify as diverse under Seattle's plan, than at a school that is 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white, which under Seattle's definition would be racially concentrated.

Similarly, Jefferson County's expert referred to the importance of having "at least 20 percent" minority group representation for the group "to be visible enough to make a difference," and noted that "small isolated minority groups in a school are not likely to have a strong effect on the overall school." App. in No. 05–915, at 159, 147. The

Jefferson County plan, however, is based on a goal of replicating at each school "an African-American enrollment equivalent to the average district-wide African-American enrollment." *Id.,* at 81. Joshua McDonald's requested transfer was denied because his race was listed as "other" rather than black, and allowing the transfer would have had an adverse effect on the racial guideline compliance of Young Elementary, the school he sought to leave. *Id.,* at 21. At the time, however, Young Elementary was 46.8 percent black. *Id.,* at 73. The transfer might have had an adverse effect on the effort to approach district-wide racial proportionality at Young, but it had nothing to do with preventing either the black or "other" group from becoming "small" or "isolated" at Young.

In fact, in each case the extreme measure of relying on race in assignments is unnecessary to achieve the stated goals, even as defined by the districts. For example, at Franklin High School in Seattle, the racial tiebreaker was applied because nonwhite enrollment exceeded 69 percent, and resulted in an incoming ninth-grade class in 2000–2001 that was 30.3 percent Asian-American, 21.9 percent African-American, 6.8 percent Latino, 0.5 percent Native-American, and 40.5 percent Caucasian. Without the racial tiebreaker, the class would have been 39.6 percent Asian-American, 30.2 percent African-American, 8.3 percent Latino, 1.1 percent Native-American, and 20.8 percent Caucasian. See App. in No. 05–908, at 308a. When the actual racial breakdown is considered, enrolling students without regard to their race yields a substantially diverse student body under any definition of diversity.[13]

_____

[13] Data for the Seattle schools in the several years since this litigation was commenced further demonstrate the minimal role that the racial tiebreaker in fact played. At Ballard, in 2005–2006—when no class at the school was subject to the racial tiebreaker—the student body was 14.2 percent Asian-American, 9 percent African-American, 11.7 percent Latino, 62.3 percent Caucasian, and 2.8 percent Native-American.

Opinion of ROBERTS, C. J.

In *Grutter*, the number of minority students the school sought to admit was an undefined "meaningful number" necessary to achieve a genuinely diverse student body. 539 U. S., at 316, 335–336. Although the matter was the subject of disagreement on the Court, see *id.,* at 346–347 (SCALIA, J., concurring in part and dissenting in part); *id.,* at 382–383 (Rehnquist, C. J., dissenting); *id.,* at 388–392 (KENNEDY, J., dissenting), the majority concluded that the law school did not count back from its applicant pool to arrive at the "meaningful number" it regarded as necessary to diversify its student body. *Id.,* at 335–336. Here the racial balance the districts seek is a defined range set solely by reference to the demographics of the respective school districts.

This working backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported benefits, is a fatal flaw under our existing precedent. We have many times over reaffirmed that "[r]acial balance is not to be achieved for its own sake."

—————

Reply Brief for Petitioner in No. 05–908, p. 7. In 2000–2001, when the racial tiebreaker was last used, Ballard's total enrollment was 17.5 percent Asian-American, 10.8 percent African-American, 10.7 percent Latino, 56.4 percent Caucasian, and 4.6 percent Native-American. App. in No. 05–908, at 283a. Franklin in 2005–2006 was 48.9 percent Asian-American, 33.5 percent African-American, 6.6 percent Latino, 10.2 percent Caucasian, and 0.8 percent Native-American. Reply Brief for Petitioner in No. 05–908, at 7. With the racial tiebreaker in 2000–2001, total enrollment was 36.8 percent Asian-American, 32.2 percent African-American, 5.2 percent Latino, 25.1 percent Caucasian, and 0.7 percent Native-American. App. in No. 05–908, at 284a. Nathan Hale's 2005–2006 enrollment was 17.3 percent Asian-American, 10.7 percent African-American, 8 percent Latino, 61.5 percent Caucasian, and 2.5 percent Native-American. Reply Brief for Petitioner in No. 05–908, at 7. In 2000–2001, with the racial tiebreaker, it was 17.9 percent Asian-American, 13.3 percent African-American, 7 percent Latino, 58.4 percent Caucasian, and 3.4 percent Native-American. App. in No. 05–908, at 286a.

*Freeman*, 503 U. S., at 494.  See also *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 507 (1989); *Bakke*, 438 U. S., at 307 (opinion of Powell, J.) ("If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected . . . as facially invalid").  *Grutter* itself reiterated that "outright racial balancing" is "patently unconstitutional."  539 U. S., at 330.

Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995) (quoting *Metro Broadcasting*, 497 U. S., at 602 (O'Connor, J., dissenting); internal quotation marks omitted).[14]  Allowing racial balancing as a compelling end in itself would "effectively assur[e] that race will always be relevant in American life, and that the 'ultimate goal' of 'eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race' will never be achieved."  *Croson, supra*, at 495 (plurality opinion of O'Connor, J.) (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 320 (1986) (STEVENS, J., dissenting), in turn quoting *Fullilove,*

———————

[14] In contrast, Seattle's website formerly described "emphasizing individualism as opposed to a more collective ideology" as a form of "cultural racism," and currently states that the district has no intention "to hold onto unsuccessful concepts such as [a] . . . colorblind mentality."  Harrell, School Web Site Removed: Examples of Racism Sparked Controversy, Seattle Post-Intelligencer, June 2, 2006, pp. B1, B5.  Compare *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind, and neither knows nor tolerates classes among citizens.  In respect of civil rights, all citizens are equal before the law").

448 U. S., at 547 (STEVENS, J., dissenting); brackets and citation omitted). An interest "linked to nothing other than proportional representation of various races . . . would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the [program] continues to reflect that mixture." *Metro Broadcasting, supra,* at 614 (O'Connor, J., dissenting).

The validity of our concern that racial balancing has "no logical stopping point," *Croson, supra,* at 498 (quoting *Wygant, supra,* at 275 (plurality opinion); internal quotation marks omitted); see also *Grutter, supra,* at 343, is demonstrated here by the degree to which the districts tie their racial guidelines to their demographics. As the districts' demographics shift, so too will their definition of racial diversity. See App. in No. 05–908, at 103a (describing application of racial tiebreaker based on "*current* white percentage" of 41 percent and "*current* minority percentage" of 59 percent (emphasis added)).

The Ninth Circuit below stated that it "share[d] in the hope" expressed in *Grutter* that in 25 years racial preferences would no longer be necessary to further the interest identified in that case. *Parents Involved VII,* 426 F. 3d, at 1192. But in Seattle the plans are defended as necessary to address the consequences of racially identifiable housing patterns. The sweep of the mandate claimed by the district is contrary to our rulings that remedying past societal discrimination does not justify race-conscious government action. See, *e.g., Shaw* v. *Hunt,* 517 U. S. 899, 909–910 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest"); *Croson, supra,* at 498–499; *Wygant,* 476 U. S., at 276 (plurality opinion) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy"); *id.,* at 288 (O'Connor, J., concurring in part and concurring in judgment) ("[A] governmental agency's

interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster").

The principle that racial balancing is not permitted is one of substance, not semantics. Racial balancing is not transformed from "patently unconstitutional" to a compelling state interest simply by relabeling it "racial diversity." While the school districts use various verbal formulations to describe the interest they seek to promote—racial diversity, avoidance of racial isolation, racial integration— they offer no definition of the interest that suggests it differs from racial balance. See, *e.g.,* App. in No. 05–908, at 257a ("Q. What's your understanding of when a school suffers from racial isolation? A. I don't have a definition for that"); *id.,* at 228a–229a ("I don't think we've ever sat down and said, 'Define racially concentrated school exactly on point in quantitative terms.' I don't think we've ever had that conversation"); Tr. in *McFarland I*, at 1–90 (Dec. 8, 2003) ("Q. How does the Jefferson County School Board define diversity . . . ?" "A. Well, we want to have the schools that make up the percentage of students of the population").

Jefferson County phrases its interest as "racial integration," but integration certainly does not require the sort of racial proportionality reflected in its plan. Even in the context of mandatory desegregation, we have stressed that racial proportionality is not required, see *Milliken,* 433 U. S., at 280, n. 14 ("[A desegregation] order contemplating the substantive constitutional right [to a] particular degree of racial balance or mixing is . . . infirm as a matter of law" (internal quotation marks omitted)); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 24 (1971) ("The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system

as a whole"), and here Jefferson County has already been found to have eliminated the vestiges of its prior segregated school system.

The en banc Ninth Circuit declared that "when a racially diverse school system is the goal (or racial concentration or isolation is the problem), there is no more effective means than a consideration of race to achieve the solution." *Parents Involved VII, supra,* at 1191. For the foregoing reasons, this conclusory argument cannot sustain the plans. However closely related race-based assignments may be to achieving racial balance, that itself cannot be the goal, whether labeled "racial diversity" or anything else. To the extent the objective is sufficient diversity so that students see fellow students as individuals rather than solely as members of a racial group, using means that treat students solely as members of a racial group is fundamentally at cross-purposes with that end.

C

The districts assert, as they must, that the way in which they have employed individual racial classifications is necessary to achieve their stated ends. The minimal effect these classifications have on student assignments, however, suggests that other means would be effective. Seattle's racial tiebreaker results, in the end, only in shifting a small number of students between schools. Approximately 307 student assignments were affected by the racial tiebreaker in 2000–2001; the district was able to track the enrollment status of 293 of these students. App. in No. 05–908, at 162a. Of these, 209 were assigned to a school that was one of their choices, 87 of whom were assigned to the same school to which they would have been assigned without the racial tiebreaker. Eighty-four students were assigned to schools that they did not list as a choice, but 29 of those students would have been assigned to their respective school without the racial tiebreaker, and 3 were

able to attend one of the oversubscribed schools due to waitlist and capacity adjustments. *Id.,* at 162a–163a. In over one-third of the assignments affected by the racial tiebreaker, then, the use of race in the end made no difference, and the district could identify only 52 students who were ultimately affected adversely by the racial tiebreaker in that it resulted in assignment to a school they had not listed as a preference and to which they would not otherwise have been assigned.

As the panel majority in *Parents Involved VI* concluded:

"[T]he tiebreaker's annual effect is thus merely to shuffle a few handfuls of different minority students between a few schools—about a dozen additional Latinos into Ballard, a dozen black students into Nathan Hale, perhaps two dozen Asians into Roosevelt, and so on. The District has not met its burden of proving these marginal changes . . . outweigh the cost of subjecting hundreds of students to disparate treatment based solely upon the color of their skin." 377 F. 3d, at 984–985 (footnote omitted).

Similarly, Jefferson County's use of racial classifications has only a minimal effect on the assignment of students. Elementary school students are assigned to their first- or second-choice school 95 percent of the time, and transfers, which account for roughly 5 percent of assignments, are only denied 35 percent of the time—and presumably an even smaller percentage are denied on the basis of the racial guidelines, given that other factors may lead to a denial. *McFarland I*, 330 F. Supp. 2d, at 844–845, nn. 16, 18. Jefferson County estimates that the racial guidelines account for only 3 percent of assignments. Brief in Opposition in No. 05–915, p. 7, n. 4; Tr. of Oral Arg. in No. 05–915, at 46. As Jefferson County explains, "the racial guidelines have minimal impact in this process, because they 'mostly influence student assignment in subtle and

indirect ways.'"  Brief for Respondents in No. 05–915, pp. 8–9.

While we do not suggest that *greater* use of race would be preferable, the minimal impact of the districts' racial classifications on school enrollment casts doubt on the necessity of using racial classifications.  In *Grutter*, the consideration of race was viewed as indispensable in more than tripling minority representation at the law school— from 4 to 14.5 percent.  See 539 U. S., at 320.  Here the most Jefferson County itself claims is that "because the guidelines provide a firm definition of the Board's goal of racially integrated schools, they 'provide administrators with the authority to facilitate, negotiate and collaborate with principals and staff to maintain schools within the 15–50% range.'"  Brief in Opposition in No. 05–915, at 7 (quoting *McFarland I, supra*, at 842).  Classifying and assigning schoolchildren according to a binary conception of race is an extreme approach in light of our precedents and our Nation's history of using race in public schools, and requires more than such an amorphous end to justify it.

The districts have also failed to show that they considered methods other than explicit racial classifications to achieve their stated goals.  Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," *Grutter, supra*, at 339, and yet in Seattle several alternative assignment plans—many of which would not have used express racial classifications—were rejected with little or no consideration.  See, *e.g.*, App. in No. 05–908, at 224a–225a, 253a–259a, 307a.  Jefferson County has failed to present any evidence that it considered alternatives, even though the district already claims that its goals are achieved primarily through means other than the racial classifications.  Brief for Respondents in No. 05–915, at 8–9.  Compare *Croson*, 488 U. S., at 519 (KENNEDY, J., concurring in part and concurring in judg-

ment) (racial classifications permitted only "as a last resort").

## IV

JUSTICE BREYER's dissent takes a different approach to these cases, one that fails to ground the result it would reach in law. Instead, it selectively relies on inapplicable precedent and even dicta while dismissing contrary holdings, alters and misapplies our well-established legal framework for assessing equal protection challenges to express racial classifications, and greatly exaggerates the consequences of today's decision.

To begin with, JUSTICE BREYER seeks to justify the plans at issue under our precedents recognizing the compelling interest in remedying past intentional discrimination. See *post*, at 18–24. Not even the school districts go this far, and for good reason. The distinction between segregation by state action and racial imbalance caused by other factors has been central to our jurisprudence in this area for generations. See, *e.g.*, *Milliken*, 433 U. S., at 280, n. 14; *Freeman*, 503 U. S., at 495–496 ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications"). The dissent elides this distinction between *de jure* and *de facto* segregation, casually intimates that Seattle's school attendance patterns reflect illegal segregation, *post*, at 5, 18, 23,[15] and

———————

[15] JUSTICE BREYER makes much of the fact that in 1978 Seattle "settled" an NAACP complaint alleging illegal segregation with the federal Office for Civil Rights (OCR). See *post*, at 5, 8–9, 18, 23. The memorandum of agreement between Seattle and OCR, of course, contains no admission by Seattle that such segregation ever existed or was ongoing at the time of the agreement, and simply reflects a "desire to avoid the incovenience [*sic*] and expense of a formal OCR investigation," which OCR was obligated under law to initiate upon the filing of such a complaint. Memorandum of Agreement between Seattle School District No. 1 of King County, Washington, and the Office for Civil Rights, United States Department of Health, Education, and Welfare 2 (June 9,

fails to credit the judicial determination—under the most rigorous standard—that Jefferson County had eliminated the vestiges of prior segregation. The dissent thus alters in fundamental ways not only the facts presented here but the established law.

JUSTICE BREYER's reliance on *McDaniel* v. *Barresi*, 402 U. S. 39 (1971), *post*, at 23–24, 29–30, highlights how far removed the discussion in the dissent is from the question actually presented in these cases. *McDaniel* concerned a Georgia school system that had been segregated by law. There was no doubt that the county had operated a "dual school system," *McDaniel*, *supra*, at 41, and no one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies— whether or not a court had issued an order to that effect. See *supra*, at 12. The present cases are before us, however, because the Seattle school district was never segregated by law, and the Jefferson County district has been found to be unitary, having eliminated the vestiges of its prior dual status. The justification for race-conscious remedies in *McDaniel* is therefore not applicable here. The dissent's persistent refusal to accept this distinction— its insistence on viewing the racial classifications here as if they were just like the ones in *McDaniel*, "devised to overcome a history of segregated public schools," *post*, at 47—explains its inability to understand why the remedial justification for racial classifications cannot decide these cases.

JUSTICE BREYER's dissent next relies heavily on dicta from *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S., at 16—far more heavily than the school districts themselves. Compare *post*, at 3, 22–28, with Brief for Respondents in No. 05–908, at 19–20; Brief for Respondents in No. 05–915, at 31. The dissent acknowledges that

—————

1978); see also 45 CFR §80.7(c) (2006).

the two-sentence discussion in *Swann* was pure dicta, *post*, at 22, but nonetheless asserts that it demonstrates a "basic principle of constitutional law" that provides "authoritative legal guidance." *Post*, at 22, 30. Initially, as the Court explained just last Term, "we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated." *Central Va. Community College* v. *Katz,* 546 U. S. 356, 363 (2006). That is particularly true given that, when *Swann* was decided, this Court had not yet confirmed that strict scrutiny applies to racial classifications like those before us. See n. 16, *infra*. There is nothing "technical" or "theoretical," *post*, at 30, about our approach to such dicta. See, *e.g., Cohens* v. *Virginia*, 6 Wheat. 264, 399–400 (1821) (Marshall, C. J.) (explaining why dicta is not binding).

JUSTICE BREYER would not only put such extraordinary weight on admitted dicta, but relies on the statement for something it does not remotely say. *Swann* addresses only a possible state objective; it says nothing of the permissible *means*—race conscious or otherwise—that a school district might employ to achieve that objective. The reason for this omission is clear enough, since the case did not involve any voluntary means adopted by a school district. The dissent's characterization of *Swann* as recognizing that "the Equal Protection Clause permits local school boards to use race-conscious criteria to achieve positive race-related goals" is—at best—a dubious inference. *Post*, at 22. Even if the dicta from *Swann* were entitled to the weight the dissent would give it, and no dicta is, it not only did not address the question presented in *Swann*, it also does not address the question presented in these cases—whether the school districts' use of racial classifications to achieve their stated goals is permissible.

Further, for all the lower court cases JUSTICE BREYER cites as evidence of the "prevailing legal assumption" embodied by *Swann*, very few are pertinent. Most are not.

For example, the dissent features *Tometz* v. *Board of Ed., Waukegan City School Dist. No. 61*, 39 Ill. 2d 593, 596–598, 237 N. E. 2d 498, 500–502 (1968), an Illinois decision, as evidence that "state and federal courts had considered the matter settled and uncontroversial." *Post*, at 25. But *Tometz* addressed a challenge to a statute requiring race-consciousness in drawing school attendance boundaries—an issue well beyond the scope of the question presented in these cases. Importantly, it considered that issue only under rational-basis review, 39 Ill. 2d, at 600, 237 N. E. 2d, at 502 ("The test of any legislative classification essentially is one of reasonableness"), which even the dissent grudgingly recognizes is an improper standard for evaluating express racial classifications. Other cases cited are similarly inapplicable. See, *e.g.*, *Citizens for Better Ed.* v. *Goose Creek Consol. Independent School Dist.*, 719 S. W. 2d 350, 352–353 (Tex. App. 1986) (upholding rezoning plan under rational-basis review).[16]

─────────

[16] In fact, all the cases JUSTICE BREYER's dissent cites as evidence of the "prevailing legal assumption," see *post*, at 25–27, were decided before this Court definitively determined that "all racial classifications . . . must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995). Many proceeded under the now-rejected view that classifications seeking to benefit a disadvantaged racial group should be held to a lesser standard of review. See, *e.g.*, *Springfield School Comm.* v. *Barksdale*, 348 F. 2d 261, 266 (CA1 1965). Even if this purported distinction, which JUSTICE STEVENS would adopt, *post*, at 2, n. 3 (dissenting opinion), had not been already rejected by this Court, the distinction has no relevance to these cases, in which students of all races are excluded from the schools they wish to attend based solely on the racial classifications. See, *e.g.*, App. in No. 05–908, at 202a (noting that 89 nonwhite students were denied assignment to a particular school by operation of Seattle's racial tiebreaker).

JUSTICE STEVENS's reliance on *School Comm. of Boston* v. *Board of Ed.,* 352 Mass. 693, 227 N. E. 2d 729 (1967), appeal dism'd, 389 U. S. 572 (1968) *(per curiam)*, *post*, at 3–5, is inapposite for the same reason that many of the cases cited by JUSTICE BREYER are inapposite; the case involved a Massachusetts law that required school districts to avoid

JUSTICE BREYER's dissent next looks for authority to a footnote in *Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457, 472, n. 15 (1982), *post*, at 56–57, but there this Court expressly noted that it was *not* passing on the propriety of race-conscious student assignments in the absence of a finding of *de jure* segregation. Similarly, the citation of *Crawford* v. *Board of Ed. of Los Angeles*, 458 U. S. 527 (1982), *post*, at 24, in which a state referendum prohibiting a race-based assignment plan was challenged, is inapposite—in *Crawford* the Court again expressly reserved the question presented by these cases. 458 U. S*.,* at 535, n. 11. Such reservations and preliminary analyses of course did not decide the merits of this question—as evidenced by the disagreement among the lower courts on this issue. Compare *Eisenberg*, 197 F. 3d, at 133, with *Comfort*, 418 F. 3d, at 13.

JUSTICE BREYER's dissent also asserts that these cases are controlled by *Grutter,* claiming that the existence of a compelling interest in these cases "follows *a fortiori*" from *Grutter, post,* at 41, 64–66, and accusing us of tacitly

————————

racial imbalance in schools but did not specify how to achieve this goal—and certainly did not require express racial classifications as the means to do so. The law was upheld under rational-basis review, with the state court explicitly rejecting the suggestion—which is now plainly the law—that "racial group classifications bear a far heavier burden of justification." 352 Mass., at 700, 227 N. E. 2d, at 734 (internal quotation marks and citation omitted). The passage JUSTICE STEVENS quotes proves our point; all the quoted language says is that the school committee "shall prepare a plan to eliminate the imbalance." *Id.,* at 695, 227 N. E. 2d, at 731; see *post*, at 4, n. 5. Nothing in the opinion approves use of racial classifications as the means to address the imbalance. The suggestion that our decision today is somehow inconsistent with our disposition of that appeal is belied by the fact that neither the lower courts, the respondent school districts, nor any of their 51 *amici* saw fit even to cite the case. We raise this fact not to argue that the dismissal should be afforded any different *stare decisis* effect, but rather simply to suggest that perhaps—for the reasons noted above—the dismissal does not mean what JUSTICE STEVENS believes it does.

overruling that case, see *post,* at 64–66. The dissent over-reads *Grutter,* however, in suggesting that it renders pure racial balancing a constitutionally compelling interest; *Grutter* itself recognized that using race simply to achieve racial balance would be "patently unconstitutional," 539 U. S*.,* at 330. The Court was exceedingly careful in describing the interest furthered in *Grutter* as "not an interest in simple ethnic diversity" but rather a "far broader array of qualifications and characteristics" in which race was but a single element. 539 U. S., at 324–325 (internal quotation marks omitted). We take the *Grutter* Court at its word. We simply do not understand how JUSTICE BREYER can maintain that classifying every schoolchild as black or white, and using that classification as a determinative factor in assigning children to achieve pure racial balance, can be regarded as "less burdensome, and hence more narrowly tailored" than the consideration of race in *Grutter*, *post,* at 47, when the Court in *Grutter* stated that "[t]he importance of . . . individualized consideration" in the program was "paramount," and consideration of race was one factor in a "highly individualized, holistic review." 539 U. S., at 337. Certainly if the constitutionality of the stark use of race in these cases were as established as the dissent would have it, there would have been no need for the extensive analysis undertaken in *Grutter*. In light of the foregoing, JUSTICE BREYER's appeal to *stare decisis* rings particularly hollow. See *post,* at 65–66.

At the same time it relies on inapplicable desegregation cases, misstatements of admitted dicta, and other noncontrolling pronouncements, JUSTICE BREYER's dissent candidly dismisses the significance of this Court's repeated *holdings* that all racial classifications must be reviewed under strict scrutiny, see *post*, at 31–33, 35–36, arguing that a different standard of review should be applied because the districts use race for beneficent rather than malicious purposes, see *post*, at 31–36.

This Court has recently reiterated, however, that "'*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny.'" *Johnson*, 543 U. S., at 505 (quoting *Adarand*, 515 U. S., at 227; emphasis added by *Johnson* Court). See also *Grutter*, *supra*, at 326 ("[G]overnmental action based on race—a group classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry" (internal quotation marks and emphasis omitted)). JUSTICE BREYER nonetheless relies on the good intentions and motives of the school districts, stating that he has found "no case that . . . repudiated this constitutional asymmetry between that which seeks to *exclude* and that which seeks to *include* members of minority races." *Post*, at 29 (emphasis in original). We have found many. Our cases clearly reject the argument that motives affect the strict scrutiny analysis. See *Johnson*, *supra*, at 505 ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications"); *Adarand*, 515 U. S., at 227 (rejecting idea that "'benign'" racial classifications may be held to "different standard"); *Croson*, 488 U. S., at 500 ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice").

This argument that different rules should govern racial classifications designed to include rather than exclude is not new; it has been repeatedly pressed in the past, see, *e.g.*, *Gratz*, 539 U. S., at 282 (BREYER, J., concurring in judgment); *id.*, at 301 (GINSBURG, J., dissenting); *Adarand*, *supra*, at 243 (STEVENS, J., dissenting); *Wygant*, 476 U. S., at 316–317 (STEVENS, J., dissenting), and has been repeatedly rejected. See also *Bakke*, 438 U. S., at 289–291 (opinion of Powell, J.) (rejecting argument that strict scrutiny should be applied only to classifications that disadvantage minorities, stating "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call

for the most exacting judicial examination").

The reasons for rejecting a motives test for racial classifications are clear enough. "The Court's emphasis on 'benign racial classifications' suggests confidence in its ability to distinguish good from harmful governmental uses of racial criteria. History should teach greater humility. . . . '[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." *Metro Broadcasting*, 497 U. S., at 609–610 (O'Connor, J., dissenting). See also *Adarand*, *supra*, at 226 ("'[I]t may not always be clear that a so-called preference is in fact benign'" (quoting *Bakke*, *supra*, at 298 (opinion of Powell, J.))). Accepting JUSTICE BREYER's approach would "do no more than move us from 'separate but equal' to 'unequal but benign.'" *Metro Broadcasting*, *supra*, at 638 (KENNEDY, J., dissenting).

JUSTICE BREYER speaks of bringing "the races" together (putting aside the purely black-and-white nature of the plans), as the justification for excluding individuals on the basis of their race. See *post*, at 28–29. Again, this approach to racial classifications is fundamentally at odds with our precedent, which makes clear that the Equal Protection Clause "protect[s] *persons*, not *groups*," *Adarand*, 515 U. S., at 227 (emphasis in original). See *ibid.* ("[A]ll governmental action based on race—a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited,' *Hirabayashi* [v. *United States*, 320 U. S. 81, 100 (1943)]—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed" (first emphasis in original); *Metro Broadcasting*, *supra*, at 636 ("[O]ur Constitution protects each citizen as an individual, not as a member of a group" (KENNEDY, J., dissenting)); *Bakke*, *supra*, at 289 (opinion of Powell, J.) (Four-

teenth Amendment creates rights "guaranteed to the individual.  The rights established are personal rights"). This fundamental principle goes back, in this context, to *Brown* itself.  See *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955) (*Brown II*) ("At stake is the *personal* interest of the plaintiffs in admission to public schools . . . on a nondiscriminatory basis" (emphasis added)).   For the dissent, in contrast, "'individualized scrutiny' is simply beside the point." *Post*, at 55.

JUSTICE BREYER's position comes down to a familiar claim: The end justifies the means.  He admits that "there is a cost in applying 'a state-mandated racial label,'" *post*, at 67, but he is confident that the cost is worth paying. Our established strict scrutiny test for racial classifications, however, insists on "detailed examination, both as to ends *and* as to means." *Adarand*, *supra*, at 236 (emphasis added).  Simply because the school districts may seek a worthy goal does not mean they are free to discriminate on the basis of race to achieve it, or that their racial classifications should be subject to less exacting scrutiny.

Despite his argument that these cases should be evaluated under a "standard of review that is not 'strict' in the traditional sense of that word," *post*, at 36, JUSTICE BREYER still purports to apply strict scrutiny to these cases.  See *post*, at 37.   It is evident, however, that JUSTICE BREYER's brand of narrow tailoring is quite unlike anything found in our precedents.  Without any detailed discussion of the operation of the plans, the students who are affected, or the districts' failure to consider race-neutral alternatives, the dissent concludes that the districts have shown that these racial classifications are necessary to achieve the districts' stated goals.  This conclusion is divorced from any evaluation of the actual impact of the plans at issue in these cases—other than to

note that the plans "often have no effect." *Post*, at 46.[17]
Instead, the dissent suggests that some combination of the
development of these plans over time, the difficulty of the
endeavor, and the good faith of the districts suffices to
demonstrate that these stark and controlling racial classi-
fications are constitutional.  The Constitution and our
precedents require more.

　In keeping with his view that strict scrutiny should not
apply, JUSTICE BREYER repeatedly urges deference to local
school boards on these issues.  See, *e.g.*, *post*, at 21, 48–49,
66.  Such deference "is fundamentally at odds with our
equal protection jurisprudence.  We put the burden on
state actors to demonstrate that their race-based policies
are justified." *Johnson*, 543 U. S., at 506, n. 1.  See *Cro-
son*, 488 U. S., at 501 ("The history of racial classifications
in this country suggests that blind judicial deference to
legislative or executive pronouncements of necessity has
no place in equal protection analysis"); *West Virginia Bd.
of Ed.* v. *Barnette*, 319 U. S. 624, 637 (1943) ("The Four-
teenth Amendment . . . protects the citizen against the
State itself and all of its creatures—Boards of Education
not excepted").

　JUSTICE BREYER's dissent ends on an unjustified note of
alarm.  It predicts that today's decision "threaten[s]" the
validity of "[h]undreds of state and federal statutes and
regulations." *Post*, at 61; see also *post*, at 27–28.  But the

--------

　[17]JUSTICE BREYER also tries to downplay the impact of the racial as-
signments by stating that in Seattle "students can decide voluntarily to
transfer to a preferred district high school (without any consideration of
race-conscious criteria)." *Post*, at 46.  This presumably refers to the
district's decision to cease, for 2001–2002 school year assignments,
applying the racial tiebreaker to students seeking to transfer to a
different school after ninth grade.  See App. in No. 05–908, at 137a–
139a.  There are obvious disincentives for students to transfer to a
different school after a full quarter of their high school experience has
passed, and the record sheds no light on how transfers to the oversub-
scribed high schools are handled.

examples the dissent mentions—for example, a provision
of the No Child Left Behind Act that requires States to set
measurable objectives to track the achievement of stu-
dents from major racial and ethnic groups, 20 U. S. C.
§6311(b)(2)(C)(v)—have nothing to do with the pertinent
issues in these cases.

JUSTICE BREYER also suggests that other means for
achieving greater racial diversity in schools are necessar-
ily unconstitutional if the racial classifications at issue in
these cases cannot survive strict scrutiny. *Post*, at 58–62.
These other means—*e.g.*, where to construct new schools,
how to allocate resources among schools, and which aca-
demic offerings to provide to attract students to certain
schools—implicate different considerations than the ex-
plicit racial classifications at issue in these cases, and we
express no opinion on their validity—not even in dicta.
Rather, we employ the familiar and well-established ana-
lytic approach of strict scrutiny to evaluate the plans at
issue today, an approach that in no way warrants the
dissent's cataclysmic concerns. Under that approach, the
school districts have not carried their burden of showing
that the ends they seek justify the particular extreme
means they have chosen—classifying individual students
on the basis of their race and discriminating among them
on that basis.

\* \* \*

If the need for the racial classifications embraced by the
school districts is unclear, even on the districts' own
terms, the costs are undeniable. "[D]istinctions between
citizens solely because of their ancestry are by their very
nature odious to a free people whose institutions are
founded upon the doctrine of equality." *Adarand*, 515
U. S., at 214 (internal quotation marks omitted). Gov-
ernment action dividing us by race is inherently suspect
because such classifications promote "notions of racial

inferiority and lead to a politics of racial hostility," *Croson*, *supra*, at 493, "reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin," *Shaw* v. *Reno*, 509 U. S. 630, 657 (1993), and "endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict." *Metro Broadcasting*, 497 U. S., at 603 (O'Connor, J., dissenting). As the Court explained in *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000), "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities."

All this is true enough in the contexts in which these statements were made—government contracting, voting districts, allocation of broadcast licenses, and electing state officers—but when it comes to using race to assign children to schools, history will be heard. In *Brown* v. *Board of Education*, 347 U. S. 483 (1954) (*Brown I*), we held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because government classification and separation on grounds of race themselves denoted inferiority. *Id.,* at 493–494. It was not the inequality of the facilities but the fact of legally separating children on the basis of race on which the Court relied to find a constitutional violation in 1954. See *id.,* at 494 ("'The impact [of segregation] is greater when it has the sanction of the law'"). The next Term, we accordingly stated that "full compliance" with *Brown I* required school districts "to achieve a system of determining admission to the public schools *on a nonracial basis*." *Brown II,* 349 U. S., at 300–301 (emphasis added).

The parties and their *amici* debate which side is more faithful to the heritage of *Brown*, but the position of the plaintiffs in *Brown* was spelled out in their brief and could

not have been clearer: "[T]he Fourteenth Amendment prevents states from according differential treatment to American children on the basis of their color or race." Brief for Appellants in Nos. 1, 2, and 4 and for Respondents in No. 10 on Reargument in *Brown I*, O. T. 1953, p. 15 (Summary of Argument). What do the racial classifications at issue here do, if not accord differential treatment on the basis of race? As counsel who appeared before this Court for the plaintiffs in *Brown* put it: "We have one fundamental contention which we will seek to develop in the course of this argument, and that contention is that no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." Tr. of Oral Arg. in *Brown I*, p. 7 (Robert L. Carter, Dec. 9, 1952). There is no ambiguity in that statement. And it was that position that prevailed in this Court, which emphasized in its remedial opinion that what was "[a]t stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable *on a nondiscriminatory basis*," and what was required was "determining admission to the public schools *on a nonracial basis*." *Brown II*, *supra*, at 300–301 (emphasis added). What do the racial classifications do in these cases, if not determine admission to a public school on a racial basis?

Before *Brown*, schoolchildren were told where they could and could not go to school based on the color of their skin. The school districts in these cases have not carried the heavy burden of demonstrating that we should allow this once again—even for very different reasons. For schools that never segregated on the basis of race, such as Seattle, or that have removed the vestiges of past segregation, such as Jefferson County, the way "to achieve a system of determining admission to the public schools on a nonracial basis," *Brown II*, 349 U. S., at 300–301, is to stop assigning students on a racial basis. The way to stop

Opinion of ROBERTS, C. J.

discrimination on the basis of race is to stop discriminating on the basis of race.

The judgments of the Courts of Appeals for the Sixth and Ninth Circuits are reversed, and the cases are remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

─────────────

Nos. 05–908 and 05–915

─────────────

### PARENTS INVOLVED IN COMMUNITY SCHOOLS, PETITIONER

05–908                              *v.*

### SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


### CRYSTAL D. MEREDITH, CUSTODIAL PARENT AND NEXT FRIEND OF JOSHUA RYAN McDONALD, PETITIONER

05–915                              *v.*

### JEFFERSON COUNTY BOARD OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 28, 2007]

JUSTICE THOMAS, concurring.

Today, the Court holds that state entities may not experiment with race-based means to achieve ends they deem socially desirable. I wholly concur in THE CHIEF JUSTICE's opinion. I write separately to address several of the contentions in JUSTICE BREYER's dissent (hereinafter the dissent). Contrary to the dissent's arguments, resegregation is not occurring in Seattle or Louisville; these school boards have no present interest in remedying past segregation; and these race-based student-assignment programs do not serve any compelling state interest. Accordingly, the plans are unconstitutional. Disfavoring a color-blind interpretation of the Constitution, the dissent would give school boards a free hand to make decisions on the basis of race—an approach reminiscent of that advo-

cated by the segregationists in *Brown* v. *Board of Education,* 347 U. S 483 (1954).  This approach is just as wrong today as it was a half-century ago.  The Constitution and our cases require us to be much more demanding before permitting local school boards to make decisions based on race.

## I

The dissent repeatedly claims that the school districts are threatened with resegregation and that they will succumb to that threat if these plans are declared unconstitutional.  It also argues that these plans can be justified as part of the school boards' attempts to "eradicat[e] earlier school segregation."  See, *e.g.*, *post*, at 4.  Contrary to the dissent's rhetoric, neither of these school districts is threatened with resegregation, and neither is constitutionally compelled or permitted to undertake race-based remediation.  Racial imbalance is not segregation, and the mere incantation of terms like resegregation and remediation cannot make up the difference.

## A

Because this Court has authorized and required race-based remedial measures to address *de jure* segregation, it is important to define segregation clearly and to distinguish it from racial imbalance.  In the context of public schooling, segregation is the deliberate operation of a school system to "carry out a governmental policy to separate pupils in schools solely on the basis of race."  *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 6 (1971); see also *Monroe* v. *Board of Comm'rs of Jackson*, 391 U. S. 450, 452 (1968).  In *Brown,* this Court declared that segregation was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.  *Swann*, *supra*, at 6; see also *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 435 (1968) ("[T]he State, acting through the local

school board and school officials, organized and operated a dual system, part 'white' and part 'Negro.'  It was such dual systems that 14 years ago *Brown I*[, 347 U. S. 483,] held unconstitutional and a year later *Brown II*[, 349 U. S. 294 (1955)] held must be abolished").[1]

Racial imbalance is the failure of a school district's individual schools to match or approximate the demographic makeup of the student population at large.  Cf. *Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457, 460 (1982).  Racial imbalance is not segregation.[2]  Although presently observed racial imbalance might result from past *de jure* segregation, racial imbalance can also result from any number of innocent private decisions, including voluntary housing choices.  See *Swann*, *supra*, at 25–26; *Missouri* v. *Jenkins*, 515 U. S. 70, 116 (1995) (THOMAS, J., concurring).  Because racial imbalance is not inevitably linked to unconstitutional segregation, it is not unconstitutional in and of itself.  *Dayton Bd. of Ed.* v. *Brinkman*, 433 U. S. 406, 413 (1977); *Dayton Bd. of Ed.* v. *Brinkman*, 443 U. S. 526, 531, n. 5 (1979) ("Racial imbalance . . . is not *per se* a constitutional violation"); *Freeman* v. *Pitts*, 503 U. S. 467, 494 (1992); see also *Swann*, *supra*, at 31–32; cf. *Milliken* v. *Bradley*, 418 U. S. 717, 740–741, and n. 19 (1974).

————————

[1] In this Court's paradigmatic segregation cases, there was a local ordinance, state statute, or state constitutional provision requiring racial separation.  See, *e.g.*, Brief for Petitioners in *Bolling* v. *Sharpe*, O. T. 1952, No. 4, pp. 28–30 (cataloging state laws requiring separation of the races); *id.,* at App. A (listing "Statutory and Constitutional Provisions in the States Where Segregation in Education is Institutionalized").

[2] The dissent refers repeatedly and reverently to "'integration.'" However, outside of the context of remediation for past *de jure* segregation, "integration" is simply racial balancing.  See *post*, at 37.  Therefore, the school districts' attempts to further "integrate" are properly thought of as little more than attempts to achieve a particular racial balance.

Although there is arguably a danger of racial imbalance
in schools in Seattle and Louisville, there is no danger of
resegregation.  No one contends that Seattle has estab-
lished or that Louisville has reestablished a dual school
system that separates students on the basis of race.  The
statistics cited in Appendix A to the dissent are not to the
contrary.  See *post*, at 69–72.  At most, those statistics
show a national trend toward classroom racial imbalance.
However, racial imbalance without intentional state action
to separate the races does not amount to segregation.  To
raise the specter of resegregation to defend these pro-
grams is to ignore the meaning of the word and the nature
of the cases before us.[3]

## B

Just as the school districts lack an interest in prevent-
ing resegregation, they also have no present interest in
remedying past segregation.  The Constitution generally
prohibits government race-based decisionmaking, but this
Court has authorized the use of race-based measures for
remedial purposes in two narrowly defined circumstances.

---

[3] The dissent's assertion that these plans are necessary for the school
districts to maintain their "hard-won gains" reveals its conflation of
segregation and racial imbalance.  *Post*, at 38.  For the dissent's pur-
poses, the relevant hard-won gains are the present racial compositions
in the individual schools in Seattle and Louisville.  However, the actual
hard-won gain in these cases is the elimination of the vestiges of the
system of state-enforced racial separation that once existed in Louis-
ville.  To equate the achievement of a certain statistical mix in several
schools with the elimination of the system of systematic *de jure* segre-
gation trivializes the latter accomplishment.  Nothing but an interest in
classroom aesthetics and a hypersensitivity to elite sensibilities justi-
fies the school districts' racial balancing programs.  See Part II–B,
*infra*.  But "the principle of inherent equality that underlies and infuses
our Constitution" required the disestablishment of *de jure* segregation.
See *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 240 (1995)
(THOMAS, J., concurring in part and concurring in judgment).  Assessed
in any objective manner, there is no comparison between the two.

First, in schools that were formerly segregated by law, race-based measures are sometimes constitutionally compelled to remedy prior school segregation. Second, in *Croson*, the Court appeared willing to authorize a government unit to remedy past discrimination for which it was responsible. *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 504 (1989). Without explicitly resting on either of these strands of doctrine, the dissent repeatedly invokes the school districts' supposed interests in remedying past segregation. Properly analyzed, though, these plans do not fall within either existing category of permissible race-based remediation.

1

The Constitution does not permit race-based government decisionmaking simply because a school district claims a remedial purpose and proceeds in good faith with arguably pure motives. *Grutter* v. *Bollinger*, 539 U. S. 306, 371 (2003) (THOMAS, J., concurring in part and dissenting in part) (citing *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 239 (1995) (SCALIA, J., concurring in part and concurring in judgment)). Rather, race-based government decisionmaking is categorically prohibited unless narrowly tailored to serve a compelling interest. *Grutter*, *supra*, at 326; see also Part II–A, *infra*. This exacting scrutiny "has proven automatically fatal" in most cases. *Jenkins*, *supra*, at 121 (THOMAS, J., concurring); cf. *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943) ("[R]acial discriminations are in most circumstances irrelevant and therefore prohibited"). And appropriately so. "The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, *supra*, at 353

(opinion of THOMAS, J.). Therefore, as a general rule, all race-based government decisionmaking—regardless of context—is unconstitutional.

### 2

This Court has carved out a narrow exception to that general rule for cases in which a school district has a "history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race."[4] See *Swann*, 402 U. S., at 5–6. In such cases, race-based remedial measures are sometimes required.[5] *Green*, 391 U. S., at 437–438; cf. *United States* v. *Fordice*, 505 U. S. 717, 745 (1992) (THOMAS, J., concurring).[6] But without a history of state-enforced racial

_____

[4] The dissent makes much of the supposed difficulty of determining whether prior segregation was *de jure* or *de facto*. See, *e.g.*, *post*, at 19–20. That determination typically will not be nearly as difficult as the dissent makes it seem. In most cases, there either will or will not have been a state constitutional amendment, state statute, local ordinance, or local administrative policy explicitly requiring separation of the races. See, *e.g.*, n. 1, *supra*. And even if the determination is difficult, it is one the dissent acknowledges must be made to determine what remedies school districts are required to adopt. *Post*, at 43.

[5] This Court's opinion in *McDaniel* v. *Barresi*, 402 U. S. 39 (1971), fits comfortably within this framework. There, a Georgia school board voluntarily adopted a desegregation plan. At the time of *Brown*, v. *Board of Education,* 347 U. S. 483 (1954), Georgia's Constitution required that "[s]eparate schools shall be provided for the white and colored races." Ga. Const., Art. VII, §1, ch. 2–6401 (1948). Given that state law had previously required the school board to maintain a dual school system, the county was obligated to take measures to remedy its prior *de jure* segregation. This Court recognized as much in its opinion, which stated that the school board had an "affirmative duty to disestablish the dual school system." *McDaniel*, *supra*, at 41.

[6] As I have explained elsewhere, the remedies this Court authorized lower courts to compel in early desegregation cases like *Green* and *Swann* were exceptional. See *Missouri* v. *Jenkins*, 515 U. S. 70, 124–125 (1995), (THOMAS, J., concurring). Sustained resistance to *Brown* prompted the Court to authorize extraordinary race-conscious remedial

separation, a school district has no affirmative legal obligation to take race-based remedial measures to eliminate segregation and its vestiges.

Neither of the programs before us today is compelled as a remedial measure, and no one makes such a claim. Seattle has no history of *de jure* segregation; therefore, the Constitution did not require Seattle's plan.[7]  Although Louisville once operated a segregated school system and was subject to a Federal District Court's desegregation decree, see *ante*, at 7; *Hampton* v. *Jefferson Cty. Bd. of Ed.,* 102 F. Supp. 2d 358, 376–377 (WD Ky. 2000), that decree was dissolved in 2000, *id.*, at 360.  Since then, no race-based remedial measures have been required in Louisville.  Thus, the race-based student-assignment plan at issue here, which was instituted the year after the dissolution of the desegregation decree, was not even arguably required by the Constitution.

––––––––––

measures (like compelled racial mixing) to turn the Constitution's dictate to desegregate into reality.  515 U. S., at 125 (THOMAS, J., concurring).  Even if these measures were appropriate as remedies in the face of widespread resistance to *Brown*'s mandate, they are not forever insulated from constitutional scrutiny.  Rather, "such powers should have been temporary and used only to overcome the widespread resistance to the dictates of the Constitution."  515 U. S., at 125 (THOMAS, J., concurring).

[7] Though the dissent cites every manner of complaint, record material, and scholarly article relating to Seattle's race-based student assignment efforts, *post*, at 73–75, it cites no law or official policy that required separation of the races in Seattle's schools.  Nevertheless, the dissent tries to cast doubt on the historical fact that the Seattle schools were never segregated by law by citing allegations that the National Association for the Advancement of Colored People and other organizations made in court filings to the effect that Seattle's schools were once segregated by law.  See *post*, at 7–9, 23.  These allegations were never proved and were not even made in this case.  Indeed, the record before us suggests the contrary.  See App. in No. 05–908, pp. 214a, 225a, 257a.  Past allegations in another case provide no basis for resolving these cases.

3

Aside from constitutionally compelled remediation in schools, this Court has permitted government units to remedy prior racial discrimination only in narrow circumstances. See *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 277 (1986) (plurality opinion). Regardless of the constitutional validity of such remediation, see *Croson*, *supra*, at 524–525 (SCALIA, J., concurring in judgment), it does not apply here. Again, neither school board asserts that its race-based actions were taken to remedy prior discrimination. Seattle provides three forward-looking—as opposed to remedial—justifications for its race-based assignment plan. Brief for Respondents in No. 05–908, pp. 24–34. Louisville asserts several similar forward-looking interests, Brief for Respondents in No. 05–915, pp. 24–29, and at oral argument, counsel for Louisville disavowed any claim that Louisville's argument "depend[ed] in any way on the prior de jure segregation," Tr. of Oral Arg. in No. 05–915, p. 38.

Furthermore, for a government unit to remedy past discrimination for which it was responsible, the Court has required it to demonstrate "a 'strong basis in evidence for its conclusion that remedial action was necessary.'" *Croson*, 488 U. S., at 500 (quoting *Wygant*, *supra*, at 277 (plurality opinion)). Establishing a "strong basis in evidence" requires proper findings regarding the extent of the government unit's past racial discrimination. *Croson*, 488 U. S., at 504. The findings should "define the scope of any injury [and] the necessary remedy," *id.,* at 505, and must be more than "inherently unmeasurable claims of past wrongs," *id.,* at 506. Assertions of general societal discrimination are plainly insufficient. *Id.,* at 499, 504; *Wygant*, *supra*, at 274 (plurality opinion); cf. *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 310 (1978) (opinion of Powell, J.). Neither school district has made any such specific findings. For Seattle, the dissent attempts to

make up for this failing by adverting to allegations made in past complaints filed against the Seattle school district. However, allegations in complaints cannot substitute for specific findings of prior discrimination—even when those allegations lead to settlements with complaining parties. Cf. *Croson*, *supra*, at 505; *Wygant*, *supra*, at 279, n. 5 (plurality opinion). As for Louisville, its slate was cleared by the District Court's 2000 dissolution decree, which effectively declared that there were no longer any effects of *de jure* discrimination in need of remediation.[8]

Despite the dissent's repeated intimation of a remedial purpose, neither of the programs in question qualifies as a permissible race-based remedial measure. Thus, the programs are subject to the general rule that government race-based decisionmaking is unconstitutional.

C

As the foregoing demonstrates, racial balancing is sometimes a constitutionally permissible remedy for the discrete legal wrong of *de jure* segregation, and when directed to that end, racial balancing is an exception to the general rule that government race-based decisionmaking is uncon-

---

[8] Contrary to the dissent's argument, *post*, at 44, the Louisville school district's interest in remedying its past *de jure* segregation did vanish the day the District Court found that Louisville had eliminated the vestiges of its historic *de jure* segregation. See *Hampton* v. *Jefferson Cty. Bd. of Ed.,* 102 F. Supp. 2d 358, at 360 (WD Ky. 2000). If there were further remediation to be done, the District Court could not logically have reached the conclusion that Louisville "ha[d] eliminated the vestiges associated with the former policy of segregation and its pernicious effects." *Ibid.* Because Louisville could use race-based measures only as a remedy for past *de jure* segregation, it is not "incoherent," *post*, at 56, to say that race-based decisionmaking was allowed to Louisville one day—while it was still remedying—and forbidden to it the next—when remediation was finished. That seemingly odd turnaround is merely a result of the fact that the remediation of *de jure* segregation is a jealously guarded exception to the Equal Protection Clause's general rule against government race-based decisionmaking.

stitutional. Perhaps for this reason, the dissent conflates the concepts of segregation and racial imbalance: If racial imbalance equates to segregation, then it must also be constitutionally acceptable to use racial balancing to remedy racial imbalance.

For at least two reasons, however, it is wrong to place the remediation of segregation on the same plane as the remediation of racial imbalance. First, as demonstrated above, the two concepts are distinct. Although racial imbalance can result from *de jure* segregation, it does not necessarily, and the further we get from the era of state-sponsored racial separation, the less likely it is that racial imbalance has a traceable connection to any prior segregation. See *Freeman*, 503 U. S., at 496; *Jenkins*, 515 U. S., at 118 (THOMAS, J., concurring).

Second, a school cannot "remedy" racial imbalance in the same way that it can remedy segregation. Remediation of past *de jure* segregation is a one-time process involving the redress of a discrete legal injury inflicted by an identified entity. At some point, the discrete injury will be remedied, and the school district will be declared unitary. See *Swann*, 402 U. S., at 31. Unlike *de jure* segregation, there is no ultimate remedy for racial imbalance. Individual schools will fall in and out of balance in the natural course, and the appropriate balance itself will shift with a school district's changing demographics. Thus, racial balancing will have to take place on an indefinite basis—a continuous process with no identifiable culpable party and no discernable end point. In part for those reasons, the Court has never permitted outright racial balancing solely for the purpose of achieving a particular racial balance.

## II

Lacking a cognizable interest in remediation, neither of these plans can survive strict scrutiny because neither plan serves a genuinely compelling state interest. The

dissent avoids reaching that conclusion by unquestion-ingly accepting the assertions of selected social scientists while completely ignoring the fact that those assertions are the subject of fervent debate. Ultimately, the dissent's entire analysis is corrupted by the considerations that lead it initially to question whether strict scrutiny should apply at all. What emerges is a version of "strict scrutiny" that combines hollow assurances of harmlessness with reflex-ive acceptance of conventional wisdom. When it comes to government race-based decisionmaking, the Constitution demands more.

## A

The dissent claims that "the law requires application here of a standard of review that is not 'strict' in the tradi-tional sense of that word." *Post*, at 36. This view is in-formed by dissents in our previous cases and the concur-rences of two Court of Appeals judges. *Post,* at 34–36 (citing 426 F. 3d 1162, 1193–1194 (CA9 2005) (Kozinski, J., concurring); *Comfort* v. *Lynn School Comm.,* 418 F. 3d 1, 28–29 (CA1 2005) (Boudin, C. J., concurring)). Those lower court judges reasoned that programs like these are not "aimed at oppressing blacks" and do not "seek to give one racial group an edge over another." *Comfort, supra*, at 27 (Boudin, C. J., concurring); 426 F. 3d, at 1193 (Kozin-ski, J., concurring). They were further persuaded that these plans differed from other race-based programs this Court has considered because they are "certainly more benign than laws that favor or disfavor one race, segregate by race, or create quotas for or against a racial group," *Comfort*, 418 F. 3d, at 28 (Boudin, C. J., concurring), and they are "far from the original evils at which the Four-teenth Amendment was addressed," *id.,* at 29; 426 F. 3d, at 1195 (Kozinski, J., concurring). Instead of strict scru-tiny, Judge Kozinski would have analyzed the plans under "robust and realistic rational basis review." *Id.,* at 1194.

These arguments are inimical to the Constitution and to
this Court's precedents.[9]  We have made it unusually clear
that strict scrutiny applies to *every* racial classification.
*Adarand*, 515 U. S., at 227; *Grutter*, 539 U. S., at 326;
*Johnson* v. *California*, 543 U. S. 499, 505 (2005) ("We have
insisted on strict scrutiny in every context, even for so-
called 'benign' racial classifications").[10]  There are good
reasons not to apply a lesser standard to these cases.  The
constitutional problems with government race-based
decisionmaking are not diminished in the slightest by the
presence or absence of an intent to oppress any race or by
the real or asserted well-meaning motives for the race-
based decisionmaking.  *Adarand*, 515 U. S., at 228–229.
Purportedly benign race-based decisionmaking suffers the
same constitutional infirmity as invidious race-based
decisionmaking.  *Id.,* at 240 (THOMAS, J., concurring in
part and concurring in judgment) ("As far as the Constitu-
tion is concerned, it is irrelevant whether a government's
racial classifications are drawn by those who wish to
oppress a race or by those who have a sincere desire to
help those thought to be disadvantaged").

Even supposing it mattered to the constitutional analy-
sis, the race-based student assignment programs before us

---

[9] The dissent's appeal to *stare decisis*, *post*, at 65, is particularly ironic
in light of its apparent willingness to depart from these precedents,
*post*, at 36–37.

[10] The idea that government racial classifications must be subjected
to strict scrutiny did not originate in *Adarand*.  As early as *Loving* v.
*Virginia*, 388 U. S. 1 (1967), this Court made clear that government
action that "rest[s] solely upon distinctions drawn according to race"
had to be "subjected to the 'most rigid scrutiny.'"  *Id.,* at 11 (quoting
*Korematsu* v. *United States*, 323 U. S. 214, 216 (1944)); see also
*McLaughlin* v. *Florida*, 379 U. S. 184, 196 (1964) (requiring a statute
drawing a racial classification to be "necessary, and not merely ration-
ally related, to accomplishment of a permissible state policy"); *id.,* at
197 (Harlan, J., concurring) ("The necessity test . . . should be equally
applicable in a case involving state racial discrimination").

are not as benign as the dissent believes. See *post*, at 34–
35. "[R]acial paternalism and its unintended conse-
quences can be as poisonous and pernicious as any other
form of discrimination." *Adarand*, *supra*, at 241 (opinion
of THOMAS, J.). As these programs demonstrate, every
time the government uses racial criteria to "bring the
races together," *post*, at 29, someone gets excluded, and
the person excluded suffers an injury solely because of his
or her race. The petitioner in the Louisville case received
a letter from the school board informing her that her
*kindergartener* would not be allowed to attend the school
of petitioner's choosing because of the child's race. App. in
No. 05–915, p. 97. Doubtless, hundreds of letters like this
went out from both school boards every year these race-
based assignment plans were in operation. This type of
exclusion, solely on the basis of race, is precisely the sort
of government action that pits the races against one an-
other, exacerbates racial tension, and "provoke[s] resent-
ment among those who believe that they have been
wronged by the government's use of race." *Adarand*,
*supra*, at 241 (opinion of THOMAS, J.). Accordingly, these
plans are simply one more variation on the government
race-based decisionmaking we have consistently held must
be subjected to strict scrutiny. *Grutter*, *supra*, at 326.

B

Though the dissent admits to discomfort in applying
strict scrutiny to these plans, it claims to have nonetheless
applied that exacting standard. But in its search for a
compelling interest, the dissent casually accepts even the
most tenuous interests asserted on behalf of the plans,
grouping them all under the term "'integration.'" See
*post*, at 37. "'[I]ntegration,'" we are told, has "three essen-
tial elements." *Ibid.* None of these elements is compel-
ling. And the combination of the three unsubstantiated
elements does not produce an interest any more compel-

ling than that represented by each element independently.

### 1

According to the dissent, integration involves "an inter-est in setting right the consequences of prior conditions of segregation." *Post*, at 37. For the reasons explained above, the records in these cases do not demonstrate that either school board's plan is supported by an interest in remedying past discrimination. Part I–B, *supra.*

Moreover, the school boards have no interest in remedy-ing the sundry consequences of prior segregation unre-lated to schooling, such as "housing patterns, employment practices, economic conditions, and social attitudes." *Post*, at 38. General claims that past school segregation af-fected such varied societal trends are "too amorphous a basis for imposing a racially classified remedy," *Wygant*, 476 U. S., at 276 (plurality opinion), because "[i]t is sheer speculation" how decades-past segregation in the school system might have affected these trends, see *Croson*, 488 U. S., at 499. Consequently, school boards seeking to remedy those societal problems with race-based measures in schools today would have no way to gauge the proper scope of the remedy. *Id.,* at 498. Indeed, remedial meas-ures geared toward such broad and unrelated societal ills have "'no logical stopping point,'" *ibid.*, and threaten to become "ageless in their reach into the past, and timeless in their ability to affect the future," *Wygant*, *supra*, at 276 (plurality opinion). See *Grutter*, 539 U. S., at 342 (stating the "requirement that all governmental use of race must have a logical end point").

Because the school boards lack any further interest in remedying segregation, this element offers no support for the purported interest in "integration."

### 2

Next, the dissent argues that the interest in integration

has an educational element. The dissent asserts that racially balanced schools improve educational outcomes for black children. In support, the dissent unquestioningly cites certain social science research to support propositions that are hotly disputed among social scientists. In reality, it is far from apparent that coerced racial mixing has any educational benefits, much less that integration is necessary to black achievement.

Scholars have differing opinions as to whether educational benefits arise from racial balancing. Some have concluded that black students receive genuine educational benefits. See, *e.g.*, Crain & Mahard, Desegregation and Black Achievement: A Review of the Research, 42 L. & Contemp. Probs. 17, 48 (1978). Others have been more circumspect. See, *e.g.*, Henderson, Greenberg, Schneider, Uribe, & Verdugo, High Quality Schooling for African American Students, in Beyond Desegregation 166 (M. Shujaa ed. 1996) ("Perhaps desegregation does not have a single effect, positive or negative, on the academic achievement of African American students, but rather some strategies help, some hurt, and still others make no difference whatsoever. It is clear to us that focusing simply on demographic issues detracts from focusing on improving schools"). And some have concluded that there are no demonstrable educational benefits. See, *e.g.*, Armor & Rossell, Desegregation and Resegregation in the Public Schools, in Beyond the Color Line: New Perspectives on Race and Ethnicity in America 239, 251 (A. Thernstrom & S. Thernstrom eds. 2002).

The *amicus* briefs in the cases before us mirror this divergence of opinion. Supporting the school boards, one *amicus* has assured us that "both early desegregation research and recent statistical and econometric analyses . . . indicate that there are positive effects on minority student achievement scores arising from diverse school settings." Brief for American Educational Research Asso-

ciation as *Amicus Curiae* 10.  Another brief claims that
"school desegregation has a modest positive impact on the
achievement of African-American students."  App. to Brief
for 553 Social Scientists as *Amici Curiae* 13–14 (footnote
omitted).  Yet neither of those briefs contains specific
details like the magnitude of the claimed positive effects
or the precise demographic mix at which those positive
effects begin to be realized.  Indeed, the social scientists'
brief rather cautiously claims the existence of any benefit
at all, describing the "positive impact" as "modest," *id.,* at
13, acknowledging that "there appears to be little or no
effect on math scores," *id.,* at 14, and admitting that the
"underlying reasons for these gains in achievement are not
entirely clear," *id.,* at 15.[11]

Other *amici* dispute these findings.  One *amicus* reports
that "[i]n study after study, racial composition of a student
body, when isolated, proves to be an insignificant determi-
nant of student achievement."  Brief for Dr. John Murphy
et al. as *Amici Curiae* in No. 05–908, p. 8; see also *id.*, at 9
("[T]here is no evidence that diversity in the K–12 class-
room positively affects student achievement").  Another
*amicus* surveys several social science studies and con-
cludes that "a fair and comprehensive analysis of the

—————

[11] At least one of the academic articles the dissent cites to support
this proposition fails to establish a causal connection between the
supposed educational gains realized by black students and racial
mixing.  See Hallinan, Diversity Effects on Student Outcomes: Social
Science Evidence, 59 Ohio St. L. J. 733 (1998).  In the pages following
the ones the dissent cites, the author of that article remarks that "the
main reason white and minority students perform better academically
in majority white schools is likely that these schools provide greater
opportunities to learn.  In other words, it is not desegregation per se
that improves achievement, but rather the learning advantages some
desegregated schools provide." *Id.,* at 744.  Evidence that race is a good
proxy for other factors that might be correlated with educational
benefits does not support a compelling interest in the use of race to
achieve academic results.

research shows that there is no clear and consistent evidence of [educational] benefits." Brief for David J. Armor et al. as *Amici Curiae* 29.

Add to the inconclusive social science the fact of black achievement in "racially isolated" environments. See T. Sowell, Education: Assumptions Versus History 7–38 (1986). Before *Brown*, the most prominent example of an exemplary black school was Dunbar High School. *Id.,* at 29 ("[I]n the period 1918–1923, Dunbar graduates earned fifteen degrees from Ivy League colleges, and ten degrees from Amherst, Williams, and Wesleyan"). Dunbar is by no means an isolated example. See *id.,* at 10–32 (discussing other successful black schools); Walker, Can Institutions Care? Evidence from the Segregated Schooling of African American Children, in Beyond Desegregation 209–226 (M. Shujaa ed. 1996); see also T. Sowell, Affirmative Action Around the World: An Empirical Study 141–165 (2004). Even after *Brown*, some schools with predominantly black enrollments have achieved outstanding educational results. See, *e.g.*, S. Carter, No Excuses: Lessons from 21 High-Performing, High-Poverty Schools 49–50, 53–56, 71–73, 81–84, 87–88 (2001); A. Thernstrom & S. Thernstrom, No Excuses: Closing the Racial Gap in Learning 43–64 (2003); see also L. Izumi, They Have Overcome: High-Poverty, High-Performing Schools in California (2002) (chronicling exemplary achievement in predominantly Hispanic schools in California). There is also evidence that black students attending historically black colleges achieve better academic results than those attending predominantly white colleges. *Grutter, supra*, at 364–365 (THOMAS, J., concurring in part and concurring in judgment) (citing sources); see also *Fordice*, 505 U. S., at 748–749 (THOMAS, J., concurring).

The Seattle school board itself must believe that racial mixing is not necessary to black achievement. Seattle operates a K–8 "African-American Academy," which has a

"nonwhite" enrollment of 99%. See App. in No. 05–908, p. 227a; Reply Brief in No. 05–908, p. 13, n. 13. That school was founded in 1990 as part of the school board's effort to "increase academic achievement."[12] See African American Academy History, online at http://www. seattleschools.org/schools/aaa/history.htm (all Internet materials as visited June 26, 2007, and available in Clerk of Court's case file). According to the school's most recent annual report, "[a]cademic excellence" is its "primary goal." See African American Academy 2006 Annual Report, p. 2, online at http://www.seattleschools.org/area/siso/reports/anrep/altern/938.pdf. This racially imbalanced environment has reportedly produced test scores "higher across all grade levels in reading, writing and math." *Ibid.* Contrary to what the dissent would have predicted, see *post*, at 38–39, the children in Seattle's African American Academy have shown gains when placed in a "highly segregated" environment.

Given this tenuous relationship between forced racial mixing and improved educational results for black children, the dissent cannot plausibly maintain that an educational element supports the integration interest, let alone makes it compelling.[13] See *Jenkins*, 515 U. S., at 121–122

_____

[12] Of course, if the Seattle school board were truly committed to the notion that diversity leads directly to educational benefits, operating a school with such a high "nonwhite" enrollment would be a shocking dereliction of its duty to educate the students enrolled in that school.

[13] In fact, the available data from the Seattle school district appear to undercut the dissent's view. A comparison of the test results of the schools in the last year the racial balancing program operated to the results in the 2004-to-2005 school year (in which student assignments were race-neutral) does not indicate the decline in black achievement one would expect to find if black achievement were contingent upon a particular racial mix. See Washington State Report Card, online at http://reportcard.ospi.k12.wa.us/summary.aspx?schoolId=1099&OrgType=4&reportLevel=School; http://reportcard.ospi.k12.wa.us/summary.aspx?schoolId=1104&reportLevel=School&orgLinkId=1104&yrs=;

(Thomas, J., concurring) ("[T]here is no reason to think that black students cannot learn as well when surrounded by members of their own race as when they are in an integrated environment").

Perhaps recognizing as much, the dissent argues that the social science evidence is "strong enough to permit a democratically elected school board reasonably to determine that this interest is a compelling one." *Post*, at 38. This assertion is inexplicable. It is not up to the school boards—the very government entities whose race-based practices we must strictly scrutinize—to determine what interests qualify as compelling under the Fourteenth Amendment to the United States Constitution. Rather, this Court must assess independently the nature of the interest asserted and the evidence to support it in order to determine whether it qualifies as compelling under our precedents. In making such a determination, we have deferred to state authorities only once, see *Grutter*, 539 U. S., at 328–330, and that deference was prompted by factors uniquely relevant to higher education. *Id.,* at 328 ("Our holding today is in keeping with our tradition of giving a degree of deference to a university's academic decisions"). The dissent's proposed test—whether sufficient social science evidence supports a government unit's conclusion that the interest it asserts is compelling—calls to mind the rational-basis standard of review the dissent purports not to apply, *post*, at 36-37. See *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 488 (1955) ("It is enough that there is an evil at hand for correction, and

––––––––––

http://reportcard.ospi.k12.wa.us/summary.aspx?schoolId=1061&report Level=School&orgLinkId=1061&yrs=; http://reportcard.ospi.k12.wa.us/ summary.aspx?schoolId=1043&reportLevel=School&orgLinkId=1043& yrs= (showing that reading scores went up, not down, when Seattle's race-based assignment program ended at Sealth High School, Ingraham High School, and Franklin High School—some of the schools most affected by the plan).

that it might be thought that the particular legislative measure was a rational way to correct it"). Furthermore, it would leave our equal-protection jurisprudence at the mercy of elected government officials evaluating the evanescent views of a handful of social scientists. To adopt the dissent's deferential approach would be to abdicate our constitutional responsibilities.[14]

3

Finally, the dissent asserts a "democratic element" to the integration interest. It defines the "democratic element" as "an interest in producing an educational environment that reflects the 'pluralistic society' in which our children will live." *Post*, at 39.[15]  Environmental reflec-

_____

[14] The dissent accuses me of "feel[ing] confident that, to end invidious discrimination, one must end *all* governmental use of race-conscious criteria" and chastises me for not deferring to democratically elected majorities. See *post*, at 62. Regardless of what JUSTICE BREYER's goals might be, this Court does not sit to "create a society that includes all Americans" or to solve the problems of "troubled inner city schooling." *Ibid.* We are not social engineers. The United States Constitution dictates that local governments cannot make decisions on the basis of race. Consequently, regardless of the perceived negative effects of racial imbalance, I will not defer to legislative majorities where the Constitution forbids it.

It should escape no one that behind JUSTICE BREYER's veil of judicial modesty hides an inflated role for the Federal Judiciary. The dissent's approach confers on judges the power to say what sorts of discrimination are benign and which are invidious. Having made that determination (based on no objective measure that I can detect), a judge following the dissent's approach will set the level of scrutiny to achieve the desired result. Only then must the judge defer to a democratic majority. In my view, to defer to one's preferred result is not to defer at all.

[15] The notion that a "democratic" interest qualifies as a compelling interest (or constitutes a part of a compelling interest) is proposed for the first time in today's dissent and has little basis in the Constitution or our precedent, which has narrowly restricted the interests that qualify as compelling. See *Grutter* v. *Bollinger,* 539 U. S. 306, 351–354 (2003) (THOMAS, J., concurring in part and dissenting in part). The Fourteenth Amendment does not enact the dissent's newly minted

tion, though, is just another way to say racial balancing. And "[p]referring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake." *Bakke*, 438 U. S., at 307 (opinion of Powell, J.). "This the Constitution forbids." *Ibid.; Grutter*, *supra,* at 329–330; *Freeman*, 503 U. S., at 494.

Navigating around that inconvenient authority, the dissent argues that the racial balancing in these plans is not an end in itself but is instead intended to "teac[h] children to engage in the kind of cooperation among Americans of all races that is necessary to make a land of three hundred million people one Nation." *Post*, at 39–40. These "generic lessons in socialization and good citizenship" are too sweeping to qualify as compelling interests. *Grutter*, 539 U. S., at 348 (SCALIA, J., concurring in part and dissenting in part). And they are not "uniquely relevant" to schools or "uniquely 'teachable' in a formal educational setting." *Id.,* at 347. Therefore, if governments may constitutionally use racial balancing to achieve these aspirational ends in schools, they may use racial balancing to achieve similar goals at every level—from state-sponsored 4–H clubs, see *Bazemore* v. *Friday*, 478 U. S. 385, 388–390 (1986) (Brennan, J., concurring), to the state civil service. See *Grutter*, 539 U. S. 347–348 (opinion of SCALIA, J.).

Moreover, the democratic interest has no durational limit, contrary to *Grutter*'s command. See *id.,* at 342; see also *Croson*, 488 U. S., at 498; *Wygant*, 476 U. S., at 275 (plurality opinion). In other words, it will always be important for students to learn cooperation among the races. If this interest justifies race-conscious measures today, then logically it will justify race-conscious measures for-

―――――――

understanding of liberty. See *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting) ("The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics").

ever. Thus, the democratic interest, limitless in scope and "timeless in [its] ability to affect the future," *id.,* at 276 (plurality opinion), cannot justify government race-based decisionmaking.[16]

In addition to these defects, the democratic element of the integration interest fails on the dissent's own terms. The dissent again relies upon social science research to support the proposition that state-compelled racial mixing teaches children to accept cooperation and improves racial attitudes and race relations. Here again, though, the dissent overstates the data that supposedly support the interest.

The dissent points to data that indicate that "black and white students in desegregated schools are less racially prejudiced than those in segregated schools." *Post*, at 40 (internal quotation marks omitted). By the dissent's account, improvements in racial attitudes depend upon the increased contact between black and white students thought to occur in more racially balanced schools. There is no guarantee, however, that students of different races in the same school will actually spend time with one another. Schools frequently group students by academic

_____

[16]The dissent does not explain how its recognition of an interest in teaching racial understanding and cooperation here is consistent with the Court's rejection of a similar interest in *Wygant*. In *Wygant*, a school district justified its race-based teacher-layoff program in part on the theory that "minority teachers provided 'role models' for minority students and that a racially 'diverse' faculty would improve the education of all students." *Grutter*, *supra*, at 352 (opinion of THOMAS, J.) (citing Brief for Respondents, O. T. 1984, No. 84–1340, pp. 27–28; 476 U. S., at 315 (STEVENS, J., dissenting)). The Court rejected the interests asserted to justify the layoff program as insufficiently compelling. *Wygant,* 476 U. S., at 275–276 (plurality opinion); *id.,* at 295 (White, J., concurring in judgment). If a school district has an interest in teaching racial understanding and cooperation, there is no logical reason why that interest should not extend to the composition of the teaching staff as well as the composition of the student body. The dissent's reliance on this interest is, therefore, inconsistent with *Wygant*.

ability as an aid to efficient instruction, but such group-
ings often result in classrooms with high concentrations of
one race or another. See, *e.g.*, Yonezawa, Wells, & Serna,
Choosing Tracks: "Freedom of Choice" in Detracting
Schools, 39 Am. Ed. Research J., No. 1, p. 38 (Spring
2002); Mickelson, Subverting Swann: First- and Second-
Generation Segregation in the Charlotte-Mecklenburg
Schools, 38 Am. Ed. Research J., No. 2, pp. 233–234
(Summer 2001) (describing this effect in schools in Char-
lotte, North Carolina). In addition to classroom separa-
tion, students of different races within the same school
may separate themselves socially. See Hallinan & Wil-
liams, Interracial Friendship Choices in Secondary
Schools, 54 Am. Sociological Rev., No. 1, pp. 72–76 (Feb.
1989); see also Clotfelter, Interracial Contact in High
School Extracurricular Activities, 34 Urban Rev., No. 1,
pp. 41–43 (Mar. 2002). Therefore, even supposing interra-
cial contact leads directly to improvements in racial atti-
tudes and race relations, a program that assigns students
of different races to the same schools might not capture
those benefits. Simply putting students together under
the same roof does not necessarily mean that the students
will learn together or even interact.

Furthermore, it is unclear whether increased interracial
contact improves racial attitudes and relations.[17]  One

_____

[17] Outside the school context, this Court's cases reflect the fact that
racial mixing does not always lead to harmony and understanding. In
*Johnson* v. *California*, 543 U. S. 499 (2005), this Court considered a
California prison policy that separated inmates racially. *Id.,* at 525–
528 (THOMAS, J., dissenting). That policy was necessary because of
"numerous incidents of racial violence." *Id.,* at 502; *id.,* at 532–534
(THOMAS, J., dissenting). As a result of this Court's insistence on strict
scrutiny of that policy, but see *id.,* at 538–547, inmates in the Califor-
nia prisons were killed. See *Beard* v. *Banks*, 548 U. S. \_\_\_, \_\_\_ (2006)
(THOMAS, J., concurring in judgment) (noting that two were killed and
hundreds were injured in race rioting subsequent to this Court's
decision in *Johnson*).

researcher has stated that "the reviews of desegregation and intergroup relations were unable to come to any conclusion about what the probable effects of desegregation were . . . [;] virtually all of the reviewers determined that few, if any, firm conclusions about the impact of desegregation on intergroup relations could be drawn." Schofield, School Desegregation and Intergroup Relations: A Review of the Literature, in 17 Review of Research in Education 356 (G. Grant ed. 1991). Some studies have even found that a deterioration in racial attitudes seems to result from racial mixing in schools. See N. St. John, School Desegregation Outcomes for Children 67–68 (1975) ("A glance at [the data] shows that for either race positive findings are less common than negative findings"); Stephan, The Effects of School Desegregation: An Evaluation 30 Years After Brown, in Advances in Applied Social Psychology 183–186 (M. Saks & L. Saxe eds. 1986). Therefore, it is not nearly as apparent as the dissent suggests that increased interracial exposure automatically leads to improved racial attitudes or race relations.

Given our case law and the paucity of evidence supporting the dissent's belief that these plans improve race relations, no democratic element can support the integration interest.[18]

4

The dissent attempts to buttress the integration interest by claiming that it follows *a fortiori* from the interest this

─────────

[18]After discussing the "democratic element," the dissent repeats its assertion that the social science evidence supporting that interest is "sufficiently strong to permit a school board to determine . . . that this interest is compelling." *Post*, at 40. Again, though, the school boards have no say in deciding whether an interest is compelling. Strict scrutiny of race-based government decisionmaking is more searching than *Chevron*-style administrative review for reasonableness. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 845 (1984).

Court recognized as compelling in *Grutter*. *Post*, at 41. Regardless of the merit of *Grutter*, the compelling interest recognized in that case cannot support these plans. *Grutter* recognized a compelling interest in a law school's attainment of a diverse student body. 539 U. S., at 328. This interest was critically dependent upon features unique to higher education: "the expansive freedoms of speech and thought associated with the university environment," the "special niche in our constitutional tradition" occupied by universities, and "[t]he freedom of a university to make its own judgments as to education[,] includ[ing] the selection of its student body." *Id.,* at 329 (internal quotation marks omitted). None of these features is present in elementary and secondary schools. Those schools do not select their own students, and education in the elementary and secondary environment generally does not involve the free interchange of ideas thought to be an integral part of higher education. See 426 F. 3d, at 1208 (Bea, J., dissenting). Extending *Grutter* to this context would require us to cut that holding loose from its theoretical moorings. Thus, only by ignoring *Grutter*'s reasoning can the dissent claim that recognizing a compelling interest in these cases is an *a fortiori* application of *Grutter*.

## C

Stripped of the baseless and novel interests the dissent asserts on their behalf, the school boards cannot plausibly maintain that their plans further a compelling interest. As I explained in *Grutter*, only "those measures the State must take to provide a bulwark against anarchy . . . or to prevent violence" and "a government's effort to remedy past discrimination for which it is responsible" constitute compelling interests. 539 U. S., at 351–352, 353. Neither of the parties has argued—nor could they—that race-based student assignment is necessary to provide a bul-

wark against anarchy or to prevent violence. And as I explained above, the school districts have no remedial interest in pursuing these programs. See Part I–B, *supra.* Accordingly, the school boards cannot satisfy strict scrutiny. These plans are unconstitutional.

## III

Most of the dissent's criticisms of today's result can be traced to its rejection of the color-blind Constitution. See *post*, at 29. The dissent attempts to marginalize the notion of a color-blind Constitution by consigning it to me and Members of today's plurality.[19] See *ibid.;* see also *post,* at 61. But I am quite comfortable in the company I keep. My view of the Constitution is Justice Harlan's view in *Plessy:* "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (dissenting opinion). And my view was the rallying cry for the lawyers who litigated *Brown.* See, *e.g.*, Brief for Appellants in *Brown* v. *Board of Education*, O. T. 1953, Nos. 1, 2, and 4 p. 65 ("That the Constitution is color blind is our dedicated belief"); Brief for Appellants in *Brown* v. *Board of Education*, O. T. 1952, No. 1, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifica-

————————

[19] The dissent half-heartedly attacks the historical underpinnings of the color-blind Constitution. *Post*, at 28–29. I have no quarrel with the proposition that the Fourteenth Amendment sought to bring former slaves into American society as full members. *Post,* at 28 (citing *Slaughter-House Cases*, 16 Wall. 36, 71–72 (1873)). What the dissent fails to understand, however, is that the color-blind Constitution does not bar the government from taking measures to remedy past state-sponsored discrimination—indeed, it requires that such measures be taken in certain circumstances. See, *e.g.*, Part I–B, *supra.* Race-based government measures during the 1860's and 1870's to remedy *state-enforced slavery* were therefore not inconsistent with the color-blind Constitution.

tions based upon race and color alone");[20] see also In Memoriam: Honorable Thurgood Marshall, Proceedings of the Bar and Officers of the Supreme Court of the United States, X (1993) (remarks of Judge Motley) ("Marshall had a 'Bible' to which he turned during his most depressed moments. The 'Bible' would be known in the legal community as the first Mr. Justice Harlan's dissent in *Plessy* v. *Ferguson*, 163 U. S. 537, 552 (1896). I do not know of any opinion which buoyed Marshall more in his pre-*Brown* days . . .").

The dissent appears to pin its interpretation of the Equal Protection Clause to current societal practice and expectations, deference to local officials, likely practical consequences, and reliance on previous statements from this and other courts. Such a view was ascendant in this Court's jurisprudence for several decades. It first appeared in *Plessy,* where the Court asked whether a state law providing for segregated railway cars was "a reasonable regulation." 163 U. S., at 550. The Court deferred to local authorities in making its determination, noting that in inquiring into reasonableness "there must necessarily be a large discretion on the part of the legislature." *Ibid.* The Court likewise paid heed to societal practices, local expectations, and practical consequences by looking to "the established usages, customs and traditions of the people,

---

[20] See also Juris. Statement in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 8 ("[W]e take the unqualified position that the Fourteenth Amendment has totally stripped the state of power to make race and color the basis for governmental action"); Tr. of Oral Arg. in *Brown* v. *Board of Education*, O. T. 1952, No. 1, p. 7 ("We have one fundamental contention which we will seek to develop in the course of this argument, and that contention is that no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens"); Tr. of Oral Arg. in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 50 ("[T]he state is deprived of any power to make any racial classifications in any governmental field").

and with a view to the promotion of their comfort, and the preservation of the public peace and good order." *Ibid.* Guided by these principles, the Court concluded: "[W]e cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable, or more obnoxious to the Fourteenth Amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia." *Id.,* at 550–551.

The segregationists in *Brown* embraced the arguments the Court endorsed in *Plessy*. Though *Brown* decisively rejected those arguments, today's dissent replicates them to a distressing extent. Thus, the dissent argues that "[e]ach plan embodies the results of local experience and community consultation." *Post*, at 47. Similarly, the segregationists made repeated appeals to societal practice and expectation. See, *e.g.*, Brief for Appellees on Reargument in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 76 ("[A] State has power to establish a school system which is capable of efficient administration, taking into account local problems and conditions").[21] The dissent argues that

_____

[21] See also Brief for Appellees in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 1 ("[T]he Court is asked . . . to outlaw the fixed policies of the several States which are based on local social conditions well known to the respective legislatures"); *id.,* at 9 ("For this purpose, Virginia history and present Virginia conditions are important"); Tr. of Oral Arg. in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 57 ("[T]he historical background that exists, certainly in this Virginia situation, with all the strife and the history that we have shown in this record, shows a basis, a real basis, for the classification that has been made"); *id.,* at 69 (describing the potential abolition of segregation as "contrary to the customs, the traditions and the mores of what we might claim to be a great people, established through generations, who themselves are fiercely and irrevocably dedicated to the preservation of the white and colored races"). Accord, *post*, at 68 ("Today, almost 50 years later, attitudes toward race in this Nation have changed dramatically. Many parents, white and black alike, want their children to attend schools with children of different races. Indeed, the very school districts that

"weight [must be given] to a local school board's knowl-
edge, expertise, and concerns," *post*, at 48, and with equal
vigor, the segregationists argued for deference to local
authorities. See, *e.g.*, Brief for Kansas on Reargument in
*Brown* v. *Board of Education*, O. T. 1953, No. 1, p. 14 ("We
advocate only a concept of constitutional law that permits
determinations of state and local policy to be made on
state and local levels. We defend only the validity of the
statute that enables the Topeka Board of Education to
determine its own course").[22]   The dissent argues that

_____

once spurned integration now strive for it. The long history of their
efforts reveals the complexities and difficulties they have faced"); *post,*
at 21 (emphasizing the importance of "local circumstances" and encour-
aging different localities to "try different solutions to common problems
and gravitate toward those that prove most successful or seem to them
best to suit their individual needs" (citations and internal quotation
marks omitted)); *post,* at 48 (emphasizing the school districts' "40-year
history" during which both school districts have tried numerous ap-
proaches "to achieve more integrated schools"); *post*, at 63 ("[T]he
histories of Louisville and Seattle reveal complex circumstances and a
long tradition of conscientious efforts by local school boards").

[22] See also Brief for Appellees in *Brown* v. *Board of Education*, O. T.
1952, No. 1, p. 29 ("'It is universally held, therefore, that each state
shall determine for itself, subject to the observance of the fundamental
rights and liberties guaranteed by the federal Constitution, how it shall
exercise the police power . . . . And in no field is this right of the several
states more clearly recognized than in that of public education'" (quot-
ing *Briggs* v. *Elliott,* 98 F. Supp. 529, 532 (SC 1951))); Brief for Appel-
lees in *Briggs* v. *Elliott*, O. T. 1952, No. 2, p. 7 ("Local self-government
in local affairs is essential to the peace and happiness of each locality
and to the strength and stability of our whole federal system. Nowhere
is this more profoundly true than in the field of education"); Tr. of Oral
Arg. in *Briggs* v. *Elliott*, O. T. 1952, No. 2, pp. 54–55 ("What is the great
national and federal policy on this matter? Is it not a fact that the very
strength and fiber of our federal system is local self-government in
those matters for which local action is competent? Is it not of all the
activities of government the one which most nearly approaches the
hearts and minds of people, the question of the education of their
young? Is it not the height of wisdom that the manner in which that
shall be conducted should be left to those most immediately affected by

today's decision "threatens to substitute for present calm a disruptive round of race-related litigation," *post*, at 2, and claims that today's decision "risks serious harm to the law and for the Nation," *post,* at 65. The segregationists also relied upon the likely practical consequences of ending the state-imposed system of racial separation. See, *e.g.*, Brief for Appellees on Reargument in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 37 ("Yet a holding that school segregation by race violates the Constitution will result in upheaval in all of those places not now subject to Federal judicial scrutiny. This Court has made many decisions of widespread effect; none would affect more people more directly in more fundamental interests and, in fact, cause more chaos in local government than a reversal of the decision in this case").[23] And foreshadowing today's dis-

———————

it, and that the wishes of the parents, both white and colored, should be ascertained before their children are forced into what may be an unwelcome contact?"). Accord, *post*, at 48 ("[L]ocal school boards better understand their own communities and have a better knowledge of what in practice will best meet the educational needs of their pupils"); *post*, at 66 ("[W]hat of respect for democratic local decisionmaking by States and school boards?"); *ibid.* (explaining "that the Constitution grants local school districts a significant degree of leeway").

[23] See also Reply Brief for Appellees in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 17 ("The Court is . . . dealing with thousands of local school districts and schools. Is each to be the subject of litigation in the District Courts?"); Brief for Kansas on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1, p. 51 ("The delicate nature of the problem of segregation and the paramount interest of the State of Kansas in preserving the internal peace and tranquility of its people indicates that this is a question which can best be solved on the local level, at least until Congress declares otherwise"). Accord, *post*, at 61 ("At a minimum, the plurality's views would threaten a surge of race-based litigation. Hundreds of state and federal statutes and regulations use racial classifications for educational or other purposes. . . . In many such instances, the contentious force of legal challenges to these classifications, meritorious or not, would displace earlier calm"); *post,* at 65 ("Indeed, the consequences of the approach the Court takes today are serious. Yesterday, the plans under review were lawful. Today,

sent, the segregationists most heavily relied upon judicial precedent. See, *e.g.*, Brief for Appellees on Reargument in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 59 ("[I]t would be difficult indeed to find a case so favored by precedent as is the case for South Carolina here").[24]

———————

they are not"); *post,* at 66 (predicting "further litigation, aggravating race-related conflict").

[24]See also Statement of Appellees Opposing Jurisdiction and Motion to Dismiss or Affirm in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 5 ("[I]t would be difficult to find from any field of law a legal principle more repeatedly and conclusively decided than the one sought to be raised by appellants"); Brief for Appellees in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 46–47 ("If this case were to be decided solely on the basis of precedent, this brief could have been much more limited. There is ample precedent in the decisions of this Court to uphold school segregation"); Brief for Petitioners in *Gebhart* v. *Belton*, O. T. 1952, No. 5, p. 27 ("Respondents ask this Court to upset a long established and well settled principle recognized by numerous state Legislatures, and Courts, both state and federal, over a long period of years"); Tr. of Oral Arg. in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 79 ("But be that doctrine what it may, somewhere, sometime to every principle comes a moment of repose when it has been so often announced, so confidently relied upon, so long continued, that it passes the limits of judicial discretion and disturbance. . . . We relied on the fact that this Court had not once but seven times, I think it is, pronounced in favor of the separate but equal doctrine. We relied on the fact that the courts of last appeal of some sixteen or eighteen States have passed upon the validity of the separate but equal doctrine vis-a-vis the Fourteenth Amendment. We relied on the fact that Congress has continuously since 1862 segregated its schools in the District of Columbia"); Brief for Appellees in *Briggs* v. *Elliott*, O. T. 1952, No. 2, App. D (collecting citations of state and federal cases "[w]hich [e]nunciate the [p]rinciple that [s]tate [l]aws [p]roviding for [r]acial [s]egregation in the [p]ublic [s]chools do not [c]onflict with the Fourteenth Amendment"). Accord, *post*, at 22 ("[T]he Court set forth in *Swann* a basic principle of constitutional law—a principle of law that has found wide acceptance in the legal culture" (citations and internal quotation marks omitted)); *post,* at 25 ("Lower state and federal courts had considered the matter settled and uncontroversial even before this Court decided *Swann*"); *post*, at 26 ("Numerous state and federal courts explicitly relied upon *Swann*'s guidance for decades to follow"); *post,* at

The similarities between the dissent's arguments and the segregationists' arguments do not stop there. Like the dissent, the segregationists repeatedly cautioned the Court to consider practicalities and not to embrace too theoretical a view of the Fourteenth Amendment.[25]  And just as the dissent argues that the need for these programs will lessen over time, the segregationists claimed that reliance on segregation was lessening and might eventually end.[26]

---

27 (stating "how lower courts understood and followed *Swann*'s enunciation of the relevant legal principle"); *post*, at 30 ("The constitutional principle enunciated in *Swann,* reiterated in subsequent cases, and relied upon over many years, provides, and has widely been thought to provide, authoritative legal guidance"); *post*, at 61 ("[T]oday's opinion will require setting aside the laws of several States and many local communities"); *post*, at 66 ("And what has happened to *Swann?*  To *McDaniel?*  To *Crawford?*  To *Harris?*  To *School Committee of Boston?*  To *Seattle School Dist. No. 1?*  After decades of vibrant life, they would all, under the plurality's logic, be written out of the law").

[25] Compare Brief for Appellees in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 16–17 ("'It is by such practical considerations based on experience rather than by theoretical inconsistencies that the question of equal protection is to be answered'" (quoting *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 110 (1949))); Brief for Appellees on Reargument in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 76 ("The question is a practical one for them to solve; it is not subject to solution in the theoretical realm of abstract principles"); Tr. of Oral Arg. in *Davis* v. *County School Board*, O. T. 1953, No. 4, p. 86 ("[Y]ou cannot talk about this problem just in a vacuum in the manner of a law school discussion"), with *post*, at 57 ("The Founders meant the Constitution as a practical document").

[26] Compare Brief for Kansas on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1, p. 57 ("[T]he people of Kansas . . . are abandoning the policy of segregation whenever local conditions and local attitudes make it feasible"), Brief for Appellees on Reargument in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 76 ("As time passes, it may well be that segregation will end"), with *post*, at 19 ("[T]hey use race-conscious criteria in limited and gradually diminishing ways"); *post*, at 48 ("[E]ach plan's use of race-conscious elements is *diminished* compared to the use of race in preceding integration plans"); *post,* at 55 (describing the "historically-diminishing use of race" in the school

What was wrong in 1954 cannot be right today.[27]  Whatever else the Court's rejection of the segregationists' arguments in *Brown* might have established, it certainly made clear that state and local governments cannot take from the Constitution a right to make decisions on the basis of race by adverse possession.  The fact that state and local governments had been discriminating on the basis of race for a long time was irrelevant to the *Brown* Court.  The fact that racial discrimination was preferable to the relevant communities was irrelevant to the *Brown* Court.  And the fact that the state and local governments had relied on statements in this Court's opinions was irrelevant to the *Brown* Court.  The same principles guide today's decision.  None of the considerations trumpeted by the dissent is relevant to the constitutionality of the school boards' race-based plans because no contextual detail—or

———————

districts).

[27] It is no answer to say that these cases can be distinguished from *Brown* because *Brown* involved invidious racial classifications whereas the racial classifications here are benign.  See *post*, at 62.  How does one tell when a racial classification is invidious?  The segregationists in *Brown* argued that their racial classifications were benign, not invidious.  See Tr. of Oral Arg. in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 83 ("It [South Carolina] is confident of its good faith and intention to produce equality for all of its children of whatever race or color.  It is convinced that the happiness, the progress and the welfare of these children is best promoted in segregated schools"); Brief for Appellees on Reargument in *Davis* v. *County School Board*, O. T. 1953, No. 3, p. 82–83 ("Our many hours of research and investigation have led only to confirmation of our view that segregation by race in Virginia's public schools at this time not only does not offend the Constitution of the United States but serves to provide a better education for living for the children of both races"); Tr. of Oral Arg. in *Davis* v. *County School Board*, O. T. 1952, No. 3, p. 71 ("[T]o make such a transition, would undo what we have been doing, and which we propose to continue to do for the uplift and advancement of the education of both races.  It would stop this march of progress, this onward sweep").  It is the height of arrogance for Members of this Court to assert blindly that their motives are better than others.

collection of contextual details, *post*, at 2–22—can "provide refuge from the principle that under our Constitution, the government may not make distinctions on the basis of race." *Adarand*, 515 U. S., at 240 (THOMAS, J., concurring in part and concurring in judgment).[28]

In place of the color-blind Constitution, the dissent would permit measures to keep the races together and proscribe measures to keep the races apart.[29]  See *post*, at 28–34, 64–65.  Although no such distinction is apparent in

—————

[28] See also *id.,* at 8–9 ("It has been urged that [these state laws and policies] derive validity as a consequence of a long duration supported and made possible by a long line of judicial decisions, including expressions in some of the decisions of this Court.  At the same time, it is urged that these laws are valid as a matter of constitutionally permissible social experimentation by the States.  On the matter of stare decisis, I submit that the duration of the challenged practice, while it is persuasive, is not controlling. . . . As a matter of social experimentation, the laws in question must satisfy the requirements of the Constitution.  While this Court has permitted the States to legislate or otherwise officially act experimentally in the social and economic fields, it has always recognized and held that this power is subject to the limitations of the Constitution, and that the tests of the Constitution must be met"); Reply Brief for Appellants in *Briggs* v. *Elliott*, O. T. 1953, No. 2, pp. 18–19 ("The truth of the matter is that this is an attempt to place local mores and customs above the high equalitarian principles of our Government as set forth in our Constitution and particularly the Fourteenth Amendment.  This entire contention is tantamount to saying that the vindication and enjoyment of constitutional rights recognized by this Court as present and personal can be postponed whenever such postponement is claimed to be socially desirable").

[29] The dissent does not face the complicated questions attending its proposed standard.  For example, where does the dissent's principle stop?  Can the government force racial mixing against the will of those being mixed?  Can the government force black families to relocate to white neighborhoods in the name if bringing the races together?  What about historically black colleges, which have "established traditions and programs that might disproportionately appeal to one race or another"? *United States* v. *Fordice*, 505 U. S. 717, 749 (1992) (THOMAS, J., concurring).  The dissent does not and cannot answer these questions because the contours of the distinction it propounds rest entirely in the eye of the beholder.

the Fourteenth Amendment, the dissent would constitutionalize today's faddish social theories that embrace that distinction. The Constitution is not that malleable. Even if current social theories favor classroom racial engineering as necessary to "solve the problems at hand," *post*, at 21, the Constitution enshrines principles independent of social theories. See *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting) ("The white race deems itself to be the dominant race in this country. And so it is, in prestige, in achievements, in education, in wealth and in power. So, I doubt not, it will continue to be for all time . . . . But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. . . . Our Constitution is color-blind, and neither knows nor tolerates classes among citizens"). Indeed, if our history has taught us anything, it has taught us to beware of elites bearing racial theories.[30]     See, *e.g.*, *Dred Scott* v.

———————

[30] JUSTICE BREYER's good intentions, which I do not doubt, have the shelf life of JUSTICE BREYER's tenure. Unlike the dissenters, I am unwilling to delegate my constitutional responsibilities to local school boards and allow them to experiment with race-based decisionmaking on the assumption that their intentions will forever remain as good as JUSTICE BREYER's. See The Federalist No. 51, p. 349 (J. Cooke ed. 1961) ("If men were angels, no government would be necessary"). Indeed, the racial theories endorsed by the Seattle school board should cause the dissenters to question whether local school boards should be entrusted with the power to make decisions on the basis of race. The Seattle school district's Website formerly contained the following definition of "cultural racism": "Those aspects of society that overtly and covertly attribute value and normality to white people and whiteness, and devalue, stereotype, and label people of color as 'other,' different, less than, or render them invisible. Examples of these norms include defining white skin tones as nude or flesh colored, having a future time orientation, emphasizing individualism as opposed to a more collective ideology, defining one form of English as standard . . . ." See Harrell, School Web Site Removed: Examples of Racism Sparked Controversy, Seattle Post-Intelligencer, June 2, 2006, p. B1. After the site was removed, the district offered the comforting clarification that the site was not intended "'to hold onto unsuccessful concepts such as melting

*Sandford*, 19 How. 393, 407 (1857) ("[T]hey [members of the "negro African race"] had no rights which the white man was bound to respect").  Can we really be sure that the racial theories that motivated *Dred Scott* and *Plessy* are a relic of the past or that future theories will be nothing but beneficent and progressive?  That is a gamble I am unwilling to take, and it is one the Constitution does not allow.

\*     \*     \*

The plans before us base school assignment decisions on students' race.  Because "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens," such race-based decisionmaking is unconstitutional. *Plessy*, *supra,* at 559 (Harlan, J., dissenting).  I concur in THE CHIEF JUSTICE's opinion so holding.

---

pot or colorblind mentality.'"  *Ibid.;* see also *ante*, at 22, n. 15 (plurality opinion).

More recently, the school district sent a delegation of high school students to a "White Privilege Conference."  See Equity and Race Relations White Privilege Conference, https://www.seattleschools. org/area/equityandrace/whiteprivilegeconference.xml.  One conference participant described "white privilege" as "an invisible package of unearned assets which I can count on cashing in each day, but about which I was meant to remain oblivious.  White Privilege is like an invisible weightless knapsack of special provisions, maps, passports, codebooks, visas, clothes, tools, and blank checks."  See White Privilege Conference, Questions and Answers, http://www.uccs.edu/~wpc/ faqs.htm; see generally Westneat, School District's Obsessed with Race, Seattle Times, Apr. 1, 2007, p. B1 (describing racial issues in Seattle schools).

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 05–908 and 05–915

———————

PARENTS INVOLVED IN COMMUNITY
SCHOOLS, PETITIONER
05–908                    *v.*
SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

CRYSTAL D. MEREDITH, CUSTODIAL PARENT AND NEXT
FRIEND OF JOSHUA RYAN McDONALD, PETITIONER
05–915                    *v.*
JEFFERSON COUNTY BOARD OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 28, 2007]

JUSTICE KENNEDY, concurring in part and concurring in
the judgment.

The Nation's schools strive to teach that our strength
comes from people of different races, creeds, and cultures
uniting in commitment to the freedom of all. In these
cases two school districts in different parts of the country
seek to teach that principle by having classrooms that
reflect the racial makeup of the surrounding community.
That the school districts consider these plans to be neces-
sary should remind us our highest aspirations are yet
unfulfilled. But the solutions mandated by these school
districts must themselves be lawful. To make race matter
now so that it might not matter later may entrench the
very prejudices we seek to overcome. In my view the
state-mandated racial classifications at issue, official

labels proclaiming the race of all persons in a broad class of citizens—elementary school students in one case, high school students in another—are unconstitutional as the cases now come to us.

I agree with THE CHIEF JUSTICE that we have jurisdiction to decide the cases before us and join Parts I and II of the Court's opinion. I also join Parts III–A and III–C for reasons provided below. My views do not allow me to join the balance of the opinion by THE CHIEF JUSTICE, which seems to me to be inconsistent in both its approach and its implications with the history, meaning, and reach of the Equal Protection Clause. JUSTICE BREYER's dissenting opinion, on the other hand, rests on what in my respectful submission is a misuse and mistaken interpretation of our precedents. This leads it to advance propositions that, in my view, are both erroneous and in fundamental conflict with basic equal protection principles. As a consequence, this separate opinion is necessary to set forth my conclusions in the two cases before the Court.

I

The opinion of the Court and JUSTICE BREYER's dissenting opinion (hereinafter dissent) describe in detail the history of integration efforts in Louisville and Seattle. These plans classify individuals by race and allocate benefits and burdens on that basis; and as a result, they are to be subjected to strict scrutiny. See *Johnson* v. *California*, 543 U. S. 499, 505–506 (2005); *ante*, at 11. The dissent finds that the school districts have identified a compelling interest in increasing diversity, including for the purpose of avoiding racial isolation. See *post*, at 37–45. The plurality, by contrast, does not acknowledge that the school districts have identified a compelling interest here. See *ante*, at 17–25. For this reason, among others, I do not join Parts III–B and IV. Diversity, depending on its meaning and definition, is a compelling educational goal a

school district may pursue.

It is well established that when a governmental policy is subjected to strict scrutiny, "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson, supra,* at 505 (quoting *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995)). "Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 493 (1989) (plurality opinion). And the inquiry into less restrictive alternatives demanded by the narrow tailoring analysis requires in many cases a thorough understanding of how a plan works. The government bears the burden of justifying its use of individual racial classifications. As part of that burden it must establish, in detail, how decisions based on an individual student's race are made in a challenged governmental program. The Jefferson County Board of Education fails to meet this threshold mandate.

Petitioner Crystal Meredith challenges the district's decision to deny her son Joshua McDonald a requested transfer for his kindergarten enrollment. The district concedes it denied his request "under the guidelines," which is to say, on the basis of Joshua's race. Brief for Respondents in No. 05–915, p. 10; see also App. in No. 05–915, p. 97. Yet the district also maintains that the guidelines do not apply to "kindergartens," Brief for Respondents in No. 05–915, at 4, and it fails to explain the discrepancy. Resort to the record, including the parties' Stipulation of Facts, further confuses the matter. See App. in No. 05–915, at 43 ("Transfer applications can be denied because of lack of available space or, for students in grades other than Primary 1 (kindergarten), the racial

guidelines in the District's current student assignment plan"); *id.*, at 29 ("The student assignment plan does not apply to . . . students in Primary 1"); see also Stipulation of Facts in No. 3:02–CV–00620–JGH; Doc. 32, Exh. 44, p. 6 (2003–04 Jefferson County Public Schools Elementary Student Assignment Application, Section B) ("Assignment is made to a school for Primary 1 (Kindergarten) through Grade Five as long as racial guidelines are maintained.  If the Primary 1 (Kindergarten) placement does not enhance racial balance, a new application must be completed for Primary 2 (Grade One)").

The discrepancy identified is not some simple and straightforward error that touches only upon the peripheries of the district's use of individual racial classifications. To the contrary, Jefferson County in its briefing has explained how and when it employs these classifications only in terms so broad and imprecise that they cannot withstand strict scrutiny.  See, *e.g.*, Brief for Respondents in No. 05–915, at 4–10.  While it acknowledges that racial classifications are used to make certain assignment decisions, it fails to make clear, for example, who makes the decisions; what if any oversight is employed; the precise circumstances in which an assignment decision will or will not be made on the basis of race; or how it is determined which of two similarly situated children will be subjected to a given race-based decision.  See *ibid.;* see also App. in No. 05–915, at 38, 42 (indicating that decisions are "based on . . . the racial guidelines" without further explanation); *id.*, at 81 (setting forth the blanket mandate that "[s]chools shall work cooperatively with each other and with central office to ensure that enrollment at all schools [in question] is within the racial guidelines annually and to encourage that the enrollment at all schools progresses toward the midpoint of the guidelines"); *id.*, at 43, 76–77, 81–83; *McFarland* v. *Jefferson Cty. Public Schools*, 330 F. Supp. 2d 834, 837–845, 855–862 (WD Ky. 2004).

Opinion of KENNEDY, J.

When litigation, as here, involves a "complex, comprehensive plan that contains multiple strategies for achieving racially integrated schools," Brief for Respondents in No. 05–915, at 4, these ambiguities become all the more problematic in light of the contradictions and confusions that result. Compare, *e.g.*, App. in No. 05–915, at 37 ("Each [Jefferson County] school . . . has a designated geographic attendance area, which is called the 'resides area' of the school[, and each] such school is the 'resides school' for those students whose parent's or guardian's residence address is within the school's geographic attendance area"); *id.*, at 82 ("All elementary students . . . shall be assigned to the school which serves the area in which they reside"); and Brief for Respondents in No. 05–915, at 5 ("There are no selection criteria for admission to [an elementary school student's] resides school, except attainment of the appropriate age and completion of the previous grade"), with App. in No. 05–915, at 38 ("Decisions to assign students to schools within each cluster are based on available space within the [elementary] schools and the racial guidelines in the District's current student assignment plan"); *id.*, at 82 (acknowledging that a student may not be assigned to his or her resides school if it "has reached . . . the extremes of the racial guidelines").

One can attempt to identify a construction of Jefferson County's student assignment plan that, at least as a logical matter, complies with these competing propositions; but this does not remedy the underlying problem. Jefferson County fails to make clear to this Court—even in the limited respects implicated by Joshua's initial assignment and transfer denial—whether in fact it relies on racial classifications in a manner narrowly tailored to the interest in question, rather than in the far-reaching, inconsistent, and *ad hoc* manner that a less forgiving reading of the record would suggest. When a court subjects governmental action to strict scrutiny, it cannot construe ambi-

guities in favor of the State.

As for the Seattle case, the school district has gone further in describing the methods and criteria used to determine assignment decisions on the basis of individual racial classifications. See, *e.g.*, Brief for Respondents in No. 05–908, p. 5–11. The district, nevertheless, has failed to make an adequate showing in at least one respect. It has failed to explain why, in a district composed of a diversity of races, with fewer than half of the students classified as "white," it has employed the crude racial categories of "white" and "non-white" as the basis for its assignment decisions. See, *e.g., id.,* at 1–11.

The district has identified its purposes as follows: "(1) to promote the educational benefits of diverse school enrollments; (2) to reduce the potentially harmful effects of racial isolation by allowing students the opportunity to opt out of racially isolated schools; and (3) to make sure that racially segregated housing patterns did not prevent non-white students from having equitable access to the most popular over-subscribed schools." *Id.,* at 19. Yet the school district does not explain how, in the context of its diverse student population, a blunt distinction between "white" and "non-white" furthers these goals. As the Court explains, "a school with 50 percent Asian-American students and 50 percent white students but no African-American, Native-American, or Latino students would qualify as balanced, while a school with 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white students would not." *Ante*, at 15–16; see also Brief for United States as *Amicus Curiae* in No. 05–908, pp. 13–14. Far from being narrowly tailored to its purposes, this system threatens to defeat its own ends, and the school district has provided no convincing explanation for its design. Other problems are evident in Seattle's system, but there is no need to address them now. As the district fails to account for the classification

system it has chosen, despite what appears to be its ill fit, Seattle has not shown its plan to be narrowly tailored to achieve its own ends; and thus it fails to pass strict scrutiny.

## II

Our Nation from the inception has sought to preserve and expand the promise of liberty and equality on which it was founded. Today we enjoy a society that is remarkable in its openness and opportunity. Yet our tradition is to go beyond present achievements, however significant, and to recognize and confront the flaws and injustices that remain. This is especially true when we seek assurance that opportunity is not denied on account of race. The enduring hope is that race should not matter; the reality is that too often it does.

This is by way of preface to my respectful submission that parts of the opinion by THE CHIEF JUSTICE imply an all-too-unyielding insistence that race cannot be a factor in instances when, in my view, it may be taken into account. The plurality opinion is too dismissive of the legitimate interest government has in ensuring all people have equal opportunity regardless of their race. The plurality's postulate that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race," *ante*, at 40–41, is not sufficient to decide these cases. Fifty years of experience since *Brown* v. *Board of Education,* 347 U. S. 483 (1954), should teach us that the problem before us defies so easy a solution. School districts can seek to reach *Brown*'s objective of equal educational opportunity. The plurality opinion is at least open to the interpretation that the Constitution requires school districts to ignore the problem of *de facto* resegregation in schooling. I cannot endorse that conclusion. To the extent the plurality opinion suggests the Constitution mandates that state and local school authorities must accept the status quo of

racial isolation in schools, it is, in my view, profoundly mistaken.

The statement by Justice Harlan that "[o]ur Constitution is color-blind" was most certainly justified in the context of his dissent in *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896). The Court's decision in that case was a grievous error it took far too long to overrule. *Plessy*, of course, concerned official classification by race applicable to all persons who sought to use railway carriages. And, as an aspiration, Justice Harlan's axiom must command our assent. In the real world, it is regrettable to say, it cannot be a universal constitutional principle.

In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. Cf. *Grutter* v. *Bollinger*, 539 U. S. 306 (2003); *id.*, at 387–388 (KENNEDY, J., dissenting). If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.

School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would de-

mand strict scrutiny to be found permissible. See *Bush* v.
*Vera*, 517 U. S. 952, 958 (1996) (plurality opinion) ("Strict
scrutiny does not apply merely because redistricting is
performed with consciousness of race. . . . Electoral district
lines are 'facially race neutral' so a more searching inquiry
is necessary before strict scrutiny can be found applicable
in redistricting cases than in cases of 'classifications based
explicitly on race'" (quoting *Adarand*, 515 U. S., at 213)).
Executive and legislative branches, which for generations
now have considered these types of policies and proce-
dures, should be permitted to employ them with candor
and with confidence that a constitutional violation does
not occur whenever a decisionmaker considers the impact
a given approach might have on students of different
races. Assigning to each student a personal designation
according to a crude system of individual racial classifica-
tions is quite a different matter; and the legal analysis
changes accordingly.

Each respondent has asserted that its assignment of
individual students by race is permissible because there is
no other way to avoid racial isolation in the school dis-
tricts. Yet, as explained, each has failed to provide the
support necessary for that proposition. Cf. *Croson*, 488
U. S., at 501 ("The history of racial classifications in this
country suggests that blind judicial deference to legislative
or executive pronouncements of necessity has no place in
equal protection analysis"). And individual racial classifi-
cations employed in this manner may be considered le-
gitimate only if they are a last resort to achieve a compel-
ling interest. See *id.*, at 519 (KENNEDY, J., concurring in
part and concurring in judgment).

In the cases before us it is noteworthy that the number
of students whose assignment depends on express racial
classifications is limited. I join Part III–C of the Court's
opinion because I agree that in the context of these plans,
the small number of assignments affected suggests that

the schools could have achieved their stated ends through
different means. These include the facially race-neutral
means set forth above or, if necessary, a more nuanced,
individual evaluation of school needs and student charac-
teristics that might include race as a component. The
latter approach would be informed by *Grutter*, though of
course the criteria relevant to student placement would
differ based on the age of the students, the needs of the
parents, and the role of the schools.

## III

The dissent rests on the assumptions that these sweep-
ing race-based classifications of persons are permitted by
existing precedents; that its confident endorsement of race
categories for each child in a large segment of the commu-
nity presents no danger to individual freedom in other,
prospective realms of governmental regulation; and that
the racial classifications used here cause no hurt or anger
of the type the Constitution prevents. Each of these prem-
ises is, in my respectful view, incorrect.

## A

The dissent's reliance on this Court's precedents to
justify the explicit, sweeping, classwide racial classifica-
tions at issue here is a misreading of our authorities that,
it appears to me, tends to undermine well-accepted princi-
ples needed to guard our freedom. And in his critique of
that analysis, I am in many respects in agreement with
THE CHIEF JUSTICE. The conclusions he has set forth in
Part III–A of the Court's opinion are correct, in my view,
because the compelling interests implicated in the cases
before us are distinct from the interests the Court has
recognized in remedying the effects of past intentional
discrimination and in increasing diversity in higher edu-
cation. See *ante*, at 12–13. As the Court notes, we recog-
nized the compelling nature of the interest in remedying

past intentional discrimination in *Freeman* v. *Pitts*, 503 U. S. 467, 494 (1992), and of the interest in diversity in higher education in *Grutter*.  At the same time, these compelling interests, in my view, do help inform the present inquiry.  And to the extent the plurality opinion can be interpreted to foreclose consideration of these interests, I disagree with that reasoning.

As to the dissent, the general conclusions upon which it relies have no principled limit and would result in the broad acceptance of governmental racial classifications in areas far afield from schooling.  The dissent's permissive strict scrutiny (which bears more than a passing resemblance to rational-basis review) could invite widespread governmental deployment of racial classifications.  There is every reason to think that, if the dissent's rationale were accepted, Congress, assuming an otherwise proper exercise of its spending authority or commerce power, could mandate either the Seattle or the Jefferson County plans nationwide.  There seems to be no principled rule, moreover, to limit the dissent's rationale to the context of public schools.  The dissent emphasizes local control, see *post*, at 48–49, the unique history of school desegregation, see *post*, at 2, and the fact that these plans make less use of race than prior plans, see *post*, at 57, but these factors seem more rhetorical than integral to the analytical structure of the opinion.

This brings us to the dissent's reliance on the Court's opinions in *Gratz* v. *Bollinger*, 539 U. S. 244 (2003), and *Grutter*, 539 U. S. 306.  If today's dissent said it was adhering to the views expressed in the separate opinions in *Gratz* and *Grutter*, see *Gratz*, 539 U. S., at 281 (BREYER, J., concurring in judgment); *id.,* at 282 (STEVENS, J., dissenting); *id.,* at 291 (SOUTER, J., dissenting); *id.,* at 298 (GINSBURG, J., dissenting); *Grutter*, *supra*, at 344 (GINSBURG, J., concurring), that would be understandable, and likely within the tradition—to be invoked, in my view,

in rare instances—that permits us to maintain our own positions in the face of *stare decisis* when fundamental points of doctrine are at stake. See, *e.g., Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 770 (2002) (STEVENS, J., dissenting). To say, however, that we must ratify the racial classifications here at issue based on the majority opinions in *Gratz* and *Grutter* is, with all respect, simply baffling.

*Gratz* involved a system where race was not the entire classification. The procedures in *Gratz* placed much less reliance on race than do the plans at issue here. The issue in *Gratz* arose, moreover, in the context of college admissions where students had other choices and precedent supported the proposition that First Amendment interests give universities particular latitude in defining diversity. See *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 312–314 (1978) (opinion of Powell, J.). Even so the race factor was found to be invalid. *Gratz*, *supra*, at 251. If *Gratz* is to be the measure, the racial classification systems here are *a fortiori* invalid. If the dissent were to say that college cases are simply not applicable to public school systems in kindergarten through high school, this would seem to me wrong, but at least an arguable distinction. Under no fair reading, though, can the majority opinion in *Gratz* be cited as authority to sustain the racial classifications under consideration here.

The same must be said for the controlling opinion in *Grutter*. There the Court sustained a system that, it found, was flexible enough to take into account "all pertinent elements of diversity," 539 U. S., at 341 (internal quotation marks omitted), and considered race as only one factor among many, *id.*, at 340. Seattle's plan, by contrast, relies upon a mechanical formula that has denied hundreds of students their preferred schools on the basis of three rigid criteria: placement of siblings, distance from schools, and race. If those students were considered for a

whole range of their talents and school needs with race as just one consideration, *Grutter* would have some application. That, though, is not the case. The only support today's dissent can draw from *Grutter* must be found in its various separate opinions, not in the opinion filed for the Court.

B

To uphold these programs the Court is asked to brush aside two concepts of central importance for determining the validity of laws and decrees designed to alleviate the hurt and adverse consequences resulting from race discrimination. The first is the difference between *de jure* and *de facto* segregation; the second, the presumptive invalidity of a State's use of racial classifications to differentiate its treatment of individuals.

In the immediate aftermath of *Brown* the Court addressed other instances where laws and practices enforced *de jure* segregation. See, *e.g., Loving* v. *Virginia*, 388 U. S. 1 (1967) (marriage); *New Orleans City Park Improvement Assn.* v. *Detiege*, 358 U. S. 54 (1958) *(per curiam)* (public parks); *Gayle* v. *Browder*, 352 U. S. 903 (1956) *(per curiam)* (buses); *Holmes* v. *Atlanta*, 350 U. S. 879 (1955) *(per curiam)* (golf courses); *Mayor of Baltimore* v. *Dawson*, 350 U. S. 877 (1955) *(per curiam)* (beaches). But with reference to schools, the effect of the legal wrong proved most difficult to correct. To remedy the wrong, school districts that had been segregated by law had no choice, whether under court supervision or pursuant to voluntary desegregation efforts, but to resort to extraordinary measures including individual student and teacher assignment to schools based on race. See, *e.g., Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 8–10 (1971); see also *Croson*, 488 U. S., at 519 (KENNEDY, J., concurring in part and concurring in judgment) (noting that racial classifications "may be the only adequate remedy after a judicial

determination that a State or its instrumentality has violated the Equal Protection Clause"). So it was, as the dissent observes, see *post*, at 13–14, that Louisville classified children by race in its school assignment and busing plan in the 1970's.

Our cases recognized a fundamental difference between those school districts that had engaged in *de jure* segregation and those whose segregation was the result of other factors. School districts that had engaged in *de jure* segregation had an affirmative constitutional duty to desegregate; those that were *de facto* segregated did not. Compare *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 437–438 (1968), with *Milliken* v. *Bradley*, 418 U. S. 717, 745 (1974). The distinctions between *de jure* and *de facto* segregation extended to the remedies available to governmental units in addition to the courts. For example, in *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 274 (1986), the plurality noted: "This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." The Court's decision in *Croson, supra*, reinforced the difference between the remedies available to redress *de facto* and *de jure* discrimination:

"To accept [a] claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group. The dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Id.*, at 505–506.

From the standpoint of the victim, it is true, an injury stemming from racial prejudice can hurt as much when the demeaning treatment based on race identity stems from bias masked deep within the social order as when it is imposed by law. The distinction between government and private action, furthermore, can be amorphous both as a historical matter and as a matter of present-day finding of fact. Laws arise from a culture and vice versa. Neither can assign to the other all responsibility for persisting injustices.

Yet, like so many other legal categories that can overlap in some instances, the constitutional distinction between *de jure* and *de facto* segregation has been thought to be an important one. It must be conceded its primary function in school cases was to delimit the powers of the Judiciary in the fashioning of remedies. See, *e.g., Milliken, supra,* at 746. The distinction ought not to be altogether disregarded, however, when we come to that most sensitive of all racial issues, an attempt by the government to treat whole classes of persons differently based on the government's systematic classification of each individual by race. There, too, the distinction serves as a limit on the exercise of a power that reaches to the very verge of constitutional authority. Reduction of an individual to an assigned racial identity for differential treatment is among the most pernicious actions our government can undertake. The allocation of governmental burdens and benefits, contentious under any circumstances, is even more divisive when allocations are made on the basis of individual racial classifications. See, *e.g., Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978); *Adarand*, 515 U. S. 200.

Notwithstanding these concerns, allocation of benefits and burdens through individual racial classifications was found sometimes permissible in the context of remedies for *de jure* wrong. Where there has been *de jure* segregation, there is a cognizable legal wrong, and the courts and

legislatures have broad power to remedy it.  The remedy, though, was limited in time and limited to the wrong.  The Court has allowed school districts to remedy their prior *de jure* segregation by classifying individual students based on their race.  See *North Carolina Bd. of Ed.* v. *Swann*, 402 U. S. 43, 45–46 (1971).  The limitation of this power to instances where there has been *de jure* segregation serves to confine the nature, extent, and duration of governmental reliance on individual racial classifications.

The cases here were argued upon the assumption, and come to us on the premise, that the discrimination in question did not result from *de jure* actions.  And when *de facto* discrimination is at issue our tradition has been that the remedial rules are different.  The State must seek alternatives to the classification and differential treatment of individuals by race, at least absent some extraordinary showing not present here.

C

The dissent refers to an opinion filed by Judge Kozinski in one of the cases now before us, and that opinion relied upon an opinion filed by Chief Judge Boudin in a case presenting an issue similar to the one here.  See *post*, at 35 (citing 426 F. 3d 1162, 1193–1196 (CA9 2005) (concurring opinion) (citing *Comfort* v. *Lynn School Comm.*, 418 F. 3d 1, 27–29 (CA1 2005) (Boudin, C. J., concurring))).  Though this may oversimplify the matter a bit, one of the main concerns underlying those opinions was this: If it is legitimate for school authorities to work to avoid racial isolation in their schools, must they do so only by indirection and general policies?  Does the Constitution mandate this inefficient result?  Why may the authorities not recognize the problem in candid fashion and solve it altogether through resort to direct assignments based on student racial classifications?  So, the argument proceeds, if race is the problem, then perhaps race is the solution.

The argument ignores the dangers presented by individual classifications, dangers that are not as pressing when the same ends are achieved by more indirect means. When the government classifies an individual by race, it must first define what it means to be of a race. Who exactly is white and who is nonwhite? To be forced to live under a state-mandated racial label is inconsistent with the dignity of individuals in our society. And it is a label that an individual is powerless to change. Governmental classifications that command people to march in different directions based on racial typologies can cause a new divisiveness. The practice can lead to corrosive discourse, where race serves not as an element of our diverse heritage but instead as a bargaining chip in the political process. On the other hand race-conscious measures that do not rely on differential treatment based on individual classifications present these problems to a lesser degree.

The idea that if race is the problem, race is the instrument with which to solve it cannot be accepted as an analytical leap forward. And if this is a frustrating duality of the Equal Protection Clause it simply reflects the duality of our history and our attempts to promote freedom in a world that sometimes seems set against it. Under our Constitution the individual, child or adult, can find his own identity, can define her own persona, without state intervention that classifies on the basis of his race or the color of her skin.

\*   \*   \*

This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children. A compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue. Likewise, a district may consider it a compelling interest to achieve a diverse student

population.  Race may be one component of that diversity, but other demographic factors, plus special talents and needs, should also be considered.  What the government is not permitted to do, absent a showing of necessity not made here, is to classify every student on the basis of race and to assign each of them to schools based on that classification.  Crude measures of this sort threaten to reduce children to racial chits valued and traded according to one school's supply and another's demand.

That statement, to be sure, invites this response: A sense of stigma may already become the fate of those separated out by circumstances beyond their immediate control.  But to this the replication must be:  Even so, measures other than differential treatment based on racial typing of individuals first must be exhausted.

The decision today should not prevent school districts from continuing the important work of bringing together students of different racial, ethnic, and economic backgrounds.  Due to a variety of factors—some influenced by government, some not—neighborhoods in our communities do not reflect the diversity of our Nation as a whole.  Those entrusted with directing our public schools can bring to bear the creativity of experts, parents, administrators, and other concerned citizens to find a way to achieve the compelling interests they face without resorting to widespread governmental allocation of benefits and burdens on the basis of racial classifications.

With this explanation I concur in the judgment of the Court.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 05–908 and 05–915

_____

PARENTS INVOLVED IN COMMUNITY
SCHOOLS, PETITIONER

05–908                 *v.*

SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

CRYSTAL D. MEREDITH, CUSTODIAL PARENT AND NEXT
FRIEND OF JOSHUA RYAN McDONALD, PETITIONER

05–915                 *v.*

JEFFERSON COUNTY BOARD OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 28, 2007]

JUSTICE STEVENS, dissenting.

While I join JUSTICE BREYER's eloquent and unanswerable dissent in its entirety, it is appropriate to add these words.

There is a cruel irony in THE CHIEF JUSTICE's reliance on our decision in *Brown* v. *Board of Education,* 349 U. S. 294 (1955). The first sentence in the concluding paragraph of his opinion states: "Before *Brown,* schoolchildren were told where they could and could not go to school based on the color of their skin." *Ante,* at 40. This sentence reminds me of Anatole France's observation: "[T]he majestic equality of the la[w], forbid[s] rich and poor alike to sleep under bridges, to beg in the streets, and to steal

their bread."[1]  THE CHIEF JUSTICE fails to note that it was
only black schoolchildren who were so ordered; indeed, the
history books do not tell stories of white children strug-
gling to attend black schools.[2]  In this and other ways, THE
CHIEF JUSTICE rewrites the history of one of this Court's
most important decisions.  Compare *ante,* at 39 ("history
will be heard"), with *Brewer* v. *Quarterman,* 550 U. S. ___,
___ (2007) (slip op., at 11) (ROBERTS, C. J., dissenting) ("It
is a familiar adage that history is written by the victors").

  THE CHIEF JUSTICE rejects the conclusion that the racial
classifications at issue here should be viewed differently
than others, because they do not impose burdens on one
race alone and do not stigmatize or exclude.[3]  The only
justification for refusing to acknowledge the obvious im-

––––––––––

[1] Le Lys Rouge (The Red Lily) 95 (W. Stephens transl. 6th ed. 1922).

[2] See, *e.g.*, J. Wilkinson, From *Brown* to *Bakke* 11 (1979) ("Everyone
understands that *Brown* v. *Board of Education* helped deliver the
Negro from over three centuries of legal bondage"); Black, The Lawful-
ness of the Segregation Decisions, 69 Yale L. J. 421, 424–425 ("History,
too, tells us that segregation was imposed on one race by the other race;
consent was not invited or required.  Segregation in the South grew up
and is kept going because and only because the white race has wanted
it that way—an incontrovertible fact which itself hardly consorts with
equality").

[3] I have long adhered to the view that a decision to exclude a member
of a minority because of his race is fundamentally different from a
decision to include a member of a minority for that reason.  See, *e.g.*,
*Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 243, 248, n. 6 (1995)
(STEVENS, J., dissenting); *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267,
316 (1986) (same).  This distinction is critically important in the context
of education.  While the focus of our opinions is often on the benefits
that minority schoolchildren receive from an integrated education, see,
*e.g.*, *ante*, at 15 (THOMAS, J., concurring), children of *all* races benefit
from integrated classrooms and playgrounds, see *Wygant*, 476 U. S., at
316 ("[T]he fact that persons of different races do, indeed, have differ-
ently colored skin, may give rise to a belief that there is some signifi-
cant difference between such persons.  The inclusion of minority teach-
ers in the educational process inevitably tends to dispel that illusion
whereas their exclusion could only tend to foster it").

portance of that difference is the citation of a few recent opinions—none of which even approached unanimity— grandly proclaiming that all racial classifications must be analyzed under "strict scrutiny." See, *e.g., Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995). Even today, two of our wisest federal judges have rejected such a wooden reading of the Equal Protection Clause in the context of school integration. See 426 F. 3d 1162, 1193– 1196 (CA9 2005) (Kozinski, J., concurring); *Comfort* v. *Lynn School Comm.,* 418 F. 3d 1, 27–29 (CA1 2005) (Boudin, C. J., concurring). The Court's misuse of the three-tiered approach to Equal Protection analysis merely reconfirms my own view that there is only one such Clause in the Constitution. See *Craig* v. *Boren,* 429 U. S. 190, 211 (1976) (concurring opinion).[4]

If we look at cases decided during the interim between *Brown* and *Adarand,* we can see how a rigid adherence to tiers of scrutiny obscures *Brown*'s clear message. Perhaps the best example is provided by our approval of the decision of the Supreme Judicial Court of Massachusetts in 1967 upholding a state statute mandating racial integration in that State's school system. See *School Comm. of*

―――――――

[4] THE CHIEF JUSTICE twice cites my dissent in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980). See *ante*, at 12, 23. In that case, I stressed the importance of confining a remedy for *past* wrongdoing to the members of the injured class. See 448 U. S., at 539. The present cases, unlike *Fullilove* but like our decision in *Wygant*, 476 U. S. 267, require us to "ask whether the Board[s'] actions[s] advanc[e] the public interest in educating children for the *future*," *id*., at 313 (STEVENS, J., dissenting) (emphasis added). See *ibid*. ("In my opinion, it is not necessary to find that the Board of Education has been guilty of racial discrimination in the past to support the conclusion that it has a legitimate interest in employing more black teachers in the future"). See also *Adarand,* 515 U. S., at 261–262 (1995) (STEVENS, J., dissenting) ("This program, then, if in part a remedy for past discrimination, is most importantly a forward-looking response to practical problems faced by minority subcontractors").

*Boston* v. *Board of Education,* 352 Mass. 693, 227 N. E. 2d 729.[5]  Rejecting arguments comparable to those that the plurality accepts today,[6] that court noted: "It would be the height of irony if the racial imbalance act, enacted as it was with the laudable purpose of achieving equal educational opportunities, should, by prescribing school pupil allocations based on race, founder on unsuspected shoals in the Fourteenth Amendment."  *Id.,* at 698, 227 N. E. 2d, at 733 (footnote omitted).

Invoking our mandatory appellate jurisdiction,[7] the

———————

[5] THE CHIEF JUSTICE states that the Massachusetts racial imbalance Act did not require express classifications.  See *ante*, at 31-32, n. 16. This is incorrect.  The Massachusetts Supreme Judicial Court expressly stated:

"The racial imbalance act requires the school committee of every municipality annually to submit statistics showing the percentage of nonwhite pupils in all public schools and in each school.  Whenever the board finds that racial imbalance exists in a public school, it shall give written notice to the appropriate school committee, which shall prepare a plan to eliminate imbalance and file a copy with the board.  The term "racial imbalance" refers to a ratio between nonwhite and other students in public schools which is sharply out of balance with the racial composition of the society in which nonwhite children study, serve and work.  For the purpose of this section, racial imbalance shall be deemed to exist when the per cent of nonwhite students in any public school is in excess of fifty per cent of the total number of students in such school.'"  352 Mass., at 695, 227 N. E. 2d, at 731.

[6] Compare *ante*, at 39 ("It was not the inequality of the facilities but the fact of legally separating children on the basis of race on which the Court relied to find a constitutional violation in 1954"), with Juris. Statement in *School Comm. of Boston* v. *Board of Education,* O. T. 1967, No. 67–759, p. 11 ("It is implicit in *Brown* v. *Board of Education of Topeka,* 347 U. S. 483, that color or race is a constitutionally impermissible standard for the assignment of school children to public schools.  We construe *Brown* as endorsing Mr. Justice Harlan's classical statement in *Plessy* v. *Ferguson,* 163 U. S. 537, 539: 'Our constitution is color-blind, and neither knows nor tolerates classes among citizens' ").

[7] In 1968 our mandatory jurisdiction was defined by the provision of the 1948 Judicial Code then codified at 28 U. S. C. §1257, see 62 Stat. 929; that provision was repealed in 1988, see 102 Stat. 662.

Boston plaintiffs prosecuted an appeal in this Court. Our ruling on the merits simply stated that the appeal was "dismissed for want of a substantial federal question." *School Comm. of Boston* v. *Board of Education,* 389 U. S. 572 (1968) *(per curiam).* That decision not only expressed our appraisal of the merits of the appeal, but it constitutes a precedent that the Court overrules today. The subsequent statements by the unanimous Court in *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1, 16 (1971), by then-Justice Rehnquist in chambers in *Bustop, Inc.* v. *Los Angeles Bd. of Ed.,* 439 U. S. 1380, 1383 (1978), and by the host of state court decisions cited by JUSTICE BREYER, see *post,* 25–27,[8] were fully consistent with that disposition. Unlike today's decision, they were also entirely loyal to *Brown.*

The Court has changed significantly since it decided *School Comm. of Boston* in 1968. It was then more faithful to *Brown* and more respectful of our precedent than it

---

[8] For example, prior to our decision in *School Comm. of Boston,* the Illinois Supreme Court had issued an unpublished opinion holding unconstitutional a similar statute aimed at eliminating racial imbalance in public schools. See Juris. Statement in *School Comm. of Boston* v. *Board of Education,* O. T. 1967, No. 67–759, at 9 ("Unlike the Massachusetts Court, the Illinois Supreme Court has recently held its law to eliminate racial imbalance unconstitutional on the ground that it violated the Equal Protection Clause of the Fourteenth Amendment"); *ibid.,* n. 1. However, shortly after we dismissed the Massachusetts suit for want of a substantial federal question, the Illinois Supreme Court reversed course and upheld its statute in the published decision that JUSTICE BREYER extensively quotes in his dissent. See *Tometz* v. *Board of Ed., Waukegan School Dist. No. 6,* 39 Ill. 2d 593, 237 N. E. 2d 498 (1968). In so doing, the Illinois Supreme Court acted in explicit reliance on our decision in *School Comm. of Boston.* See 39 Ill. 2d, at 599–600, 237 N. E. 2d, at 502 ("Too, the United States Supreme Court on January 15, 1968, dismissed an appeal in School Committee of Boston v. Board of Education, (Mass. 1967) 227 N. E. 2d 729, which challenged the statute providing for elimination of racial imbalance in public schools 'for want of a substantial federal question.' 389 U. S. 572").

is today. It is my firm conviction that no Member of the Court that I joined in 1975 would have agreed with today's decision.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 05–908 and 05–915

———

PARENTS INVOLVED IN COMMUNITY
SCHOOLS, PETITIONER

05–908                      *v.*

SEATTLE SCHOOL DISTRICT NO. 1 ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

CRYSTAL D. MEREDITH, CUSTODIAL PARENT AND NEXT
FRIEND OF JOSHUA RYAN McDONALD, PETITIONER

05–915                      *v.*

JEFFERSON COUNTY BOARD OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 28, 2007]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

These cases consider the longstanding efforts of two local school boards to integrate their public schools. The school board plans before us resemble many others adopted in the last 50 years by primary and secondary schools throughout the Nation. All of those plans represent local efforts to bring about the kind of racially integrated education that *Brown* v. *Board of Education*, 347 U. S. 483 (1954), long ago promised—efforts that this Court has repeatedly required, permitted, and encouraged local authorities to undertake. This Court has recognized that the public interests at stake in such cases are "com-

pelling." We have approved of "narrowly tailored" plans that are no less race-conscious than the plans before us. And we have understood that the Constitution *permits* local communities to adopt desegregation plans even where it does not *require* them to do so.

The plurality pays inadequate attention to this law, to past opinions' rationales, their language, and the contexts in which they arise. As a result, it reverses course and reaches the wrong conclusion. In doing so, it distorts precedent, it misapplies the relevant constitutional principles, it announces legal rules that will obstruct efforts by state and local governments to deal effectively with the growing resegregation of public schools, it threatens to substitute for present calm a disruptive round of race-related litigation, and it undermines *Brown*'s promise of integrated primary and secondary education that local communities have sought to make a reality. This cannot be justified in the name of the Equal Protection Clause.

## I

### *Facts*

The historical and factual context in which these cases arise is critical. In *Brown*, this Court held that the government's segregation of schoolchildren by race violates the Constitution's promise of equal protection. The Court emphasized that "education is perhaps the most important function of state and local governments." 347 U. S., at 493. And it thereby set the Nation on a path toward public school integration.

In dozens of subsequent cases, this Court told school districts previously segregated by law what they must do at a minimum to comply with *Brown*'s constitutional holding. The measures required by those cases often included race-conscious practices, such as mandatory busing and race-based restrictions on voluntary transfers. See, *e.g.*, *Columbus Bd. of Ed.* v. *Penick*, 443 U. S. 449,

455, n. 3 (1979); *Davis* v. *Board of School Comm'rs of Mobile Cty.*, 402 U. S. 33, 37–38 (1971); *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 441–442 (1968).

Beyond those minimum requirements, the Court left much of the determination of how to achieve integration to the judgment of local communities. Thus, in respect to race-conscious desegregation measures that the Constitution *permitted,* but did not *require* (measures similar to those at issue here), this Court unanimously stated:

> "School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. *To do this as an educational policy is within the broad discretionary powers of school authorities.*" *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 16 (1971) (emphasis added).

As a result, different districts—some acting under court decree, some acting in order to avoid threatened lawsuits, some seeking to comply with federal administrative orders, some acting purely voluntarily, some acting after federal courts had dissolved earlier orders—adopted, modified, and experimented with hosts of different kinds of plans, including race-conscious plans, all with a similar objective: greater racial integration of public schools. See F. Welch & A. Light, New Evidence on School Desegregation v (1987) (hereinafter Welch) (prepared for the Commission on Civil Rights) (reviewing a sample of 125 school districts, constituting 20% of national public school enrollment, that had experimented with nearly 300 different plans over 18 years). The techniques that different districts have employed range "from voluntary transfer programs to mandatory reassignment." *Id.*, at 21. And the

design of particular plans has been "dictated by both the law and the specific needs of the district." *Ibid.*

Overall these efforts brought about considerable racial integration. More recently, however, progress has stalled. Between 1968 and 1980, the number of black children attending a school where minority children constituted more than half of the school fell from 77% to 63% in the Nation (from 81% to 57% in the South) but then reversed direction by the year 2000, rising from 63% to 72% in the Nation (from 57% to 69% in the South). Similarly, between 1968 and 1980, the number of black children attending schools that were more than 90% minority fell from 64% to 33% in the Nation (from 78% to 23% in the South), but that too reversed direction, rising by the year 2000 from 33% to 37% in the Nation (from 23% to 31% in the South). As of 2002, almost 2.4 million students, or over 5% of all public school enrollment, attended schools with a white population of less than 1%. Of these, 2.3 million were black and Latino students, and only 72,000 were white. Today, more than one in six black children attend a school that is 99–100% minority. See Appendix A, *infra.* In light of the evident risk of a return to school systems that are in fact (though not in law) resegregated, many school districts have felt a need to maintain or to extend their integration efforts.

The upshot is that myriad school districts operating in myriad circumstances have devised myriad plans, often with race-conscious elements, all for the sake of eradicating earlier school segregation, bringing about integration, or preventing retrogression. Seattle and Louisville are two such districts, and the histories of their present plans set forth typical school integration stories.

I describe those histories at length in order to highlight three important features of these cases. First, the school districts' plans serve "compelling interests" and are "narrowly tailored" on any reasonable definition of those

terms. Second, the distinction between *de jure* segregation (caused by school systems) and *de facto* segregation (caused, *e.g.*, by housing patterns or generalized societal discrimination) is meaningless in the present context, thereby dooming the plurality's endeavor to find support for its views in that distinction. Third, real-world efforts to substitute racially diverse for racially segregated schools (however caused) are complex, to the point where the Constitution cannot plausibly be interpreted to rule out categorically all local efforts to use means that are "conscious" of the race of individuals.

In both Seattle and Louisville, the local school districts began with schools that were highly segregated in fact. In both cities plaintiffs filed lawsuits claiming unconstitutional segregation. In Louisville, a federal district court found that school segregation reflected pre-*Brown* state laws separating the races. In Seattle, the plaintiffs alleged that school segregation unconstitutionally reflected not only generalized societal discrimination and residential housing patterns, but also *school board policies and actions* that had helped to create, maintain, and aggravate racial segregation. In Louisville, a federal court entered a remedial decree. In Seattle, the parties settled after the school district pledged to undertake a desegregation plan. In both cities, the school boards adopted plans designed to achieve integration by bringing about more racially diverse schools. In each city the school board modified its plan several times in light of, for example, hostility to busing, the threat of resegregation, and the desirability of introducing greater student choice. And in each city, the school boards' plans have evolved over time in ways that progressively *diminish* the plans' use of explicit race-conscious criteria.

The histories that follow set forth these basic facts. They are based upon numerous sources, which for ease of exposition I have cataloged, along with their correspond-

ing citations, at Appendix B, *infra.*

## A

### *Seattle*

*1. Segregation, 1945 to 1956.* During and just after
World War II, significant numbers of black Americans
began to make Seattle their home. Few black residents
lived outside the central section of the city. Most worked
at unskilled jobs. Although black students made up about
3% of the total Seattle population in the mid-1950's,
nearly all black children attended schools where a major-
ity of the population was minority. Elementary schools in
central Seattle were between 60% and 80% black; Gar-
field, the central district high school, was more than 50%
minority; schools outside the central and southeastern
sections of Seattle were virtually all white.

*2. Preliminary Challenges, 1956 to 1969.* In 1956, a
memo for the Seattle School Board reported that school
segregation reflected not only segregated housing patterns
but also school board policies that permitted white stu-
dents to transfer out of black schools while restricting the
transfer of black students into white schools. In 1958,
black parents whose children attended Harrison Elemen-
tary School (with a black student population of over 75%)
wrote the Seattle board, complaining that the "'boundaries
for the Harrison Elementary School were not set in accor-
dance with the long-established standards of the School
District . . . but were arbitrarily set with an end to exclud-
ing colored children from McGilvra School, which is adja-
cent to the Harrison school district.'"

In 1963, at the insistence of the National Association for
the Advancement of Colored People (NAACP) and other
community groups, the school board adopted a new race-
based transfer policy. The new policy added an explicitly
racial criterion: If a place exists in a school, then, irrespec-
tive of other transfer criteria, a white student may trans-

fer to a predominantly black school, and a black student may transfer to a predominantly white school.

At that time one high school, Garfield, was about two-thirds minority; eight high schools were virtually all white. In 1963, the transfer program's first year, 239 black students and 8 white students transferred. In 1969, about 2,200 (of 10,383 total) of the district's black students and about 400 of the district's white students took advantage of the plan. For the next decade, annual program transfers remained at approximately this level.

*3. The NAACP's First Legal Challenge and Seattle's Response, 1969 to 1977.* In 1969 the NAACP filed a federal lawsuit against the school board, claiming that the board had "unlawfully and unconstitutionally" "establish[ed]" and "maintain[ed]" a system of "racially segregated public schools." The complaint said that 77% of black public elementary school students in Seattle attended 9 of the city's 86 elementary schools and that 23 of the remaining schools had no black students at all. Similarly, of the 1,461 black students enrolled in the 12 senior high schools in Seattle, 1,151 (or 78.8%) attended 3 senior high schools, and 900 (61.6%) attended a single school, Garfield.

The complaint charged that the school board had brought about this segregated system in part by "mak[ing] and enforc[ing]" certain "rules and regulations," in part by "drawing . . . boundary lines" and "executing school attendance policies" that would create and maintain "predominantly Negro or non-white schools," and in part by building schools "in such a manner as to restrict the Negro plaintiffs and the class they represent to predominantly negro or non-white schools." The complaint also charged that the board discriminated in assigning teachers.

The board responded to the lawsuit by introducing a plan that required race-based transfers and mandatory busing. The plan created three new middle schools at

three school buildings in the predominantly white north end. It then created a "mixed" student body by assigning to those schools students who would otherwise attend predominantly white, or predominantly black, schools elsewhere. It used explicitly racial criteria in making these assignments (*i.e.*, it deliberately assigned to the new middle schools black students, not white students, from the black schools and white students, not black students, from the white schools). And it used busing to transport the students to their new assignments. The plan provoked considerable local opposition. Opponents brought a lawsuit. But eventually a state court found that the mandatory busing was lawful.

In 1976–1977, the plan involved the busing of about 500 middle school students (300 black students and 200 white students). Another 1,200 black students and 400 white students participated in the previously adopted voluntary transfer program. Thus about 2,000 students out of a total district population of about 60,000 students were involved in one or the other transfer program. At that time, about 20% or 12,000 of the district's students were black. And the board continued to describe 26 of its 112 schools as "segregated."

*4. The NAACP's Second Legal Challenge, 1977.* In 1977, the NAACP filed another legal complaint, this time with the federal Department of Health, Education, and Welfare's Office for Civil Rights (OCR). The complaint alleged that the Seattle School Board had created or perpetuated unlawful racial segregation through, *e.g.*, certain school-transfer criteria, a construction program that needlessly built new schools in white areas, district line-drawing criteria, the maintenance of inferior facilities at black schools, the use of explicit racial criteria in the assignment of teachers and other staff, and a general pattern of delay in respect to the implementation of promised desegregation efforts.

The OCR and the school board entered into a formal settlement agreement. The agreement required the board to implement what became known as the "Seattle Plan."

*5. The Seattle Plan: Mandatory Busing, 1978 to 1988.* The board began to implement the Seattle Plan in 1978. This plan labeled "racially imbalanced" any school at which the percentage of black students exceeded by more than 20% the minority population of the school district as a whole. It applied that label to 26 schools, including 4 high schools—Cleveland (72.8% minority), Franklin (76.6% minority), Garfield (78.4% minority), and Rainier Beach (58.9% minority). The plan paired (or "triaded") "imbalanced" black schools with "imbalanced" white schools. It then placed some grades (say, third and fourth grades) at one school building and other grades (say, fifth and sixth grades) at the other school building. And it thereby required, for example, all fourth grade students from the previously black and previously white schools first to attend together what would now be a "mixed" fourth grade at one of the school buildings and then the next year to attend what would now be a "mixed" fifth grade at the other school building.

At the same time, the plan provided that a previous "black" school would remain about 50% black, while a previous "white" school would remain about two-thirds white. It was consequently necessary to decide with some care *which* students would attend the new "mixed" grade. For this purpose, administrators cataloged the racial makeup of each neighborhood housing block. The school district met its percentage goals by assigning to the new "mixed" school an appropriate number of "black" housing blocks and "white" housing blocks. At the same time, transport from house to school involved extensive busing, with about half of all students attending a school other than the one closest to their home.

The Seattle Plan achieved the school integration that it

sought. Just prior to the plan's implementation, for example, 4 of Seattle's 11 high schools were "imbalanced," *i.e.*, almost exclusively "black" or almost exclusively "white." By 1979, only two were out of "balance." By 1980 only Cleveland remained out of "balance" (as the board defined it) and that by a mere two students.

Nonetheless, the Seattle Plan, due to its busing, provoked serious opposition within the State. See generally *Washington* v. *Seattle School Dist. No. 1*, 458 U. S. 457, 461–466 (1982). Thus, Washington state voters enacted an initiative that amended state law to require students to be assigned to the schools closest to their homes. *Id.*, at 462. The Seattle School Board challenged the constitutionality of the initiative. *Id.*, at 464. This Court then held that the initiative—which would have prevented the Seattle Plan from taking effect—violated the Fourteenth Amendment. *Id.*, at 470.

*6. Student Choice, 1988 to 1998.* By 1988, many white families had left the school district, and many Asian families had moved in. The public school population had fallen from about 100,000 to less than 50,000. The racial makeup of the school population amounted to 43% white, 24% black, and 23% Asian or Pacific Islander, with Hispanics and Native Americans making up the rest. The cost of busing, the harm that members of all racial communities feared that the Seattle Plan caused, the desire to attract white families back to the public schools, and the interest in providing greater school choice led the board to abandon busing and to substitute a new student assignment policy that resembles the plan now before us.

The new plan permitted each student to choose the school he or she wished to attend, subject to race-based constraints. In respect to high schools, for example, a student was given a list of a subset of schools, carefully selected by the board to balance racial distribution in the district by including neighborhood schools and schools in

racially different neighborhoods elsewhere in the city. The student could then choose among those schools, indicating a first choice, and other choices the student found acceptable. In making an assignment to a particular high school, the district would give first preference to a student with a sibling already at the school. It gave second preference to a student whose race differed from a race that was "over-represented" at the school (*i.e.,* a race that accounted for a higher percentage of the school population than of the total district population). It gave third preference to students residing in the neighborhood. It gave fourth preference to students who received child care in the neighborhood. In a typical year, say, 1995, about 20,000 potential high school students participated. About 68% received their first choice. Another 16% received an "acceptable" choice. A further 16% were assigned to a school they had not listed.

*7. The Current Plan, 1999 to the Present.* In 1996, the school board adopted the present plan, which began in 1999. In doing so, it sought to deemphasize the use of racial criteria and to increase the likelihood that a student would receive an assignment at his first or second choice high school. The district retained a racial tiebreaker for oversubscribed schools, which takes effect only if the school's minority or majority enrollment falls outside of a 30% range centered on the minority/majority population ratio within the district. At the same time, all students were free subsequently to transfer from the school at which they were initially placed to a different school of their choice without regard to race. Thus, at worst, a student would have to spend one year at a high school he did not pick as a first or second choice.

The new plan worked roughly as expected for the two school years during which it was in effect (1999–2000 and 2000–2001). In the 2000–2001 school year, for example, with the racial tiebreaker, the entering ninth grade class

at Franklin High School had a 60% minority population;
without the racial tiebreaker that same class at Franklin
would have had an almost 80% minority population. (We
consider only the ninth grade since only students entering
that class were subject to the tiebreaker, and because the
plan was not in place long enough to change the composi-
tion of an entire school.)  In the year 2005–2006, by which
time the racial tiebreaker had not been used for several
years, Franklin's overall minority enrollment had risen to
90%.  During the period the tiebreaker applied, it typically
affected about 300 students per year.  Between 80% and
90% of all students received their first choice assignment;
between 89% and 97% received their first or second choice
assignment.

Petitioner Parents Involved in Community Schools
objected to Seattle's most recent plan under the State and
Federal Constitutions.  In due course, the Washington
Supreme Court, the Federal District Court, and the Court
of Appeals for the Ninth Circuit (sitting en banc) rejected
the challenge and found Seattle's plan lawful.

## B

### *Louisville*

*1. Before the Lawsuit, 1954 to 1972.*  In 1956, two years
after *Brown* made clear that Kentucky could no longer
require racial segregation by law, the Louisville Board of
Education created a geography-based student assignment
plan designed to help achieve school integration.  At the
same time it adopted an open transfer policy under which
approximately 3,000 of Louisville's 46,000 students ap-
plied for transfer.  By 1972, however, the Louisville School
District remained highly segregated.  Approximately half
the district's public school enrollment was black; about
half was white.  Fourteen of the district's nineteen non-
vocational middle and high schools were close to totally
black or totally white.  Nineteen of the district's forty-six

elementary schools were between 80% and 100% black. Twenty-one elementary schools were between roughly 90% and 100% white.

*2. Court-Imposed Guidelines and Busing, 1972 to 1991.* In 1972, civil rights groups and parents, claiming unconstitutional segregation, sued the Louisville Board of Education in federal court. The original litigation eventually became a lawsuit against the Jefferson County School System, which in April 1975 absorbed Louisville's schools and combined them with those of the surrounding suburbs. (For ease of exposition, I shall still use "Louisville" to refer to what is now the combined districts.) After preliminary rulings and an eventual victory for the plaintiffs in the Court of Appeals for the Sixth Circuit, the District Court in July 1975 entered an order requiring desegregation.

The order's requirements reflected a (newly enlarged) school district student population of about 135,000, approximately 20% of whom were black. The order required the school board to create and to maintain schools with student populations that ranged, for elementary schools, between 12% and 40% black, and for secondary schools (with one exception), between 12.5% and 35% black.

The District Court also adopted a complex desegregation plan designed to achieve the order's targets. The plan required redrawing school attendance zones, closing 12 schools, and busing groups of students, selected by race and the first letter of their last names, to schools outside their immediate neighborhoods. The plan's initial busing requirements were extensive, involving the busing of 23,000 students and a transportation fleet that had to "operate from early in the morning until late in the evening." For typical students, the plan meant busing for several years (several more years for typical black students than for typical white students). The following notice, published in a Louisville newspaper in 1976, gives

a sense of how the district's race-based busing plan operated in practice:

## How to tell when your child will be bused...unless

| If child's last name begins with letters: | White child will be bused in grades: | Black child will be bused in grades: |
|---|---|---|
| A, B, F, Q | 11, 12 | 2, 3, 5, 6, 7, 8, 9, 10, 11, 12 |
| G, H, L | 2, 7 | 2, 3, 4, 6, 7, 8, 9, 10, 11, 12 |
| C, P, R, X | 3, 8 | 2, 3, 4, 5, 6, 7, 8 |
| M, O, T, U, V, Y | 4, 9 | 2, 3, 4, 5, 9, 10, 11, 12 |
| D, E, N, W, Z | 5, 10 | 2, 4, 5, 6, 7, 8, 9, 10, 11, 12 |
| I, J, K, S | 6 | 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 |

Exempted students:

✔ Kindergarten students

✔ First graders

✔ Students in special schools, primarily for the emotionally or or physically handicapped

✔ Students attending schools exempted under the plan

✔ Some students with specific handicaps

Source: Louisville Courier-Journal, June 18, 1976

Louisville Courier Journal, June 18, 1976 (reproduced in J. Wilkinson, From *Brown* to *Bakke:* The Supreme Court and School Integration 1954–1978, p. 176 (1979)).

The District Court monitored implementation of the plan. In 1978, it found that the plan had brought all of Louisville's schools within its "'guidelines' for racial composition" for "at least a substantial portion of the [previous] three years." It removed the case from its active docket while stating that it expected the board "to continue to implement those portions of the desegregation order which are by their nature of a continuing effect."

By 1984, after several schools had fallen out of compliance with the order's racial percentages due to shifting demographics in the community, the school board revised its desegregation plan. In doing so, the board created a new racial "guideline," namely a "floating range of 10% above and 10% below the countywide average for the different grade levels." The board simultaneously redrew district boundaries so that middle school students could

attend the same school for three years and high school students for four years. It added "magnet" programs at two high schools. And it adjusted its alphabet-based system for grouping and busing students. The board estimated that its new plan would lead to annual reassignment (with busing) of about 8,500 black students and about 8,000 white students.

*3. Student Choice and Project Renaissance, 1991 to 1996.* By 1991, the board had concluded that assigning elementary school students to two or more schools during their elementary school years had proved educationally unsound and, if continued, would undermine Kentucky's newly adopted Education Reform Act. It consequently conducted a nearly year-long review of its plan. In doing so, it consulted widely with parents and other members of the local community, using public presentations, public meetings, and various other methods to obtain the public's input. At the conclusion of this review, the board adopted a new plan, called "Project Renaissance," that emphasized student choice.

Project Renaissance again revised the board's racial guidelines. It provided that each elementary school would have a black student population of between 15% and 50%; each middle and high school would have a black population and a white population that fell within a range, the boundaries of which were set at 15% above and 15% below the general student population percentages in the county at that grade level. The plan then drew new geographical school assignment zones designed to satisfy these guidelines; the district could reassign students if particular schools failed to meet the guidelines and was required to do so if a school repeatedly missed these targets.

In respect to elementary schools, the plan first drew a neighborhood line around each elementary school, and it then drew a second line around groups of elementary schools (called "clusters"). It initially assigned each stu-

dent to his or her neighborhood school, but it permitted
each student freely to transfer between elementary schools
within each cluster *provided that* the transferring student
(a) was black if transferring from a predominantly black
school to a predominantly white school, or (b) was white if
transferring from a predominantly white school to a pre-
dominantly black school. Students could also apply to
attend magnet elementary schools or programs.

The plan required each middle school student to be
assigned to his or her neighborhood school unless the
student applied for, and was accepted by, a magnet middle
school. The plan provided for "open" high school enroll-
ment. Every 9th or 10th grader could apply to any high
school in the system, and the high school would accept
applicants according to set criteria—one of which con-
sisted of the need to attain or remain in compliance with
the plan's racial guidelines. Finally, the plan created two
new magnet schools, one each at the elementary and
middle school levels.

*4. The Current Plan: Project Renaissance Modified,
1996 to 2003.* In 1995 and 1996, the Louisville School
Board, with the help of a special "Planning Team," com-
munity meetings, and other official and unofficial study
groups, monitored the effects of Project Renaissance and
considered proposals for improvement. Consequently, in
1996, the board modified Project Renaissance, thereby
creating the present plan.

At the time, the district's public school population was
approximately 30% black. The plan consequently redrew
the racial "guidelines," setting the boundaries at 15% to
50% black for *all* schools. It again redrew school assign-
ment boundaries. And it expanded the transfer opportuni-
ties available to elementary and middle school pupils. The
plan forbade transfers, however, if the transfer would lead
to a school population outside the guideline range, *i.e.*, if it
would create a school where fewer than 15% or more than

50% of the students were black.

The plan also established "Parent Assistance Centers" to help parents and students navigate the school selection and assignment process. It pledged the use of other resources in order to "encourage all schools to achieve an African-American enrollment equivalent to the average district-wide African-American enrollment at the school's respective elementary, middle or high school level." And the plan continued use of magnet schools.

In 1999, several parents brought a lawsuit in federal court attacking the plan's use of racial guidelines at one of the district's magnet schools. They asked the court to dissolve the desegregation order and to hold the use of *magnet* school racial guidelines unconstitutional. The board opposed dissolution, arguing that "the old dual system" had left a "demographic imbalance" that "prevent[ed] dissolution." In 2000, after reviewing the present plan, the District Court dissolved the 1975 order. It wrote that there was "overwhelming evidence of the Board's good faith compliance with the desegregation Decree and its underlying purposes." It added that the Louisville School Board had "treated the ideal of an integrated system as much more than a legal obligation—they consider it a positive, desirable policy and an essential element of any well-rounded public school education."

The Court also found that the magnet programs available at the high school in question were "not available at other high schools" in the school district. It consequently held unconstitutional the use of race-based "targets" to govern admission to *magnet schools*. And it ordered the board not to control access to those scarce programs through the use of racial targets.

*5. The Current Lawsuit, 2003 to the Present.* Subsequent to the District Court's dissolution of the desegregation order (in 2000) the board simply continued to implement its 1996 plan as modified to reflect the court's

magnet school determination. In 2003, the petitioner now before us, Crystal Meredith, brought this lawsuit challenging the plan's unmodified portions, *i.e.*, those portions that dealt with *ordinary*, not magnet, schools. Both the District Court and the Court of Appeals for the Sixth Circuit rejected Meredith's challenge and held the unmodified aspects of the plan constitutional.

C

The histories I have set forth describe the extensive and ongoing efforts of two school districts to bring about greater racial integration of their public schools. In both cases the efforts were in part remedial. Louisville began its integration efforts in earnest when a federal court in 1975 entered a school desegregation order. Seattle undertook its integration efforts in response to the filing of a federal lawsuit and as a result of its settlement of a segregation complaint filed with the federal OCR.

The plans in both Louisville and Seattle grow out of these earlier remedial efforts. Both districts faced problems that reflected initial periods of severe racial segregation, followed by such remedial efforts as busing, followed by evidence of resegregation, followed by a need to end busing and encourage the return of, *e.g.*, suburban students through increased student choice. When formulating the plans under review, both districts drew upon their considerable experience with earlier plans, having revised their policies periodically in light of that experience. Both districts rethought their methods over time and explored a wide range of other means, including non-race-conscious policies. Both districts also considered elaborate studies and consulted widely within their communities.

Both districts sought greater racial integration for educational and democratic, as well as for remedial, reasons. Both sought to achieve these objectives while preserving their commitment to other educational goals, *e.g.*,

districtwide commitment to high quality public schools, increased pupil assignment to neighborhood schools, diminished use of busing, greater student choice, reduced risk of white flight, and so forth. Consequently, the present plans expand student choice; they limit the burdens (including busing) that earlier plans had imposed upon students and their families; and they use race-conscious criteria in limited and gradually diminishing ways. In particular, they use race-conscious criteria only to mark the outer bounds of broad population-related ranges.

The histories also make clear the futility of looking simply to whether earlier school segregation was *de jure* or *de facto* in order to draw firm lines separating the constitutionally permissible from the constitutionally forbidden use of "race-conscious" criteria. JUSTICE THOMAS suggests that it will be easy to identify *de jure* segregation because "[i]n most cases, there either will or will not have been a state constitutional amendment, state statute, local ordinance, or local administrative policy explicitly requiring separation of the races." *Ante*, at 6, n. 4 (concurring opinion). But our precedent has recognized that *de jure* discrimination can be present even in the absence of racially explicit laws. See *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373–374 (1886).

No one here disputes that Louisville's segregation was *de jure*. But what about Seattle's? Was it *de facto? De jure?* A mixture? Opinions differed. Or is it that a prior federal court had not adjudicated the matter? Does that make a difference? Is Seattle free on remand to say that its schools were *de jure* segregated, just as in 1956 a memo for the School Board admitted? The plurality does not seem confident as to the answer. Compare *ante*, at 12 (opinion of the Court) ("[T]he Seattle public schools *have never shown* that they were ever segregated by law" (emphasis added)), with *ante* at 29–30 (plurality opinion) (assuming "the Seattle school district was never segre-

gated by law," but seeming to concede that a school district with *de jure* segregation need not be subject to a court order to be allowed to engage in race-based remedial measures).

A court finding of *de jure* segregation cannot be the crucial variable. After all, a number of school districts in the South that the Government or private plaintiffs challenged as segregated *by law* voluntarily desegregated their schools *without a court order*—just as Seattle did. See, *e.g.*, Coleman, Desegregation of the Public Schools in Kentucky—The Second Year After the Supreme Court's Decision, 25 J. Negro Educ. 254, 256, 261 (1956) (40 of Kentucky's 180 school districts began desegregation without court orders); Branton, Little Rock Revisited: Desegregation to Resegregation, 52 J. Negro Educ. 250, 251 (1983) (similar in Arkansas); Bullock & Rodgers, Coercion to Compliance: Southern School Districts and School Desegregation Guidelines, 38 J. Politics 987, 991 (1976) (similar in Georgia); *McDaniel* v. *Barresi*, 402 U. S. 39, 40, n. 1 (1971) (Clarke County, Georgia). See also Letter from Robert F. Kennedy, Attorney General, to John F. Kennedy, President (Jan. 24, 1963) (hereinafter Kennedy Report), available at http://www.gilderlehrman.org/search/collection_pdfs/05/63/0/05630.pdf (all Internet materials as visited June 26, 2007, and available in Clerk of Court's case file) (reporting successful efforts by the Government to induce voluntary desegregation).

Moreover, Louisville's history makes clear that a community under a court order to desegregate might submit a race-conscious remedial plan *before* the court dissolved the order, but with every intention of following that plan even *after* dissolution. How could such a plan be lawful the day before dissolution but then become unlawful the very next day? On what legal ground can the majority rest its contrary view? But see *ante*, at 12–13, 17, n. 12.

Are courts really to treat as merely *de facto* segregated those school districts that avoided a federal order by voluntarily complying with *Brown*'s requirements? See *id.*, at 12, 29–30. This Court has previously done just the opposite, permitting a race-conscious remedy without any kind of court decree. See *McDaniel*, *supra*, at 41. Because the Constitution emphatically does not forbid the use of race-conscious measures by districts in the South that voluntarily desegregated their schools, on what basis does the plurality claim that the law forbids Seattle to do the same? But see *ante*, at 29.

The histories also indicate the complexity of the tasks and the practical difficulties that local school boards face when they seek to achieve greater racial integration. The boards work in communities where demographic patterns change, where they must meet traditional learning goals, where they must attract and retain effective teachers, where they should (and will) take account of parents' views and maintain *their* commitment to public school education, where they must adapt to court intervention, where they must encourage voluntary student and parent action—where they will find that their own good faith, their knowledge, and their understanding of local circumstances are always necessary but often insufficient to solve the problems at hand.

These facts and circumstances help explain why in this context, as to means, the law often leaves legislatures, city councils, school boards, and voters with a broad range of choice, thereby giving "different communities" the opportunity to "try different solutions to common problems and gravitate toward those that prove most successful or seem to them best to suit their individual needs." *Comfort* v. *Lynn School Comm.*, 418 F. 3d 1, 28 (CA1 2005) (Boudin, C. J., concurring) (citing *United States* v. *Lopez*, 514 U. S. 549, 581 (1995) (KENNEDY, J., concurring)), cert. denied, 546 U. S. 1061 (2005).

With this factual background in mind, I turn to the legal question: Does the United States Constitution prohibit these school boards from using race-conscious criteria in the limited ways at issue here?

## II

### *The Legal Standard*

A longstanding and unbroken line of legal authority tells us that the Equal Protection Clause permits local school boards to use race-conscious criteria to achieve positive race-related goals, even when the Constitution does not compel it. Because of its importance, I shall repeat what this Court said about the matter in *Swann.* Chief Justice Burger, on behalf of a unanimous Court in a case of exceptional importance, wrote:

> "School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities." 402 U. S., at 16.

The statement was not a technical holding in the case. But the Court set forth in *Swann* a basic principle of constitutional law—a principle of law that has found "wide acceptance in the legal culture." *Dickerson* v. *United States*, 530 U. S. 428, 443 (2000) (internal quotation marks omitted); *Mitchell* v. *United States*, 526 U. S. 314, 330 (1999); *id.*, at 331, 332 (SCALIA, J., dissenting) (citing "'wide acceptance in the legal culture'" as "adequate reason not to overrule" prior cases).

Thus, in *North Carolina Bd. of Ed.* v. *Swann*, 402 U. S. 43, 45 (1971), this Court, citing *Swann,* restated the point. "[S]chool authorities," the Court said, "have wide discre-

tion in formulating school policy, and . . . as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements."  Then-Justice Rehnquist echoed this view in *Bustop, Inc.* v. *Los Angeles Bd. of Ed.*, 439 U. S. 1380, 1383 (1978) (opinion in chambers), making clear that he too believed that *Swann*'s statement reflected settled law: "While I have the gravest doubts that [a state supreme court] was *required* by the United States Constitution to take the [desegregation] action that it has taken in this case, I have very little doubt that it was *permitted* by that Constitution to take such action."  (Emphasis in original.)

These statements nowhere suggest that this freedom is limited to school districts where court-ordered desegregation measures are also in effect.  Indeed, in *McDaniel*, a case decided the same day as *Swann*, a group of parents challenged a race-conscious student assignment plan that the Clarke County School Board had *voluntarily* adopted as a remedy without a court order (though under federal agency pressure—pressure Seattle also encountered).  The plan required that each elementary school in the district maintain 20% to 40% enrollment of African-American students, corresponding to the racial composition of the district.  See *Barresi* v. *Browne*, 226 Ga. 456, 456–459, 175 S. E. 2d 649, 650–651 (1970).  This Court upheld the plan, see *McDaniel*, 402 U. S., at 41, rejecting the parents' argument that "a person may not be *included* or *excluded* solely because he is a Negro or because he is white."  Brief for Respondents in *McDaniel*, O. T. 1970, No. 420, p. 25.

Federal authorities had claimed—as the NAACP and the OCR did in Seattle—that Clarke County schools were segregated in law, not just in fact.  The plurality's claim that Seattle was "never segregated by law" is simply not accurate.  Compare *ante*, at 29, with *supra*, at 6–9.  The plurality could validly claim that *no court* ever found that

Seattle schools were segregated in law. But that is also true of the Clarke County schools in *McDaniel.* Unless we believe that the Constitution enforces one legal standard for the South and another for the North, this Court should grant Seattle the permission it granted Clarke County, Georgia. See *McDaniel*, 402 U. S., at 41 ("[S]teps will almost invariably require that students be assigned 'differently because of their race.' . . . Any other approach would freeze the status quo that is the very target of all desegregation processes.").

This Court has also held that school districts may be required by federal statute to undertake race-conscious desegregation efforts even when there is no likelihood that *de jure* segregation can be shown. In *Board of Ed. of City School Dist. of New York* v. *Harris*, 444 U. S. 130, 148–149 (1979), the Court concluded that a federal statute required school districts receiving certain federal funds to remedy faculty segregation, even though in this Court's view the racial disparities in the affected schools were purely *de facto* and would not have been actionable under the Equal Protection Clause. Not even the dissenters thought the race-conscious remedial program posed a *constitutional* problem. See *id.*, at 152 (opinion of Stewart, J.). See also, *e.g.*, *Crawford* v. *Board of Ed. of Los Angeles*, 458 U. S. 527, 535–536 (1982) ("[S]tate courts of California continue to have an obligation under state law to order segregated school districts to use voluntary desegregation techniques, *whether or not there has been a finding of intentional segregation.* . . . [S]chool districts themselves retain a state-law obligation to take reasonably feasible steps to desegregate, and *they remain free to adopt reassignment and busing plans to effectuate desegregation*" (emphasis added)); *School Comm. of Boston* v. *Board of Education*, 389 U. S. 572 (1968) *(per curiam)* (dismissing for want of a federal question a challenge to a voluntary statewide integration plan using express racial criteria).

Lower state and federal courts had considered the matter settled and uncontroversial even before this Court decided *Swann*. Indeed, in 1968, the Illinois Supreme Court rejected an equal protection challenge to a race-conscious state law seeking to undo *de facto* segregation:

> "To support [their] claim, the defendants heavily rely on three Federal cases, each of which held, no State law being involved, that a local school board does not have an affirmative constitutional duty to act to alleviate racial imbalance in the schools that it did not cause. However, the question as to whether the constitution requires a local school board, or a State, to act to undo *de facto* school segregation is simply not here concerned. The issue here is whether the constitution permits, rather than prohibits, voluntary State action aimed toward reducing and eventually eliminating *de facto* school segregation.

> "State laws or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation of children in the schools and racial imbalance, have been approved by every high State court which has considered the issue. Similarly, the Federal courts which have considered the issue . . . have recognized that voluntary programs of local school authorities designed to alleviate *de facto* segregation and racial imbalance in the schools are not constitutionally forbidden." *Tometz* v. *Board of Ed., Waukegan School Dist. No. 6*, 39 Ill. 2d 593, 597–598, 237 N. E. 2d 498, 501 (1968) (citations omitted) (citing decisions from the high courts of Pennsylvania, Massachusetts, New Jersey, California, New York, and Connecticut, and from the Courts of Appeals for the First, Second, Fourth, and Sixth Circuits).

See also, *e.g.*, *Offerman* v. *Nitkowski*, 378 F. 2d 22, 24 (CA2 1967); *Deal* v. *Cincinnati Bd. of Ed.*, 369 F. 2d 55, 61

(CA6 1966), cert. denied, 389 U. S. 847 (1967); *Springfield School Comm.* v. *Barksdale*, 348 F. 2d 261, 266 (CA1 1965); *Pennsylvania Human Relations Comm'n* v. *Chester School Dist.*, 427 Pa. 157, 164, 233 A. 2d 290, 294 (1967); *Booker* v. *Board of Ed. of Plainfield, Union Cty.*, 45 N. J. 161, 170, 212 A. 2d 1, 5 (1965); *Jackson* v. *Pasadena City School Dist.*, 59 Cal. 2d 876, 881–882, 382 P. 2d 878, 881–882 (1963) (in bank).

I quote the Illinois Supreme Court at length to illustrate the prevailing legal assumption at the time *Swann* was decided. In this respect, *Swann* was not a sharp or unexpected departure from prior rulings; it reflected a consensus that had already emerged among state and lower federal courts.

If there were doubts before *Swann* was decided, they did not survive this Court's decision. Numerous state and federal courts explicitly relied upon *Swann*'s guidance for decades to follow. For instance, a Texas appeals court in 1986 rejected a Fourteenth Amendment challenge to a voluntary integration plan by explaining:

> "[T]he absence of a court order to desegregate does not mean that a school board cannot exceed minimum requirements in order to promote school integration. School authorities are traditionally given broad discretionary powers to formulate and implement educational policy and may properly decide to ensure to their students the value of an integrated school experience." *Citizens for Better Ed.* v. *Goose Creek Consol. Independent School Dist.*, 719 S. W. 2d 350, 352-353 (Ct. App. Tex. 1986) (citing *Swann* and *North Carolina Bd. of Ed.*), appeal dism'd for want of a substantial federal question, 484 U. S. 804 (1987).

Similarly, in *Zaslawsky* v. *Bd. of Ed. of Los Angeles City Unified School Dist.*, 610 F. 2d 661, 662–664 (1979), the Ninth Circuit rejected a federal constitutional challenge to

a school district's use of mandatory faculty transfers to ensure that each school's faculty makeup would fall within 10% of the districtwide racial composition. Like the Texas court, the Ninth Circuit relied upon *Swann* and *North Carolina Bd. of Ed.* to reject the argument that "a race-conscious plan is permissible only when there has been a judicial finding of *de jure* segregation." 610 F. 2d, at 663–664. See also, *e.g.*, *Darville* v. *Dade County School Bd.*, 497 F. 2d 1002, 1004–1006 (CA5 1974); *State ex rel. Citizens Against Mandatory Bussing* v. *Brooks*, 80 Wash. 2d 121, 128–129, 492 P. 2d 536, 541–542 (1972) (en banc), overruled on other grounds, *Cole* v. *Webster*, 103 Wash. 2d 280, 692 P. 2d 799 (1984) (en banc); *School Comm. of Springfield* v. *Board of Ed.*, 362 Mass. 417, 428–429 287 N. E. 2d 438, 447–448 (1972). These decisions illustrate well how lower courts understood and followed *Swann*'s enunciation of the relevant legal principle.

Courts are not alone in accepting as constitutionally valid the legal principle that *Swann* enunciated—*i.e.*, that the government may voluntarily adopt race-conscious measures to improve conditions of race even when it is not under a constitutional obligation to do so. That principle has been accepted by every branch of government and is rooted in the history of the Equal Protection Clause itself. Thus, Congress has enacted numerous race-conscious statutes that illustrate that principle or rely upon its validity. See, *e.g.*, 20 U. S. C. §6311(b)(2)(C)(v) (No Child Left Behind Act); §1067 *et seq.* (authorizing aid to minority institutions). In fact, without being exhaustive, I have counted 51 federal statutes that use racial classifications. I have counted well over 100 state statutes that similarly employ racial classifications. Presidential administrations for the past half-century have used and supported various race-conscious measures. See, *e.g.*, Exec. Order No. 10925, 26 Fed. Reg. 1977 (1961) (President Kennedy); Exec. Order No. 11246, 30 Fed. Reg. 12319 (1965) (President

Johnson); Sugrue, Breaking Through: The Troubled Origins of Affirmative Action in the Workplace, in Colorlines: Affirmative Action, Immigration, and Civil Rights Options for America 31 (Skretny ed. 2001) (describing President Nixon's lobbying for affirmative action plans, *e.g.*, the Philadelphia Plan); White, Affirmative Action's Alamo: Gerald Ford Returns to Fight Once More for Michigan, Time, Aug. 23, 1999, p. 48 (reporting on President Ford's support for affirmative action); Schuck, Affirmative Action: Past, Present, and Future, 20 Yale L. & Pol'y Rev. 1, 50 (2002) (describing President Carter's support for affirmation action). And during the same time, hundreds of local school districts have adopted student assignment plans that use race-conscious criteria. See Welch 83–91.

That *Swann*'s legal statement should find such broad acceptance is not surprising. For *Swann* is predicated upon a well-established legal view of the Fourteenth Amendment. That view understands the basic objective of those who wrote the Equal Protection Clause as forbidding practices that lead to racial exclusion. The Amendment sought to bring into American society as full members those whom the Nation had previously held in slavery. See *Slaughter-House Cases*, 16 Wall. 36, 71 (1872) ("[N]o one can fail to be impressed with the one pervading purpose found in [all the Reconstruction amendments] . . . we mean the freedom of the slave race"); *Strauder* v. *West Virginia*, 100 U. S. 303, 306 (1879) ("[The Fourteenth Amendment] is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated . . . all the civil rights that the superior race enjoy").

There is reason to believe that those who drafted an Amendment with this basic purpose in mind would have understood the legal and practical difference between the use of race-conscious criteria in defiance of that purpose, namely to keep the races apart, and the use of race-

conscious criteria to further that purpose, namely to bring the races together. See generally R. Sears, A Utopian Experiment in Kentucky: Integration and Social Equality at Berea, 1866–1904 (1996) (describing federal funding, through the Freedman's Bureau, of race-conscious school integration programs). See also R. Fischer, The Segregation Struggle in Louisiana 1862–77, p. 51 (1974) (describing the use of race-conscious remedies); Harlan, Desegregation in New Orleans Public Schools During Reconstruction, 67 Am. Hist. Rev. 663, 664 (1962) (same); W. Vaughn, Schools for All: The Blacks and Public Education in the South, 1865–1877, pp. 111–116 (1974) (same). Although the Constitution almost always forbids the former, it is significantly more lenient in respect to the latter. See *Gratz* v. *Bollinger*, 539 U. S. 244, 301 (2003) (GINSBURG, J., dissenting); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 243 (1995) (STEVENS, J., dissenting).

Sometimes Members of this Court have disagreed about the degree of leniency that the Clause affords to programs designed to include. See *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 274 (1986); *Fullilove* v. *Klutznick*, 448 U. S. 448, 507 (1980). But I can find no case in which this Court has followed JUSTICE THOMAS' "colorblind" approach. And I have found no case that otherwise repudiated this constitutional asymmetry between that which seeks to *exclude* and that which seeks to *include* members of minority races.

What does the plurality say in response? First, it seeks to distinguish *Swann* and other similar cases on the ground that those cases involved remedial plans in response to *judicial findings* of *de jure* segregation. As *McDaniel* and *Harris* show, that is historically untrue. See *supra*, at 22–24. Many school districts in the South adopted segregation remedies (to which *Swann* clearly applies) without any such federal order*, see *supra,* at 19–20. See also Kennedy Report. Seattle's circumstances are

not meaningfully different from those in, say, *McDaniel*, where this Court approved race-conscious remedies. Louisville's plan was created and initially adopted when a compulsory district court order was in place. And, in any event, the histories of Seattle and Louisville make clear that this distinction—between court-ordered and voluntary desegregation—seeks a line that sensibly cannot be drawn.

Second, the plurality downplays the importance of *Swann* and related cases by frequently describing their relevant statements as "dicta." These criticisms, however, miss the main point. *Swann* did not hide its understanding of the law in a corner of an obscure opinion or in a footnote, unread but by experts. It set forth its view prominently in an important opinion joined by all nine Justices, knowing that it would be read and followed throughout the Nation. The basic problem with the plurality's technical "dicta"-based response lies in its overly theoretical approach to case law, an approach that emphasizes rigid distinctions between holdings and dicta in a way that serves to mask the radical nature of today's decision. Law is not an exercise in mathematical logic. And statements of a legal rule set forth in a judicial opinion do not always divide neatly into "holdings" and "dicta." (Consider the legal "status" of Justice Powell's separate opinion in *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978).) The constitutional principle enunciated in *Swann,* reiterated in subsequent cases, and relied upon over many years, provides, and has widely been thought to provide, authoritative legal guidance. And if the plurality now chooses to reject that principle, it cannot adequately justify its retreat simply by affixing the label "dicta" to reasoning with which it disagrees. Rather, it must explain to the courts and to the Nation *why* it would abandon guidance set forth many years before, guidance that countless others have built upon over time, and which the law

has continuously embodied.

Third, a more important response is the plurality's claim that later cases—in particular *Johnson*, *Adarand*, and *Grutter*—supplanted *Swann*. See *ante*, at 11–12, 31–32, n. 16, 34–35 (citing *Adarand*, *supra,* at 227; *Johnson* v. *California*, 543 U. S. 499, 505 (2005); *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003)). The plurality says that cases such as *Swann* and the others I have described all "were decided before this Court definitively determined that 'all racial classifications . . . must be analyzed by a reviewing court under strict scrutiny.'" *Ante*, at 31, n. 16 (quoting *Adarand*, 515 U. S., at 227). This Court in *Adarand* added that "such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Ibid.* And the Court repeated this same statement in *Grutter*. See 539 U. S., at 326.

Several of these cases were significantly more restrictive than *Swann* in respect to the degree of leniency the Fourteenth Amendment grants to programs designed to *include* people of all races. See, *e.g.*, *Adarand*, *supra; Gratz*, *supra; Grutter*, *supra.* But that legal circumstance cannot make a critical difference here for two separate reasons.

First, no case—not *Adarand*, *Gratz*, *Grutter*, or any other—has ever held that the test of "strict scrutiny" means that all racial classifications—no matter whether they seek to include or exclude—must in practice be treated the same. The Court did not say in *Adarand* or in *Johnson* or in *Grutter* that it was overturning *Swann* or its central constitutional principle.

Indeed, in its more recent opinions, the Court recognized that the "fundamental purpose" of strict scrutiny review is to "take relevant differences" between "fundamentally different situations . . . into account." *Adarand*, *supra*, at 228 (internal quotation marks omitted). The Court made clear that "[s]trict scrutiny does not trea[t] dissimilar race-based decisions as though they were equally objection-

able." *Ibid.* It added that the fact that a law "treats [a person] unequally because of his or her race . . . says nothing about the ultimate validity of any particular law." *Id.*, at 229–230 (internal quotation marks omitted). And the Court, using the very phrase that Justice Marshall had used to describe strict scrutiny's application to any *exclusionary* use of racial criteria, sought to "*dispel the notion* that strict scrutiny" is as likely to condemn *inclusive* uses of "race-conscious" criteria as it is to invalidate *exclusionary* uses. That is, it is *not* in all circumstances "'strict in theory, but fatal in fact.'" *Id.*, at 237 (quoting *Fullilove* v. *Klutznick*, 448 U. S., at 519 (Marshall, J., concurring in judgment)).

The Court in *Grutter* elaborated:

"Strict scrutiny is not 'strict in theory, but fatal in fact.' . . . Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it. . . .

"Context matters when reviewing race-based governmental action under the Equal Protection Clause. See *Gomillion* v. *Lightfoot*, 364 U. S. 339, 343–344 (1960) (admonishing that, 'in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts'). . . . Not every decision influenced by race is equally objectionable, and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." 539 U. S., at 326–327.

The Court's holding in *Grutter* demonstrates that the

Court meant what it said, for the Court upheld an elite law school's race-conscious admissions program.

The upshot is that the cases to which the plurality refers, though all applying strict scrutiny, do not treat exclusive and inclusive uses the same. Rather, they apply the strict scrutiny test in a manner that is "fatal in fact" only to racial classifications that harmfully *exclude;* they apply the test in a manner that is *not* fatal in fact to racial classifications that seek to *include.*

The plurality cannot avoid this simple fact. See *ante*, at 34–36. Today's opinion reveals that the plurality would rewrite this Court's prior jurisprudence, at least in practical application, transforming the "strict scrutiny" test into a rule that is fatal in fact across the board. In doing so, the plurality parts company from this Court's prior cases, and it takes from local government the longstanding legal right to use race-conscious criteria for inclusive purposes in limited ways.

Second, as *Grutter* specified, "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause." 539 U. S., at 327 (citing *Gomillion* v. *Lightfoot,* 364 U. S. 339, 343–344 (1960)). And contexts differ dramatically one from the other. Governmental use of race-based criteria can arise in the context of, for example, census forms, research expenditures for diseases, assignments of police officers patrolling predominantly minority-race neighborhoods, efforts to desegregate racially segregated schools, policies that favor minorities when distributing goods or services in short supply, actions that create majority-minority electoral districts, peremptory strikes that remove potential jurors on the basis of race, and others. Given the significant differences among these contexts, it would be surprising if the law required an identically strict legal test for evaluating the constitutionality of race-based criteria as to each of them.

Here, the context is one in which school districts seek to advance or to maintain racial integration in primary and secondary schools. It is a context, as *Swann* makes clear, where history has required special administrative remedies. And it is a context in which the school boards' plans simply set race-conscious limits at the outer boundaries of a broad range.

This context is *not* a context that involves the use of race to decide who will receive goods or services that are normally distributed on the basis of merit and which are in short supply. It is not one in which race-conscious limits stigmatize or exclude; the limits at issue do not pit the races against each other or otherwise significantly exacerbate racial tensions. They do not impose burdens unfairly upon members of one race alone but instead seek benefits for members of all races alike. The context here is one of racial limits that seek, not to keep the races apart, but to bring them together.

The importance of these differences is clear once one compares the present circumstances with other cases where one or more of these negative features are present. See, *e.g.*, *Strauder* v. *West Virginia*, 100 U. S. 303 (1880); *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886); *Brown*, 347 U. S. 483; *Loving* v. *Virginia*, 388 U. S. 1 (1967); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978); *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989); *Shaw* v. *Reno*, 509 U. S. 630 (1993); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200 (1995); *Grutter, supra; Gratz* v. *Bollinger*, 539 U. S. 244 (2003); *Johnson* v. *California*, 543 U. S. 499 (2005).

If one examines the context more specifically, one finds that the districts' plans reflect efforts to overcome a history of segregation, embody the results of broad experience and community consultation, seek to expand student choice while reducing the need for mandatory busing, and use race-conscious criteria in highly limited ways that

diminish the use of race compared to preceding integration efforts. Compare *Wessmann* v. *Gittens*, 160 F. 3d 790, 809–810 (CA1 1998) (Boudin, J., concurring), with *Comfort*, 418 F. 3d, at 28–29 (Boudin, C. J., concurring). They do not seek to award a scarce commodity on the basis of merit, for they are not magnet schools; rather, by design and in practice, they offer substantially equivalent academic programs and electives. Although some parents or children prefer some schools over others, school popularity has varied significantly over the years. In 2000, for example, Roosevelt was the most popular first choice high school in Seattle; in 2001, Ballard was the most popular; in 2000, West Seattle was one of the least popular; by 2003, it was one of the more popular. See Research, Evaluation and Assessment, Student Information Services Office, District Summaries 1999–2005, available at http://www.seattleschools.org/area/siso/disprof/2005/DP05 all.pdf. In a word, the school plans under review do not involve the kind of race-based harm that has led this Court, in other contexts, to find the use of race-conscious criteria unconstitutional.

These and related considerations convinced one Ninth Circuit judge in the Seattle case to apply a standard of constitutionality review that is less than "strict," and to conclude that this Court's precedents do not require the contrary. See 426 F. 3d 1162, 1193–1194 (2005) (Kozinski, J., concurring) ("That a student is denied the school of his choice may be disappointing, but it carries no racial stigma and says nothing at all about that individual's aptitude or ability"). That judge is not alone. Cf. *Gratz*, *supra*, at 301 (GINSBURG, J., dissenting); *Adarand*, *supra*, at 243 (STEVENS, J., dissenting); Carter, When Victims Happen To Be Black, 97 Yale L. J. 420, 433–434 (1988).

The view that a more lenient standard than "strict scrutiny" should apply in the present context would not imply abandonment of judicial efforts carefully to deter-

mine the need for race-conscious criteria and the criteria's
tailoring in light of the need.  And the present context
requires a court to examine carefully the race-conscious
program at issue.  In doing so, a reviewing judge must be
fully aware of the potential dangers and pitfalls that
JUSTICE THOMAS and JUSTICE KENNEDY mention.  See
*ante*, at 11–12 (THOMAS, J., concurring); *ante*, at 3, 17
(opinion of KENNEDY, J.).

But unlike the plurality, such a judge would also be
aware that a legislature or school administrators, ulti-
mately accountable to the electorate, could *nonetheless*
properly conclude that a racial classification sometimes
serves a purpose important enough to overcome the risks
they mention, for example, helping to end racial isolation
or to achieve a diverse student body in public schools.  Cf.
*ante*, at 17–18 (opinion of KENNEDY, J.).  Where that is so,
the judge would carefully examine the program's details to
determine whether the use of race-conscious criteria is
proportionate to the important ends it serves.

In my view, this contextual approach to scrutiny is
altogether fitting.  I believe that the law requires applica-
tion here of a standard of review that is not "strict" in the
traditional sense of that word, although it does require the
careful review I have just described.  See *Gratz, supra*, at
301 (GINSBURG, J., joined by SOUTER, J., dissenting);
*Adarand, supra*, at 242–249 (STEVENS, J., joined by
GINSBURG, J., dissenting); 426 F. 3d, at 1193–1194 (Koz-
inski, J., concurring).  Apparently JUSTICE KENNEDY also
agrees that strict scrutiny would not apply in respect to
certain "race-conscious" school board policies.  See *ante*, at
9 ("Executive and legislative branches, which for genera-
tions now have considered these types of policies and
procedures, should be permitted to employ them with
candor and with confidence that a constitutional violation
does not occur whenever a decisionmaker considers the
impact a given approach might have on students of differ-

ent races").

Nonetheless, in light of *Grutter* and other precedents, see, *e.g.*, *Bakke*, 438 U. S., at 290 (opinion of Powell, J.), I shall adopt the first alternative. I shall apply the version of strict scrutiny that those cases embody. I shall consequently ask whether the school boards in Seattle and Louisville adopted these plans to serve a "compelling governmental interest" and, if so, whether the plans are "narrowly tailored" to achieve that interest. If the plans survive this strict review, they would survive less exacting review *a fortiori*. Hence, I conclude that the plans before us pass both parts of the strict scrutiny test. Consequently I must conclude that the plans here are permitted under the Constitution.

## III
### *Applying the Legal Standard*

#### A
##### *Compelling Interest*

The principal interest advanced in these cases to justify the use of race-based criteria goes by various names. Sometimes a court refers to it as an interest in achieving racial "diversity." Other times a court, like the plurality here, refers to it as an interest in racial "balancing." I have used more general terms to signify that interest, describing it, for example, as an interest in promoting or preserving greater racial "integration" of public schools. By this term, I mean the school districts' interest in eliminating school-by-school racial isolation and increasing the degree to which racial mixture characterizes each of the district's schools and each individual student's public school experience.

Regardless of its name, however, the interest at stake possesses three essential elements. First, there is a historical and remedial element: an interest in setting right the consequences of prior conditions of segregation. This

refers back to a time when public schools were highly segregated, often as a result of legal or administrative policies that facilitated racial segregation in public schools. It is an interest in continuing to combat the remnants of segregation caused in whole or in part by these school-related policies, which have often affected not only schools, but also housing patterns, employment practices, economic conditions, and social attitudes. It is an interest in maintaining hard-won gains. And it has its roots in preventing what gradually may become the *de facto* resegregation of America's public schools. See Part I, *supra*, at 4; Appendix A, *infra.* See also *ante*, at 17 (opinion of KENNEDY, J.) ("This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children").

Second, there is an educational element: an interest in overcoming the adverse educational effects produced by and associated with highly segregated schools. Cf. *Grutter*, 539 U. S*.,* at 345 (GINSBURG, J., concurring). Studies suggest that children taken from those schools and placed in integrated settings often show positive academic gains. See, *e.g.*, Powell, Living and Learning: Linking Housing and Education, in Pursuit of a Dream Deferred: Linking Housing and Education Policy 15, 35 (J. Powell, G. Kearney, & V. Kay eds. 2001) (hereinafter Powell); Hallinan, Diversity Effects on Student Outcomes: Social Science Evidence, 59 Ohio St. L. J. 733, 741–742 (1998) (hereinafter Hallinan).

Other studies reach different conclusions. See, *e.g.*, D. Armor, Forced Justice (1995). See also *ante*, at 15–17 (THOMAS, J., concurring). But the evidence supporting an educational interest in racially integrated schools is well established and strong enough to permit a democratically elected school board reasonably to determine that this interest is a compelling one.

Research suggests, for example, that black children from segregated educational environments significantly increase their achievement levels once they are placed in a more integrated setting. Indeed in Louisville itself the achievement gap between black and white elementary school students grew substantially smaller (by seven percentage points) after the integration plan was implemented in 1975. See Powell 35. Conversely, to take another example, evidence from a district in Norfolk, Virginia, shows that resegregated schools led to a decline in the achievement test scores of children of all races. *Ibid.*

One commentator, reviewing dozens of studies of the educational benefits of desegregated schooling, found that the studies have provided "remarkably consistent" results, showing that: (1) black students' educational achievement is improved in integrated schools as compared to racially isolated schools, (2) black students' educational achievement is improved in integrated classes, and (3) the earlier that black students are removed from racial isolation, the better their educational outcomes. See Hallinan 741–742. Multiple studies also indicate that black alumni of integrated schools are more likely to move into occupations traditionally closed to African-Americans, and to earn more money in those fields. See, *e.g.*, Schofield, Review of Research on School Desegregation's Impact on Elementary and Secondary School Students, in Handbook of Research on Multicultural Education 597, 606–607 (J. Banks & C. Banks eds. 1995). Cf. W. Bowen & D. Bok, The Shape of the River 118 (1998) (hereinafter Bowen & Bok).

Third, there is a democratic element: an interest in producing an educational environment that reflects the "pluralistic society" in which our children will live. *Swann*, 402 U. S., at 16. It is an interest in helping our children learn to work and play together with children of different racial backgrounds. It is an interest in teaching children to engage in the kind of cooperation among

Americans of all races that is necessary to make a land of three hundred million people one Nation.

Again, data support this insight. See, *e.g.*, Hallinan 745; Quillian & Campbell, Beyond Black and White: The Present and Future of Multiracial Friendship Segregation, 68 Am. Sociological Rev. 540, 541 (2003) (hereinafter Quillian & Campbell); Dawkins & Braddock, The Continuing Significance of Desegregation: School Racial Composition and African American Inclusion in American Society, 63 J. Negro Ed. 394, 401–403 (1994) (hereinafter Dawkins & Braddock); Wells & Crain, Perpetuation Theory and the Long-Term Effects of School Desegregation, 64 Rev. Educational Research 531, 550 (1994) (hereinafter Wells & Crain).

There are again studies that offer contrary conclusions. See, *e.g.*, Schofield, School Desegregation and Intergroup Relations, in 17 Review of Research in Education 356 (G. Grant ed. 1991). See also *ante*, at 22–23 (THOMAS, J., concurring). Again, however, the evidence supporting a democratic interest in racially integrated schools is firmly established and sufficiently strong to permit a school board to determine, as this Court has itself often found, that this interest is compelling.

For example, one study documented that "black and white students in desegregated schools are less racially prejudiced than those in segregated schools," and that "interracial contact in desegregated schools leads to an increase in interracial sociability and friendship." Hallinan 745. See also Quillian & Campbell 541. Cf. Bowen & Bok 155. Other studies have found that both black and white students who attend integrated schools are more likely to work in desegregated companies after graduation than students who attended racially isolated schools. Dawkins & Braddock 401–403; Wells & Crain 550. Further research has shown that the desegregation of schools can help bring adult communities together by reducing

segregated housing. Cities that have implemented suc-
cessful school desegregation plans have witnessed in-
creased interracial contact and neighborhoods that tend to
become less racially segregated. Dawkins & Braddock
403. These effects not only reinforce the prior gains of
integrated primary and secondary education; they also
foresee a time when there is less need to use race-
conscious criteria.

Moreover, this Court from *Swann* to *Grutter* has treated
these civic effects as an important virtue of racially di-
verse education. See, *e.g., Swann, supra*, at 16; *Seattle
School Dist. No. 1*, 458 U. S., at 472–473. In *Grutter,* in
the context of law school admissions, we found that these
types of interests were, constitutionally speaking, "compel-
ling." See 539 U. S., at 330 (recognizing that Michigan
Law School's race-conscious admissions policy "promotes
cross-racial understanding, helps to break down racial
stereotypes, and enables [students] to better understand
persons of different races," and pointing out that "the
skills needed in today's increasingly global marketplace
can only be developed through exposure to widely diverse
people, cultures, ideas, and viewpoints" (internal quota-
tion marks omitted; alteration in original)).

In light of this Court's conclusions in *Grutter,* the "com-
pelling" nature of these interests in the context of primary
and secondary public education follows here *a fortiori.*
Primary and secondary schools are where the education of
this Nation's children begins, where each of us begins to
absorb those values we carry with us to the end of our
days. As Justice Marshall said, "unless our children begin
to learn together, there is little hope that our people will
ever learn to live together." *Milliken* v. *Bradley*, 418 U. S.
717, 783 (1974) (dissenting opinion).

And it was *Brown,* after all, focusing upon primary and
secondary schools, not *Sweatt* v. *Painter*, 339 U. S. 629
(1950), focusing on law schools, or *McLaurin* v. *Oklahoma*

*State Regents for Higher Ed.*, 339 U. S. 637 (1950), focusing on graduate schools, that affected so deeply not only Americans but the world. R. Kluger, Simple Justice: The History of *Brown* v. *Board of Education* and Black America's Struggle for Equality, p. x (1975) (arguing that perhaps no other Supreme Court case has "affected more directly the minds, hearts, and daily lives of so many Americans"); Patterson, *Brown* v. *Board of Education* xxvii (2001) (identifying *Brown* as "the most eagerly awaited and dramatic judicial decision of modern times"). See also *Parents Involved VII,* 426 F. 3d, at 1194 (Kozinski, J., concurring); Strauss, Discriminatory Intent and the Taming of *Brown*, 56 U. Chi. L. Rev. 935, 937 (1989) (calling *Brown* "the Supreme Court's greatest anti-discrimination decision"); Brief for United States as *Amicus Curiae* in *Brown,* 347 U. S. 483; Dudziak, *Brown* as a Cold War Case, 91 J. Am. Hist. 32 (2004); A Great Decision, Hindustan Times (New Dehli, May 20, 1954), p. 5; USA Takes Positive Step, West African Pilot (Lagos, May 22, 1954), p. 2 (stating that *Brown* is an acknowledgment that the "United States should set an example for all other nations by taking the lead in removing from its national life all signs and traces of racial intolerance, arrogance or discrimination"). Hence, I am not surprised that JUSTICE KENNEDY finds that, "a district may consider it a compelling interest to achieve a diverse student population," including a *racially* diverse population. *Ante*, at 17–18.

The compelling interest at issue here, then, includes an effort to eradicate the remnants, not of general "societal discrimination," *ante*, at 23 (plurality opinion), but of primary and secondary school segregation, see *supra*, at 7, 14; it includes an effort to create school environments that provide better educational opportunities for all children; it includes an effort to help create citizens better prepared to know, to understand, and to work with people of all races

and backgrounds, thereby furthering the kind of democratic government our Constitution foresees. If an educational interest that combines these three elements is not "compelling," what is?

The majority acknowledges that in prior cases this Court has recognized at least two interests as compelling: an interest in "remedying the effects of past intentional discrimination," and an interest in "diversity in higher education." *Ante*, at 12, 13. But the plurality does not convincingly explain why those interests do not constitute a "compelling interest" here. How do the remedial interests here differ in kind from those at issue in the voluntary desegregation efforts that Attorney General Kennedy many years ago described in his letter to the President? *Supra*, at 19–20. How do the educational and civic interests differ in kind from those that underlie and justify the racial "diversity" that the law school sought in *Grutter*, where this Court found a compelling interest?

The plurality tries to draw a distinction by reference to the well-established conceptual difference between *de jure* segregation ("segregation by state action") and *de facto* segregation ("racial imbalance caused by other factors"). *Ante*, at 28. But that distinction concerns what the Constitution *requires* school boards to do, not what it *permits* them to do. Compare, *e.g.*, *Green,* 391 U. S., at 437–438 ("School boards . . . operating state-compelled dual systems" have an "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch"), with, *e.g.*, *Milliken*, 418 U. S., at 745 (the Constitution does not impose a duty to desegregate upon districts that have not been "shown to have committed any constitutional violation").

The opinions cited by the plurality to justify its reliance upon the *de jure / de facto* distinction only address what remedial measures a school district may be constitution-

ally *required* to undertake.  See, *e.g.*, *Freeman* v. *Pitts*, 503
U. S. 467, 495 (1992).  As to what is *permitted*, nothing in
our equal protection law suggests that a State may right
only those wrongs that it committed.  No case of this Court
has ever relied upon the *de jure/de facto* distinction in
order to limit what a school district is voluntarily allowed
to do.  That is what is at issue here.  And *Swann*, *McDan-
iel, Crawford, North Carolina Bd. of Ed., Harris*, and
*Bustop* made one thing clear: significant as the difference
between *de jure* and *de facto* segregation may be to the
question of what a school district *must* do, that distinction
is not germane to the question of what a school district
*may* do.

Nor does any precedent indicate, as the plurality sug-
gests with respect to Louisville, *ante*, at 29, that remedial
interests vanish the day after a federal court declares that
a district is "unitary."  Of course, Louisville adopted those
portions of the plan at issue here *before* a court declared
Louisville "unitary."  Moreover, in *Freeman*, this Court
pointed out that in "one sense of the term, vestiges of past
segregation by state decree do remain in our society and in
our schools.  Past wrongs to the black race, wrongs com-
mitted by the State and in its name, are a stubborn fact of
history.  And stubborn facts of history linger and persist."
503 U. S., at 495.  See also *ante*, at 15 (opinion of
KENNEDY, J.).  I do not understand why this Court's cases,
which rest the significance of a "unitary" finding in part
upon the wisdom and desirability of returning schools to
local control, should deprive those local officials of legal
*permission* to use means they once found necessary to
combat persisting injustices.

For his part, JUSTICE THOMAS faults my citation of
various studies supporting the view that school districts
can find compelling educational and civic interests in
integrating their public schools.  See *ante*, at 15–17, 23
(concurring opinion).  He is entitled of course to his own

opinion as to which studies he finds convincing—although it bears mention that even the author of some of JUSTICE THOMAS' preferred studies has found *some* evidence linking integrated learning environments to increased academic achievement. Cf. *ante*, at 15–17 (opinion of THOMAS, J.) (citing Armor & Rossell, Desegregation and Resegregation in the Public Schools, in Beyond the Color Line 239 (A. Thernstrom & S. Thernstrom eds. 2002); Brief for Armor *et al.* as *Amici Curiae*, with Rosen, Perhaps Not All Affirmative Action is Created Equal, N. Y. Times, June 11, 2006 (quoting David Armor as commenting "'[w]e did find the [racial] achievement gap changing *significantly*'" and acknowledging that he "'did find a modest association for math but not reading in terms of racial composition and achievement, but there's a big state variation'" (emphasis added)). If we are to insist upon unanimity in the social science literature before finding a compelling interest, we might never find one. I believe only that the Constitution allows democratically elected school boards to make up their own minds as to how best to include people of all races in one America.

## B

### *Narrow Tailoring*

I next ask whether the plans before us are "narrowly tailored" to achieve these "compelling" objectives. I shall not accept the school board's assurances on faith, cf. *Miller* v. *Johnson*, 515 U. S. 900, 920 (1995), and I shall subject the "tailoring" of their plans to "rigorous judicial review." *Grutter*, 539 U. S., at 388 (KENNEDY, J., dissenting). Several factors, taken together, nonetheless lead me to conclude that the boards' use of race-conscious criteria in these plans passes even the strictest "tailoring" test.

First, the race-conscious criteria at issue only help set the outer bounds of *broad* ranges. Cf. *id.,* at 390 (KENNEDY, J., dissenting) (expressing concern about "nar-

row fluctuation band[s]"). They constitute but one part of plans that depend primarily upon other, nonracial elements. To use race in this way is not to set a forbidden "quota." See *id.,* at 335 ("Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups'" (quoting *Croson*, 488 U. S., at 496)).

In fact, the defining feature of both plans is greater emphasis upon student choice. In Seattle, for example, in more than 80% of all cases, that choice alone determines which high schools Seattle's ninth graders will attend. After ninth grade, students can decide voluntarily to transfer to a preferred district high school (without any consideration of race-conscious criteria). *Choice*, therefore, is the "predominant factor" in these plans. *Race* is not. See *Grutter*, *supra*, at 393 (KENNEDY, J., dissenting) (allowing consideration of race only if it does "not become a predominant factor").

Indeed, the race-conscious ranges at issue in these cases often have no effect, either because the particular school is not oversubscribed in the year in question, or because the racial makeup of the school falls within the broad range, or because the student is a transfer applicant or has a sibling at the school. In these respects, the broad ranges are less like a quota and more like the kinds of "useful starting points" that this Court has consistently found permissible, even when they set boundaries upon voluntary transfers, and even when they are based upon a community's general population. See, *e.g.*, *North Carolina Bd. of Ed.* v. *Swann*, 402 U. S. 43, 46 (1971) (no "absolute prohibition against [the] use" of mathematical ratios as a "starting point"); *Swann*, 402 U. S., at 24–25 (approving the use of a ratio reflecting "the racial composition of the whole school system" as a "useful starting point," but not as an "inflexible requirement"). Cf. *United States* v. *Montgomery County Bd. of Ed.*, 395 U. S. 225, 232 (1969) (ap-

proving a lower court desegregation order that "provided
that the [school] board must move toward a goal under
which 'in each school the ratio of white to Negro faculty
members is substantially the same as it is throughout the
system,'" and "immediately" requiring "[t]he ratio of Negro
to white teachers" in each school to be equal to "the ratio
of Negro to white teachers in . . . the system as a whole").

Second, broad-range limits on voluntary school choice
plans are less burdensome, and hence more narrowly
tailored, see *Grutter, supra*, at 341, than other race-
conscious restrictions this Court has previously approved.
See, *e.g.*, *Swann, supra*, at 26–27; *Montgomery Co. Bd. of
Ed.*, *supra*, at 232. Indeed, the plans before us are *more
narrowly tailored* than the race-conscious admission plans
that this Court approved in *Grutter*. Here, race becomes a
factor only in a fraction of students' non-merit-based
assignments—not in large numbers of students' merit-
based applications. Moreover, the effect of applying race-
conscious criteria here affects potentially disadvantaged
students *less severely,* not more severely, than the criteria
at issue in *Grutter*. Disappointed students are not rejected
from a State's flagship graduate program; they simply
attend a different one of the district's many public schools,
which in aspiration and in fact are substantially equal.
Cf. *Wygant*, 476 U. S., at 283. And, in Seattle, the disad-
vantaged student loses at most one year at the high school
of his choice. One will search *Grutter* in vain for similarly
persuasive evidence of narrow tailoring as the school
districts have presented here.

Third, the manner in which the school boards developed
these plans itself reflects "narrow tailoring." Each plan
was devised to overcome a history of segregated public
schools. Each plan embodies the results of local experi-
ence and community consultation. Each plan is the prod-
uct of a process that has sought to enhance student choice,
while diminishing the need for mandatory busing. And

each plan's use of race-conscious elements is *diminished* compared to the use of race in preceding integration plans.

The school boards' widespread consultation, their experimentation with numerous other plans, indeed, the 40-year history that Part I sets forth, make clear that plans that are less explicitly race-based are unlikely to achieve the board's "compelling" objectives. The history of each school system reveals highly segregated schools, followed by remedial plans that involved forced busing, followed by efforts to attract or retain students through the use of plans that abandoned busing and replaced it with greater student choice. Both cities once tried to achieve more integrated schools by relying solely upon measures such as redrawn district boundaries, new school building construction, and unrestricted voluntary transfers. In neither city did these prior attempts prove sufficient to achieve the city's integration goals. See Parts I–A and I–B, *supra*, at 6–18.

Moreover, giving some degree of weight to a local school board's knowledge, expertise, and concerns in these particular matters is not inconsistent with rigorous judicial scrutiny. It simply recognizes that judges are not well suited to act as school administrators. Indeed, in the context of school desegregation, this Court has repeatedly stressed the importance of acknowledging that local school boards better understand their own communities and have a better knowledge of what in practice will best meet the educational needs of their pupils. See *Milliken*, 418 U. S., at 741–42 ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process"). See also *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 49–50 (1973) (extolling local control for "the opportunity it offers for participation in

the decisionmaking process that determines how . . . local tax dollars will be spent. Each locality is free to tailor local programs to local needs. Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence"); *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities"); *Brown* v. *Board of Education*, 349 U. S. 294, 299 (1955) *(Brown II)* ("Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles").

Experience in Seattle and Louisville is consistent with experience elsewhere. In 1987, the U. S. Commission on Civil Rights studied 125 large school districts seeking integration. It reported that most districts—92 of them, in fact—adopted desegregation policies that combined two or more highly race-conscious strategies, for example, rezoning or pairing. See Welch 83–91.

Having looked at dozens of *amicus* briefs, public reports, news stories, and the records in many of this Court's prior cases, which together span 50 years of desegregation history in school districts across the Nation, I have discovered many examples of districts that sought integration through explicitly race-conscious methods, including mandatory busing. Yet, I have found *no* example or model that would permit this Court to say to Seattle and to Louisville: "Here is an instance of a desegregation plan that is likely to achieve your objectives and also makes less use of race-conscious criteria than your plans." And, if the plurality

cannot suggest such a model—and it cannot—then it seeks to impose a "narrow tailoring" requirement that in practice would never be met.

Indeed, if there is no such plan, or if such plans are purely imagined, it is understandable why, as the plurality notes, *ante*, at 27, Seattle school officials concentrated on diminishing the racial component of their districts' plan, but did not pursue eliminating that element entirely. For the plurality now to insist as it does, *ante*, at 27–28, that these school districts ought to have said so officially is either to ask for the superfluous (if they need only make explicit what is implicit) or to demand the impossible (if they must somehow provide more proof that there is no hypothetical *other* plan that could work as well as theirs). I am not aware of any case in which this Court has read the "narrow tailoring" test to impose such a requirement. Cf. *People Who Care* v. *Rockford Bd. of Ed. School Dist. No. 205*, 961 F. 2d 1335, 1338 (CA7 1992) (Easterbrook, J.) ("Would it be necessary to adjudicate the obvious before adopting (or permitting the parties to agree on) a remedy . . . ?").

The plurality also points to the school districts' use of numerical goals based upon the racial breakdown of the general school population, and it faults the districts for failing to prove that *no other set of numbers will work*. See *ante*, at 18–20. The plurality refers to no case in support of its demand. Nor is it likely to find such a case. After all, this Court has in many cases explicitly permitted districts to use target ratios based upon the district's underlying population. See, *e.g.*, *Swann*, 402 U. S., at 24–25; *North Carolina Bd. of Ed.*, 402 U. S., at 46; *Montgomery County Bd. of Ed.*, 395 U. S., at 232. The reason is obvious: In Seattle, where the overall student population is 41% white, permitting 85% white enrollment at a single school would make it much more likely that other schools would have very few white students, whereas in Jefferson

County, with a 60% white enrollment, one school with 85% white students would be less likely to skew enrollments elsewhere.

Moreover, there is research-based evidence supporting, for example, that a ratio no greater than 50% minority— which is Louisville's starting point, and as close as feasible to Seattle's starting point—is helpful in limiting the risk of "white flight."  See Orfield, Metropolitan School Desegregation: Impacts on Metropolitan Society, in Pursuit of a Dream Deferred: Linking Housing and Education Policy 121, 125.  Federal law also assumes that a similar target percentage will help avoid detrimental "minority group isolation."  See No Child Left Behind Act of 2001, Title V, Part C, 115 Stat. 1806, 20 U. S. C. §7231 *et seq.* (2000 ed., Supp. IV); 34 CFR §§280.2, 280.4 (2006) (implementing regulations).  What other numbers are the boards to use as a "starting point"?  Are they to spend days, weeks, or months seeking independently to validate the use of ratios that this Court has repeatedly authorized in prior cases?  Are they to draw numbers out of thin air?  These districts have followed this Court's holdings and advice in "tailoring" their plans.  That, too, strongly supports the lawfulness of their methods.

Nor could the school districts have accomplished their desired aims (*e.g.*, avoiding forced busing, countering white flight, maintaining racial diversity) by other means.  Nothing in the extensive history of desegregation efforts over the past 50 years gives the districts, or this Court, any reason to believe that another method is possible to accomplish these goals.  Nevertheless, JUSTICE KENNEDY suggests that school boards:

> "may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the

demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Ante*, at 8.

But, as to "strategic site selection," Seattle has built one new high school in the last 44 years (and that specialized school serves only 300 students). In fact, six of the Seattle high schools involved in this case were built by the 1920's; the other four were open by the early 1960's. See generally N. Thompson & C. Marr, Building for Learning: Seattle Public Schools Histories, 1862–2000 (2002). As to "drawing" neighborhood "attendance zones" on a racial basis, Louisville tried it, and it worked only when forced busing was also part of the plan. See *supra*, at 12–14. As to "allocating resources for special programs," Seattle and Louisville have both experimented with this; indeed, these programs are often referred to as "magnet schools," but the limited desegregation effect of these efforts extends at most to those few schools to which additional resources are granted. In addition, there is no evidence from the experience of these school districts that it will make any meaningful impact. See Brief for Respondents in No. 05–908, p. 42. As to "recruiting faculty" on the basis of race, both cities have tried, but only as one part of a broader program. As to "tracking enrollments, performance and other statistics by race," tracking *reveals* the problem; it does not cure it.

JUSTICE KENNEDY sets forth two additional concerns related to "narrow tailoring." In respect to Louisville, he says first that officials stated (1) that kindergarten assignments are not subject to the race-conscious guidelines, and (2) that the child at issue here was denied permission to attend the kindergarten he wanted because of those guidelines. Both, he explains, cannot be true. He adds that this confusion illustrates that Louisville's assignment

plan (or its explanation of it to this Court) is insufficiently precise in respect to "who makes the decisions," "oversight," "the precise circumstances in which an assignment decision" will be made; and "which of two similarly situated children will be subjected to a given race-based decision." *Ante*, at 4.

The record suggests, however, that the child in question was not assigned to the school he preferred because he missed the kindergarten application deadline. See App. in 05–915, p. 20. After he had enrolled and after the academic year had begun, he then applied to transfer to his preferred school after the kindergarten assignment deadline had passed, *id.*, at 21, possibly causing school officials to treat his late request as an application to transfer to the first grade, in respect to which the guidelines apply. I am not certain just how the remainder of JUSTICE KENNEDY's concerns affect the lawfulness of the Louisville program, for they seem to be failures of explanation, not of administration. But Louisville should be able to answer the relevant questions on remand.

JUSTICE KENNEDY's second concern is directly related to the merits of Seattle's plan: Why does Seattle's plan group Asian-Americans, Hispanic-Americans, Native-Americans, and African-Americans together, treating all as similar minorities? *Ante*, at 6–7. The majority suggests that Seattle's classification system could permit a school to be labeled "diverse" with a 50% Asian-American and 50% white student body, and no African-American students, Hispanic students, or students of other ethnicity. *Ante*, at 6; *ante*, at 15–16 (opinion of the Court).

The 50/50 hypothetical has no support in the record here; it is conjured from the imagination. In fact, Seattle apparently began to treat these different minority groups alike in response to the federal Emergency School Aid Act's requirement that it do so. Siqueland 116–117. See also Hanawalt 31; Pub. L. 95–561, Tit. VI (1978) (prescrib-

ing percentage enrollment requirements for "minority" students); Siqueland 55 (discussing HEW definition of "minority"). Moreover, maintaining this federally mandated system of classification makes sense insofar as Seattle's experience indicates that the relevant circumstances in respect to each of these different minority groups are roughly similar, *e.g.*, in terms of residential patterns, and call for roughly similar responses. This is confirmed by the fact that Seattle has been able to achieve a desirable degree of diversity without the *greater* emphasis on race that drawing fine lines among minority groups would require. Does the plurality's view of the Equal Protection Clause mean that courts must give no weight to such a board determination? Does it insist upon especially strong evidence supporting inclusion of multiple minority groups in an otherwise lawful government minority-assistance program? If so, its interpretation threatens to produce divisiveness among minority groups that is incompatible with the basic objectives of the Fourteenth Amendment. Regardless, the plurality cannot object that the constitutional defect is the individualized use of race and simultaneously object that not enough account of individuals' race has been taken.

Finally, I recognize that the Court seeks to distinguish *Grutter* from these cases by claiming that *Grutter* arose in "'the context of higher education.'" *Ante*, at 16. But that is not a meaningful legal distinction. I have explained why I do not believe the Constitution could possibly find "compelling" the provision of a racially diverse education for a 23-year-old law student but not for a 13-year-old high school pupil. See *supra*, at 46–48. And I have explained how the plans before us are more narrowly tailored than those in *Grutter*. See *supra*, at 45. I add that one cannot find a relevant distinction in the fact that these school districts did not examine the merits of applications "individual[ly]." See *ante*, at 13–15. The context here does not

involve admission by merit; a child's academic, artistic, and athletic "merits" are not at all relevant to the child's placement. These are not affirmative action plans, and hence "individualized scrutiny" is simply beside the point.

The upshot is that these plans' specific features—(1) their limited and historically-diminishing use of race, (2) their strong reliance upon other non-race-conscious elements, (3) their history and the manner in which the districts developed and modified their approach, (4) the comparison with prior plans, and (5) the lack of reasonably evident alternatives—together show that the districts' plans are "narrowly tailored" to achieve their "compelling" goals. In sum, the districts' race-conscious plans satisfy "strict scrutiny" and are therefore lawful.

## IV

### *Direct Precedent*

Two additional precedents more directly related to the plans here at issue reinforce my conclusion. The first consists of the District Court determination in the Louisville case when it dissolved its desegregation order that there was "overwhelming evidence of the Board's good faith compliance with the desegregation Decree and its underlying purposes," indeed that the Board had "treated the ideal of an integrated system as much more than a legal obligation—they consider it a positive, desirable policy and an essential element of any well-rounded public school education." *Hampton II*, 102 F. Supp. 2d, at 370. When the court made this determination in 2000, it did so in the context of the Louisville desegregation plan that the board had adopted in 1996. That plan, which took effect before 1996, is the very plan that in all relevant respects is in effect now and is the subject of the present challenge.

No one claims that (the relevant portion of) Louisville's plan was unlawful in 1996 when Louisville adopted it. To the contrary, there is every reason to believe that it repre-

sented part of an effort to implement the 1978 desegrega-
tion order.  But if the plan was lawful when it was first
adopted and if it was lawful the day before the District
Court dissolved its order, how can the plurality now sug-
gest that it became *unlawful* the following day?  Is it
conceivable that the Constitution, implemented through a
court desegregation order, could permit (perhaps *require*)
the district to make use of a race-conscious plan the day
before the order was dissolved and then *forbid* the district
to use the identical plan the day after?  See *id.,* at 380
("The very analysis for dissolving desegregation decrees
supports continued maintenance of a desegregated system
as a compelling state interest").  The Equal Protection
Clause is not incoherent.  And federal courts would rightly
hesitate to find unitary status if the consequences of the
ruling were so dramatically disruptive.

Second, *Seattle School Dist. No. 1*, 458 U. S. 457, is
directly on point.  That case involves the original Seattle
Plan, a *more heavily race-conscious predecessor* of the very
plan now before us.  In *Seattle School Dist. No. 1*, this
Court struck down a state referendum that effectively
barred implementation of Seattle's desegregation plan and
"burden[ed] all future attempts to integrate Washington
schools in districts throughout the State." *Id.*, at 462–463,
483.  Because the referendum would have prohibited the
adoption of a school-integration plan that involved manda-
tory busing, and because it would have imposed a special
burden on school integration plans (plans that sought to
integrate previously segregated schools), the Court found
it unconstitutional.  *Id.*, at 483–487.

In reaching this conclusion, the Court did not directly
address the constitutional merits of the underlying Seattle
plan.  But it explicitly cited *Swann*'s statement that the
Constitution permitted a local district to adopt such a
plan.  458 U. S., at 472, n. 15.  It also cited to Justice
Powell's opinion in *Bakke, approving of* the limited use of

race-conscious criteria in a university-admissions "affirmative action" case. 458 U. S., at 472, n. 15. In addition, the Court stated that "[a]ttending an ethnically diverse school," *id.*, at 473, could help prepare "minority children for citizenship in our pluralistic society," hopefully "teaching members of the racial majority to live in harmony and mutual respect with children of minority heritage." *Ibid.* (internal quotation marks and citation omitted).

It is difficult to believe that the Court that held unconstitutional a referendum that would have interfered with the implementation of this plan thought that the integration plan it sought to preserve was itself an *unconstitutional* plan. And if *Seattle School Dist. No. 1* is premised upon the constitutionality of the original Seattle Plan, it is equally premised upon the constitutionality of the present plan, for the present plan *is* the Seattle Plan, modified only insofar as it places even *less* emphasis on race-conscious elements than its predecessors.

It is even more difficult to accept the plurality's contrary view, namely that the underlying plan was unconstitutional. If that is so, then *all* of Seattle's earlier (even more race-conscious) plans must also have been unconstitutional. That necessary implication of the plurality's position strikes the 13th chime of the clock. How could the plurality adopt a constitutional standard that would hold unconstitutional large numbers of race-conscious integration plans adopted by numerous school boards over the past 50 years while remaining true to this Court's desegregation precedent?

## V

### *Consequences*

The Founders meant the Constitution as a practical document that would transmit its basic values to future generations through principles that remained workable

over time. Hence it is important to consider the potential consequences of the plurality's approach, as measured against the Constitution's objectives. To do so provides further reason to believe that the plurality's approach is legally unsound.

For one thing, consider the effect of the plurality's views on the parties before us and on similar school districts throughout the Nation. Will Louisville and all similar school districts have to return to systems like Louisville's initial 1956 plan, which did not consider race at all? See *supra*, at 12. That initial 1956 plan proved ineffective. Sixteen years into the plan, 14 of 19 middle and high schools remained almost totally white or almost totally black. *Ibid.*

The districts' past and current plans are not unique. They resemble other plans, promulgated by hundreds of local school boards, which have attempted a variety of desegregation methods that have evolved over time in light of experience. A 1987 Civil Rights Commission Study of 125 school districts in the Nation demonstrated the breadth and variety of desegregation plans:

"The [study] documents almost 300 desegregation plans that were implemented between 1961 and 1985. The degree of heterogeneity within these districts is immediately apparent. They are located in every region of the country and range in size from Las Cruces, New Mexico, with barely over 15,000 students attending 23 schools in 1968, to New York City, with more than one million students in 853 schools. The sample includes districts in urban areas of all sizes, suburbs (*e.g.*, Arlington County, Virginia) and rural areas (*e.g.*, Jefferson Parish, Louisiana, and Raleigh County, West Virginia). It contains 34 countywide districts with central cities (the 11 Florida districts fit this description, plus Clark County, Nevada and others) and

a small number of consolidated districts (New Castle County, Delaware and Jefferson County, Kentucky).

"The districts also vary in their racial compositions and levels of segregation. Initial plans were implemented in Mobile, Alabama and Mecklenburg County, North Carolina, and in a number of other southern districts in the face of total racial segregation. At the other extreme, Santa Clara, California had a relatively even racial distribution prior to its 1979 desegregation plan. When the 1965 plan was designed for Harford County, Maryland, the district was 92 percent white. Compton, California, on the other hand, became over 99 percent black in the 1980s, while Buffalo, New York had a virtual 50–50 split between white and minority students prior to its 1977 plan.

"It is not surprising to find a large number of different desegregation strategies in a sample with this much variation." Welch 23 (footnotes omitted).

A majority of these desegregation techniques explicitly considered a student's race. See *id.*, at 24–28. Transfer plans, for example, allowed students to shift from a school in which they were in the racial majority to a school in which they would be in a racial minority. Some districts, such as Richmond, California, and Buffalo, New York, permitted only "one-way" transfers, in which only black students attending predominantly black schools were permitted to transfer to designated receiver schools. *Id.*, at 25. Fifty-three of the 125 studied districts used transfers as a component of their plans. *Id.,* at 83–91.

At the state level, 46 States and Puerto Rico have adopted policies that encourage or require local school districts to enact interdistrict or intradistrict open choice plans. Eight of those States condition approval of transfers to another school or district on whether the transfer will produce increased racial integration. Eleven other

States require local boards to deny transfers that are not in compliance with the local school board's desegregation plans. See Education Commission of the States, Open Enrollment: 50-State Report (2007), online at http://mb2.ecs.org/reports/Report.aspx?id=268.

Arkansas, for example, provides by statute that "[n]o student may transfer to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in the student's resident district." Ark. Code Ann. §6–18–206(f)(1), as amended 2007 Ark. Gen. Acts 552 (2007). An Ohio statute provides, in respect to student choice, that each school district must establish "[p]rocedures to ensure that an appropriate racial balance is maintained in the district schools." Ohio Rev. Code Ann. §3313.98(B)(2)(b)(iii) (Lexis Supp. 2006). Ohio adds that a "district may object to the enrollment of a native student in an adjacent or other district in order to maintain an appropriate racial balance." §3313.98 (F)(1)(a).

A Connecticut statute states that its student choice program will seek to "preserve racial and ethnic balance." Conn. Gen. Stat. §10–266aa(b)(2) (2007). Connecticut law requires each school district to submit racial group population figures to the State Board of Education. §10–226a. Another Connecticut regulation provides that "[a]ny school in which the Proportion for the School falls outside of a range from 25 percentage points less to 25 percentage points more than the Comparable Proportion for the School District, shall be determined to be racially imbalanced." Conn. Agencies Regs. §10–226e–3(b) (1999). A "racial imbalance" determination requires the district to submit a plan to correct the racial imbalance, which plan may include "mandatory pupil reassignment." §§10–226e–5(a) and (c)(4).

Interpreting that State's Constitution, the Connecticut Supreme Court has held legally inadequate the reliance by a local school district solely upon some of the techniques

JUSTICE KENNEDY today recommends (*e.g.*, reallocating resources, etc.). See *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A. 2d 1267 (1996). The State Supreme Court wrote: "Despite the initiatives undertaken by the defendants to alleviate the severe racial and ethnic disparities among school districts, and despite the fact that the defendants did not intend to create or maintain these disparities, the disparities that continue to burden the education of the plaintiffs infringe upon their fundamental state constitutional right to a substantially equal educational opportunity." *Id.*, at 42, 678 A. 2d, at 1289.

At a minimum, the plurality's views would threaten a surge of race-based litigation. Hundreds of state and federal statutes and regulations use racial classifications for educational or other purposes. See *supra*, at 27. In many such instances, the contentious force of legal challenges to these classifications, meritorious or not, would displace earlier calm.

The wide variety of different integration plans that school districts use throughout the Nation suggests that the problem of racial segregation in schools, including *de facto* segregation, is difficult to solve. The fact that many such plans have used explicitly racial criteria suggests that such criteria have an important, sometimes necessary, role to play. The fact that the controlling opinion would make a school district's use of such criteria often unlawful (and the plurality's "colorblind" view would make such use always unlawful) suggests that today's opinion will require setting aside the laws of several States and many local communities.

As I have pointed out, *supra*, at 4, *de facto* resegregation is on the rise. See Appendix A, *infra*. It is reasonable to conclude that such resegregation can create serious educational, social, and civic problems. See *supra,* at 37–45. Given the conditions in which school boards work to set policy, see *supra,* at 20–21, they may need all of the means

presently at their disposal to combat those problems. Yet
the plurality would deprive them of at least one tool that
some districts now consider vital—the limited use of broad
race-conscious student population ranges.

I use the words "may need" here deliberately. The
plurality, or at least those who follow JUSTICE THOMAS'
"'color-blind'" approach, see *ante*, at 26–27 (THOMAS, J.,
concurring); *Grutter*, 539 U. S., at 353–354 (THOMAS, J.,
concurring in part and dissenting in part), may feel confi-
dent that, to end invidious discrimination, one must end
*all* governmental use of race-conscious criteria including
those with inclusive objectives. See *ante*, at 40–41 (plural-
ity opinion); see also *ante*, at 26 (THOMAS, J., concurring).
By way of contrast, I do not claim to know how best to stop
harmful discrimination; how best to create a society that
includes all Americans; how best to overcome our serious
problems of increasing *de facto* segregation, troubled inner
city schooling, and poverty correlated with race. But, as a
judge, I do know that the Constitution does not authorize
judges to dictate solutions to these problems. Rather, the
Constitution creates a democratic political system through
which the people themselves must together find answers.
And it is for them to debate how best to educate the Na-
tion's children and how best to administer America's
schools to achieve that aim. The Court should leave them
to their work. And it is for them to decide, to quote the
plurality's slogan, whether the best "way to stop discrimi-
nation on the basis of race is to stop discriminating on the
basis of race." *Ante*, at 40–41. See also *Parents Involved
VII*, 426 F. 3d, at 1222 (Bea, J., dissenting) ("The way to
end racial discrimination is to stop discriminating by
race"). That is why the Equal Protection Clause outlaws
invidious discrimination, but does not similarly forbid all
use of race-conscious criteria.

Until today, this Court understood the Constitution as
affording the people, acting through their elected repre-

sentatives, freedom to select the use of "race-conscious" criteria from among their available options. See *Adarand Constructors, Inc.*, 515 U. S., at 237 ("[S]trict scrutiny" in this context is "[not] 'strict in theory, but fatal in fact'" (quoting *Fullilove*, 448 U. S., at 519 (Marshall, J., concurring in judgment))). Today, however, the Court restricts (and some Members would eliminate) that leeway. I fear the consequences of doing so for the law, for the schools, for the democratic process, and for America's efforts to create, out of its diversity, one Nation.

## VI

### *Conclusions*

To show that the school assignment plans here meet the requirements of the Constitution, I have written at exceptional length. But that length is necessary. I cannot refer to the history of the plans in these cases to justify the use of race-conscious criteria without describing that history in full. I cannot rely upon *Swann*'s statement that the use of race-conscious limits is permissible without showing, rather than simply asserting, that the statement represents a constitutional principle firmly rooted in federal and state law. Nor can I explain my disagreement with the Court's holding and the plurality's opinion, without offering a detailed account of the arguments they propound and the consequences they risk.

Thus, the opinion's reasoning is long. But its conclusion is short: The plans before us satisfy the requirements of the Equal Protection Clause. And it is the plurality's opinion, not this dissent that "fails to ground the result it would reach in law." *Ante*, at 28.

Four basic considerations have led me to this view. *First*, the histories of Louisville and Seattle reveal complex circumstances and a long tradition of conscientious efforts by local school boards to resist racial segregation in public schools. Segregation at the time of *Brown* gave way

to expansive remedies that included busing, which in turn gave rise to fears of white flight and resegregation. For decades now, these school boards have considered and adopted and revised assignment plans that sought to rely less upon race, to emphasize greater student choice, and to improve the conditions of all schools for all students, no matter the color of their skin, no matter where they happen to reside. The plans under review—which are less burdensome, more egalitarian, and more effective than prior plans—continue in that tradition. And their history reveals school district goals whose remedial, educational, and democratic elements are inextricably intertwined each with the others. See Part I, *supra,* at 2–21.

*Second*, since this Court's decision in *Brown*, the law has consistently and unequivocally approved of both voluntary and compulsory race-conscious measures to combat segregated schools. The Equal Protection Clause, ratified following the Civil War, has always distinguished in practice between state action that excludes and thereby subordinates racial minorities and state action that seeks to bring together people of all races. From *Swann* to *Grutter*, this Court's decisions have emphasized this distinction, recognizing that the fate of race relations in this country depends upon unity among our children, "for unless our children begin to learn together, there is little hope that our people will ever learn to live together." *Milliken*, 418 U. S., at 783 (Marshall, J., dissenting). See also C. Sumner, Equality Before the Law: Unconstitutionality of Separate Colored Schools in Massachusetts, in 2 The Works of Charles Sumner 327, 371 (1849) ("The law contemplates not only that all be taught, but that all shall be taught together"). See Part II, *supra,* at 21–37.

*Third*, the plans before us, subjected to rigorous judicial review, are supported by compelling state interests and are narrowly tailored to accomplish those goals. Just as diversity in higher education was deemed compelling in

*Grutter*, diversity in public primary and secondary schools—where there is even more to gain—must be, *a fortiori*, a compelling state interest. Even apart from *Grutter*, five Members of this Court agree that "avoiding racial isolation" and "achiev[ing] a diverse student population" remain today compelling interests. *Ante*, at 17–18 (opinion of KENNEDY, J.). These interests combine remedial, educational, and democratic objectives. For the reasons discussed above, however, I disagree with JUSTICE KENNEDY that Seattle and Louisville have not done enough to demonstrate that their present plans are necessary to continue upon the path set by *Brown*. These plans are *more* "narrowly tailored" than the race-conscious law school admissions criteria at issue in *Grutter*. Hence, their lawfulness follows *a fortiori* from this Court's prior decisions. See Parts III–IV, *supra*, at 37–57.

*Fourth*, the plurality's approach risks serious harm to the law and for the Nation. Its view of the law rests either upon a denial of the distinction between exclusionary and inclusive use of race-conscious criteria in the context of the Equal Protection Clause, or upon such a rigid application of its "test" that the distinction loses practical significance. Consequently, the Court's decision today slows down and sets back the work of local school boards to bring about racially diverse schools. See Part V, *supra*, at 57–63.

Indeed, the consequences of the approach the Court takes today are serious. Yesterday, the plans under review were lawful. Today, they are not. Yesterday, the citizens of this Nation could look for guidance to this Court's unanimous pronouncements concerning desegregation. Today, they cannot. Yesterday, school boards had available to them a full range of means to combat segregated schools. Today, they do not.

The Court's decision undermines other basic institutional principles as well. What has happened to *stare decisis?* The history of the plans before us, their educa-

tional importance, their highly limited use of race—all these and more—make clear that the compelling interest here is stronger than in *Grutter*. The plans here are more narrowly tailored than the law school admissions program there at issue. Hence, applying *Grutter*'s strict test, their lawfulness follows *a fortiori*. To hold to the contrary is to transform that test from "strict" to "fatal in fact"—the very opposite of what *Grutter* said. And what has happened to *Swann?* To *McDaniel?* To *Crawford?* To *Harris?* To *School Committee of Boston?* To *Seattle School Dist. No. 1?* After decades of vibrant life, they would all, under the plurality's logic, be written out of the law.

And what of respect for democratic local decisionmaking by States and school boards? For several decades this Court has rested its public school decisions upon *Swann*'s basic view that the Constitution grants local school districts a significant degree of leeway where the inclusive use of race-conscious criteria is at issue. Now localities will have to cope with the difficult problems they face (including resegregation) deprived of one means they may find necessary.

And what of law's concern to diminish and peacefully settle conflict among the Nation's people? Instead of accommodating different good-faith visions of our country and our Constitution, today's holding upsets settled expectations, creates legal uncertainty, and threatens to produce considerable further litigation, aggravating race-related conflict.

And what of the long history and moral vision that the Fourteenth Amendment itself embodies? The plurality cites in support those who argued in *Brown* against segregation, and JUSTICE THOMAS likens the approach that I have taken to that of segregation's defenders. See *ante*, at 39–41 (plurality opinion) (comparing Jim Crow segregation to Seattle and Louisville's integration polices); *ante*, at 28–32 (THOMAS, J., concurring). But segregation poli-

cies did not simply tell schoolchildren "where they could and could not go to school based on the color of their skin," *ante*, at 40 (plurality opinion); they perpetuated a caste system rooted in the institutions of slavery and 80 years of legalized subordination. The lesson of history, see *ante*, at 39 (plurality opinion), is not that efforts to continue racial segregation are constitutionally indistinguishable from efforts to achieve racial integration. Indeed, it is a cruel distortion of history to compare Topeka, Kansas, in the 1950's to Louisville and Seattle in the modern day—to equate the plight of Linda Brown (who was ordered to attend a Jim Crow school) to the circumstances of Joshua McDonald (whose request to transfer to a school closer to home was initially declined). This is not to deny that there is a cost in applying "a state-mandated racial label." *Ante*, at 17 (KENNEDY, J., concurring in part and concurring in judgment). But that cost does not approach, in degree or in kind, the terrible harms of slavery, the resulting caste system, and 80 years of legal racial segregation.

\*     \*     \*

Finally, what of the hope and promise of *Brown?* For much of this Nation's history, the races remained divided. It was not long ago that people of different races drank from separate fountains, rode on separate buses, and studied in separate schools. In this Court's finest hour, *Brown* v. *Board of Education* challenged this history and helped to change it. For *Brown* held out a promise. It was a promise embodied in three Amendments designed to make citizens of slaves. It was the promise of true racial equality—not as a matter of fine words on paper, but as a matter of everyday life in the Nation's cities and schools. It was about the nature of a democracy that must work for all Americans. It sought one law, one Nation, one people, not simply as a matter of legal principle but in terms of how we actually live.

Not everyone welcomed this Court's decision in *Brown*. Three years after that decision was handed down, the Governor of Arkansas ordered state militia to block the doors of a white schoolhouse so that black children could not enter. The President of the United States dispatched the 101st Airborne Division to Little Rock, Arkansas, and federal troops were needed to enforce a desegregation decree. See *Cooper* v. *Aaron*, 358 U. S. 1 (1958). Today, almost 50 years later, attitudes toward race in this Nation have changed dramatically. Many parents, white and black alike, want their children to attend schools with children of different races. Indeed, the very school districts that once spurned integration now strive for it. The long history of their efforts reveals the complexities and difficulties they have faced. And in light of those challenges, they have asked us not to take from their hands the instruments they have used to rid their schools of racial segregation, instruments that they believe are needed to overcome the problems of cities divided by race and poverty. The plurality would decline their modest request.

The plurality is wrong to do so. The last half-century has witnessed great strides toward racial equality, but we have not yet realized the promise of *Brown*. To invalidate the plans under review is to threaten the promise of *Brown*. The plurality's position, I fear, would break that promise. This is a decision that the Court and the Nation will come to regret.

I must dissent.

## APPENDIXES TO OPINION OF BREYER, J.

### A

### Resegregation Trends

**Percentage of Black Students in 90–100 Percent Nonwhite and Majority Nonwhite Public Schools by Region, 1950–1954 to 2000, Fall Enrollment**

| Region | 1950–1954 | 1960–1961 | 1968 | 1972 | 1976 | 1980 | 1989 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| Percentage in 90–100% Nonwhite Schools | | | | | | | | | |
| Northeast | — | 40 | 42.7 | 46.9 | 51.4 | 48.7 | 49.8 | 50.2 | 51.2 |
| Border | 100 | 59 | 60.2 | 54.7 | 42.5 | 37.0 | 33.7 | 39.7 | 39.6 |
| South | 100 | 100 | 77.8 | 24.7 | 22.4 | 23.0 | 26.0 | 31.1 | 30.9 |
| Midwest | 53 | 56 | 58.0 | 57.4 | 51.1 | 43.6 | 40.1 | 45.0 | 46.3 |
| West | — | 27 | 50.8 | 42.7 | 36.3 | 33.7 | 26.7 | 29.9 | 29.5 |
| **U. S.** | | | **64.3** | **38.7** | **35.9** | **33.2** | **33.8** | **37.4** | **37.4** |
| Percentage in 50–100% Nonwhite Schools | | | | | | | | | |
| Northeast | — | 62 | 66.8 | 69.9 | 72.5 | 79.9 | 75.4 | 77.5 | 78.3 |
| Border | 100 | 69 | 71.6 | 67.2 | 60.1 | 59.2 | 58.0 | 64.8 | 67.0 |
| South | 100 | 100 | 80.9 | 55.3 | 54.9 | 57.1 | 59.3 | 67.3 | 69.0 |
| Midwest | 78 | 80 | 77.3 | 75.3 | 70.3 | 69.5 | 69.4 | 67.9 | 73.3 |
| West | — | 69 | 72.2 | 68.1 | 67.4 | 66.8 | 67.4 | 76.7 | 75.3 |
| **U. S.** | | | **76.6** | **63.6** | **62.4** | **62.9** | **64.9** | **70.1** | **71.6** |

Source: C. Clotfelter, After *Brown:* The Rise and Retreat of School Desegregation 56 (2004) (Table 2.1).

**Changes in the Percentage of White Students in Schools Attended by the Average Black Student by State, 1970–2003 (includes States with 5% or greater enrollment of black students in 1970 and 1980)**

| | % White | % White Students in School of Average Black Student | | | | Change | | |
|---|---|---|---|---|---|---|---|---|
| | 2003 | 1970 | 1980 | 1991 | 2003 | 1970–1980 | 1980–1991 | 1991–2003 |
| Alabama | 60 | 33 | 38 | 35 | 30 | 5 | -3 | -5 |
| Arkansas | 70 | 43 | 47 | 44 | 36 | 4 | -3 | -8 |
| California | 33 | 26 | 28 | 27 | 22 | 2 | -1 | -5 |
| Connecticut | 68 | 44 | 40 | 35 | 32 | -4 | -5 | -3 |
| Delaware | 57 | 47 | 69 | 65 | 49 | 22 | -4 | -16 |
| Florida | 51 | 43 | 51 | 43 | 34 | 8 | -8 | -9 |
| Georgia | 52 | 35 | 38 | 35 | 30 | 3 | -3 | -5 |
| Illinois | 57 | 15 | 19 | 20 | 19 | 4 | 1 | -1 |
| Indiana | 82 | 32 | 39 | 47 | 41 | 7 | 8 | -6 |
| Kansas | 76 | 52 | 59 | 58 | 51 | 7 | -1 | -7 |
| Kentucky | 87 | 49 | 74 | 42 | 65 | 25 | -2 | -7 |
| Louisiana | 48 | 31 | 33 | 32 | 27 | 2 | -1 | -5 |
| Maryland | 50 | 30 | 35 | 29 | 23 | 5 | -6 | -6 |
| Massachusetts | 75 | 48 | 50 | 45 | 38 | 2 | -5 | -7 |
| Michigan | 73 | 22 | 23 | 22 | 22 | 1 | -1 | 0 |
| Mississippi | 47 | 30 | 29 | 30 | 26 | -1 | 1 | -4 |
| Missouri | 78 | 21 | 34 | 40 | 33 | 13 | 6 | -7 |
| Nebraska | 80 | 33 | 66 | 62 | 49 | 33 | -4 | -13 |
| New Jersey | 58 | 32 | 26 | 26 | 25 | -6 | 0 | -1 |
| New York | 54 | 29 | 23 | 20 | 18 | -6 | -3 | -2 |
| Nevada | 51 | 56 | 68 | 62 | 38 | 12 | -6 | -24 |
| N. Carolina | 58 | 49 | 54 | 51 | 40 | 5 | -3 | -11 |
| Ohio | 79 | 28 | 43 | 41 | 32 | 15 | -2 | -9 |
| Oklahoma | 61 | 42 | 58 | 51 | 42 | 16 | -7 | -9 |
| Pennsylvania | 76 | 28 | 29 | 31 | 30 | 1 | 2 | -1 |
| S. Carolina | 54 | 41 | 43 | 42 | 39 | 2 | -1 | -3 |
| Tennessee | 73 | 29 | 38 | 36 | 32 | 9 | -2 | -4 |
| Texas | 39 | 31 | 35 | 35 | 27 | 4 | 0 | -8 |
| Virginia | 61 | 42 | 47 | 46 | 41 | 5 | -1 | -5 |
| Wisconsin | 79 | 26 | 45 | 39 | 29 | 19 | -6 | -10 |

Source: G. Orfield & C. Lee, Racial Transformation and the Changing Nature of Segregation 18 (Table 8) (Jan. 2006), (Civil Rights Project), online at http://www.civilrightspro ject.harvard.edu/research/deseg/Racial_Transformation.pdf.

Appendix A to opinion of BREYER, J.

**Percentage of White Students in Schools Attended by the Average Black Student, 1968–2000**



Source: Modified from E. Frankenberg, C. Lee, & G. Orfield, A Multiracial Society with Segregated Schools: Are We Losing the Dream?, p. 30, fig. 5 (Jan. 2003), online at http://www.civilrightsproject.harvard.edu/research/reseg03/ AreWeLosingtheDream.pdf (Frankenberg, Lee, & Orfield) (using U. S. Dept. of Education and National Center for Education Statistics Common Core data).

## Percentage of Students in Minority Schools by Race, 2000–2001



Source: *Id.*, at 28, fig. 4.

B

## Sources for Parts I–A and I–B

*Part I–A: Seattle*
*Section 1.  Segregation*
¶1 C. Schmid & W. McVey, Growth and Distribution of Minority Races in Seattle, Washington, 3, 7–9 (1964); F. Hanawalt & R. Williams, The History of Desegregation in Seattle Public Schools, 1954–1981, pp. 1–7 (1981) (hereinafter Hanawalt); Taylor, The Civil Rights Movement in the American West: Black Protest in Seattle, 1960–1970, 80 J. Negro Hist. 1, 2–3 (1995); A. Siqueland, Without A Court Order: The Desegregation of Seattle's Schools 10 (1981) (hereinafter Siqueland); D. Pieroth, Desegregating the Public Schools, Seattle, Washington, 1954–1968, p. 6 (Dissertation Draft 1979) (hereinafter Pieroth).

*Section 2.  Preliminary Challenges, 1956 to 1969*
¶1 Pieroth 32, 41; Hanawalt 4.
¶2 Hanawalt 11–13.
¶3 *Id.*, at 5, 13, 27.

*Section 3.  The NAACP's First Legal Challenge and Seattle's Response, 1969 to 1977*
¶1 Complaint in *Adams* v. *Forbes Bottomly*, Civ. No. 6704 (WD Wash., 1969), pp. 10–11.
¶2 *Id.*, at 10, 14–15.
¶3 Planning and Evaluation Dept., Seattle Public Schools, The Plan Adopted by the Seattle School Board to Desegregate Fifth, Sixth, Seventh, and Eighth Grade Pupils in the Garfield, Lincoln, and Roosevelt High School Districts by September, 1971, pp. 6, 11 (on file with the University of Washington Library); see generally Siqueland 12–15; Hanawalt 18–20.
¶4 Siqueland 5, 7, 21.

*Section 4.  The NAACP's Second Legal Challenge, 1977*
¶1 Administrative Complaint in *Seattle Branch, NAACP* v. *Seattle School Dist. No. 1*, pp. 2–3 (OCR, Apr. 22, 1977) (OCR Complaint) (filed with Court as Exhibit in *Seattle School Dist. No. 1*, 458 U. S. 457); see generally Siqueland 23–24.

¶2 Memorandum of Agreement between Seattle School District No. 1 of King Cty., Washington, and the OCR (June 9, 1978) (filed with the Court as Exh. A to Kiner Affidavit in *Seattle School Dist. No. 1*, *supra.*

*Section 5.  The Seattle Plan: Mandatory Busing, 1978 to 1988*
¶1 See generally *Seattle School Dist. No. 1*, *supra,* at 461; Seattle Public Schools Desegregation Planning Office, Proposed Alternative Desegregation Plans: Options for Eliminating Racial Imbalance by the 1979-80 School Year (Sept. 1977) (filed with the Court as Exh. B to Roe Affidavit in *Seattle School Dist. No. 1*, *supra*); Hanawalt 36–38, 40; Siqueland 3, 184, Table 4.

¶2 *Id.,* at 151–152; Hanawalt 37–38; *Seattle School Dist. No. 1*, *supra,* at 461;  Complaint and Motion to Dismiss or Affirm in *Seattle School Dist. No. 1*, *supra.*

¶3 *Seattle School Dist. No. 1, supra,* at 461; Hanawalt 40.

¶4 See generally *Seattle School Dist. No. 1, supra.*

*Section 6.  Student Choice, 1988 to 1998*
¶1 L. Kohn, Priority Shift: The Fate of Mandatory Busing for School Desegregation in Seattle and the Nation 27–30, 32 (Mar. 1996).

¶2 *Id.,* at 32–34.

*Section 7.  The Current Plan, 1999 to the Present*
¶1 App. in No. 05–908, p. 84a; Brief for Respondents in No. 05–908, pp. 5–7; 426 F. 3d 1162, 1169–1170 (CA9 2005) (en banc) *(Parents Involved VII).*

¶2 App. in No. 05–908, at 39–42; Research, Evaluation and Assessment, Student Information Services Office, Seattle Public Schools Data Profile: DistrictSummary December 2005, online at http://www.seattleschools.org/ area/siso/disprof/2005/DP05all.pdf; Brief for Respondents in No. 05–908, at 9–10, 47; App. in No. 05–908, at 309a; School Board Report, School Choices and Assignments 2005–2006 School Year (Apr. 2005), online at http://www.seattleschools.org/area/facilties-plan/Choice/05- 06AppsChoicesBoardApril2005final.pdf.

¶3 *Parents Involved in Community Schools* v. *Seattle School Dist., No. 1*, 149 Wash. 2d 660, 72 P. 3d 151 (2003); 137 F. Supp. 2d 1224 (2001); 426 F. 3d 1162 (CA9 2005) (en banc) *(Parents Involved VII).*

*Part I–B: Louisville*
*Section 1. Before the Lawsuit, 1954 to 1972*
¶1 *Hampton* v. *Jefferson Cty., Bd. of Ed.*, 72 F. Supp. 2d 753, 756, and nn. 2, 4, 5 (WD Ky. 1999) *(Hampton I).*

*Section 2. Court-Imposed Guidelines and Busing, 1972 to 1991*
¶1 *Hampton I, supra*, at 757–758, 762; *Newburg Area Council, Inc.* v. *Board of Ed. of Jefferson Cty.*, 489 F. 2d 925 (CA6 1973), vacated and remanded, 418 U. S. 918 (1974), reinstated with modifications, 510 F. 2d 1358 (CA6 1974) *(per curiam);* Judgment and Findings of Fact and Conclusions of Law in *Newburg Area Council, Inc.* v. *Board of Ed., of Jefferson Cty.*, Nos. 7045 and 7291 (WD Ky., July 30, 1975) (1975 Judgment and Findings).

¶2 *Id.,* at 2, 3, and Attachment 1.

¶3 *Id.,* at 4–16.

¶4 Memorandum Opinion and Order in *Haycraft* v. *Board of Ed. of Jefferson Cty.*, Nos. 7045 and 7291, (WD Ky., June 16, 1978), pp. 1, 2, 4, 18 (1978 Memo & Order).

¶5 Memorandum Opinion and Order, *Haycraft* v. *Board of*

*Ed. of Jefferson Cty.*, Nos. 7045 and 7291 (WD Ky., Sept. 24, 1985), p. 3; Memorandum from Donald W. Ingwerson, Superintendent, to the Board of Education, Jefferson Cty. Public School Dist., pp. 1, 3, 5 (Apr. 4, 1984) (1984 Memorandum); Memorandum from Donald W. Ingwerson, Superintendent, to the Board of Education, Jefferson County Public School District, pp. 4–5 (Dec. 19, 1991) (1991 Memorandum).

*Section 3. Student Choice and Project Renaissance, 1991 to 1996*
¶1 1991 Memorandum 1–4, 7–11 (Stipulated Exh. 72); Brief for Respondents in No. 05–915, P. 12, n. 13.
¶2 1991 Memorandum 14–16.
¶3 *Id.,* at 11, 14–15.
¶4 *Id.,* at 15–16; Memorandum from Stephen W. Daeschner, Superintendent, to the Board of Education, Jefferson Cty. Public School Dist., p. 2 (Aug. 6, 1996) (1996 Memorandum).

*Section 4. The Current Plan: Project Renaissance Modified, 1996 to 2003*
¶1 1996 Memorandum 1–4; Brief for Respondents in No. 05–915, at 12, and n. 13.
¶2 1996 Memorandum 4–7, and Attachment 2; *Hampton I, supra*, at 768.
¶3 1996 Memorandum 5–8; *Hampton I, supra*, at 768, n. 30.
¶4 *Hampton* v. *Jefferson Cty. Bd. of Ed.*, 102 F. Supp. 2d 358, 359, 363, 370, 377 (WD Ky. 2000) *(Hampton II)*.
¶5 *Id.,* at 380–381.

*Section 5. The Current Lawsuit, 2003 to the Present*
¶1 *McFarland* v. *Jefferson Cty. Public Schools*, 330 F. Supp. 2d 834 (WD Ky. 2004); *McFarland* v. *Jefferson Cty. Public Schools*, 416 F. 3d 513 (2005); Memorandum

Appendix B to opinion of BREYER, J.

from Stephen W. Daeschner, Superintendent, to the Board of Education, Jefferson Cty. Public School Dist., 3–4 (Apr. 2, 2001).